ORIGINAL

FILED
SEP 1 6 2003
U.S. COURT OF FEDERAL CLAIMS
By leave of the Judge

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HEALTH INSURANCE PLAN OF GREATER NEW YORK, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Nos. 97-187C, 01-148C

(Judge Allegra)

PRETRIAL STIPULATIONS

For the purpose of the above captioned action and only for that purpose, plaintiff, Health Insurance Plan of Greater New York, Inc. (HIP-NY), and defendant, the United States (the Government), agree and stipulate as follows:

Statutory, Regulatory, And Contractual Background

A. The Federal Employees Health Benefits Program

1. The FEHB Program was established in 1959 by the Federal Employees Health Benefits Act (FEHB Act), 5 U.S.C. § 8901-14, to provide health insurance to Federal employees, annuitants, and surviving spouses of annuitants. The Office of Personnel Management (OPM) has been responsible for the administration of the FEHB Program since 1978. The FEHB Act authorizes OPM to contract with "qualified carriers"[1] offering "health benefits plans"[2] for a renewable term of

[1] A "carrier" is "a voluntary association, corporation, partnership, or other nongovernmental organization which is lawfully engaged in providing, paying for, or reimbursing the cost of, health services under group insurance policies or contracts, medical or hospital service agreements, membership or subscription contracts, or similar group arrangements, in consideration of premiums or other periodic charges payable to the carrier . . . ." 5 U.S.C. § 8901(7).

[2] A "health benefits plan" is "a group insurance policy or contract, medical or hospital service agreement, membership or subscription contract, or similar group insurance arrangements

(continued...)

at least one year and to "prescribe regulations necessary to carry out" the Act. 5 U.S.C. §§ 8902(a), 8913(a). Regulations issued by OPM implementing the FEHB Act are codified at 5 C.F.R. Part 890.

B. Compensation To Carriers For Health Benefits

2. A Federal employee or annuitant selects the health benefits plan that he or she desires and is "enrolled" in the plan. For the benefits it provides, a carrier is paid twice a month, on the second and fourth Thursday of each month.

3. The health insurance premiums or "subscription charges" are based upon rates negotiated annually by the carrier and OPM for the FEHB plan.

4. The rates charged under health benefits plans must "reasonably and equitably reflect the cost of benefits provided." 5 U.S.C. § 8902(i). Generally, rates are fixed under either the "community rate" or "experience rate" method. A "community rate" is "a rate of payment based on a per member per month capitation rate or its equivalent that applies to a combination of the subscriber groups for a comprehensive medical plan." 48 C.F.R. § 1602.170-2. The rates for HIP-NY's FEHB plan are set using the community rate method.

C. The Employees Health Benefits Fund

5. The FEHB Act established in the United States Treasury the "Employees Health Benefits Fund" (EHB Fund), which is administered by OPM. 5 U.S.C. § 8909(a). The contributions of employees or annuitants and the Government are paid into the EHB Fund. Id.

6. An agency that withholds less than or none of the proper health benefits contributions from an individual's pay or annuity "must submit an amount equal to the sum of the uncollected

---

[2] (...continued)
provided by a carrier for the purpose of providing, paying for, or reimbursing expenses for health services . . . ." 5 U.S.C. § 8901(6).

deductions and any applicable agency contributions required under [5 U.S.C. § 8906] for deposit in the [EHB Fund]." 5 C.F.R. § 890.502(d). The deposit "must be made as soon as possible but no later than 60 calendar days after the date the employing office determines the amount of the underdeduction that has occurred, regardless of whether the underdeduction is recovered by the agency." Id. at § 890.502(e).

D. Contributions To EHB Fund For Administrative And Contingency Reserves

7. The FEHB Act provides that, in addition to contributions for health benefits, "[t]here shall be withheld from the pay of each enrolled employee and . . . the annuity of each enrolled annuitant and there shall be contributed by the Government, amounts, in the same ratio as the contributions of the employee or annuitant and the Government [for health benefits], which are necessary for the administrative costs and the reserves provided for by [5 U.S.C. § 8909(b)]." 5 U.S.C. § 8906(c). Portions of the contributions made by enrollees and the Government are set aside in the EHB Fund as follows:

> (1) A percentage, not to exceed 1 percent of all contributions, determined by [OPM] to be reasonably adequate to pay the administrative expenses made available by [5 U.S.C. § 8909(a)].
>
> (2) For each health benefits plan, a percentage, not to exceed 3 percent of the contributions toward the plan, determined by [OPM] to be reasonably adequate to provide a contingency reserve.

Id. at § 8909(b).

8. OPM regulations implementing the FEHB Act provide that "[t]he enrollment charge consists of the rate approved by OPM for payment to the plan for each enrollee, plus 4 percent, of which one part is for an administrative reserve and 3 parts are for a contingency reserve for the plan."

5 C.F.R. § 890.503. The administrative reserve is "credited" with 1/104 of the enrollment charge and the contingency reserve for each plan is "credited" with, among other things, 3/104 of the enrollment charge. Id. at § 890.503(b) & (c)(1)(i). "[F]rom time to time and in amounts it considers appropriate," OPM "may transfer unused funds for administrative expenses to the contingency reserves of the plans then under contract with [OPM]," in which case, each contingency reserve is credited "in proportion to the total amount of the subscription charges paid and accrued to the plan for the contract term immediately before the contract term in which the transfer is made. The "income derived from dividends, rate adjustments, or other refunds made by a plan shall be credited to its contingency reserve." 5 U.S.C. § 8909(b).

9. The preferred minimum balance for a contingency reserve for a community rated plan is one (1) month's subscription charges at the average recurring monthly rate paid from the Employees Health Benefits Fund for the plan during the most recent contract period. 5 C.F.R. 890.503(c)(2). Amounts that exceed the preferred minimum balance for the contingency reserve may be used to defray increases in future rates, or may be applied to reduce the contributions of enrollees and the Government to, or to increase the benefits provided by, the plan from which the reserves are derived. Id.; 5 U.S.C. § 8909(b). When a community rated plan's contingency reserve exceeds the preferred minimum balance, the plan, such as HIP-NY, "may request OPM to pay to the plan a portion of the reserve not greater than the excess of the contingency reserve over the preferred minimum balance," in which event, "[t]he carrier shall state the reason for the request" and "OPM will decide whether to allow the request in whole or in part and will advise the plan of its decision." Id. at § 890.503(c)(4). OPM also "may authorize such other payments from the contingency reserve as in the judgment of OPM may be in the best interest of employees and annuitants enrolled in the

program" and a carrier for a plan "may at any time apply to OPM for a payment from the contingency reserve when the carrier has good cause," such as "variations from expected community rates." Id. at § 890.503(c)(5).

E. Procedures And Instructions For Operation Of The FEHB Program

10. The FEHB Act provides that OPM may prescribe regulations necessary to carry out the Act. 5 U.S.C. § 8913(a). Procedures and instructions for the operation of the FEHB Program are contained in FPM Supplement 890-1 ("Federal Employees Health Benefits") (FPM Supp. 890-1)[3] issued by OPM. FPM Supp. 890-1, § S1-1. FPM Supp. 890-1 states that OPM "has overall responsibility for administration of the law" and that OPM's responsibilities include:

> (1) approving or disapproving carriers;
>
> (2) contracting for, and approving or disapproving plans;
>
> (3) issuing regulations and instructions;
>
> (4) depositing withholdings and contributions, remitting premiums to carriers, and accounting for the fund;
>
> (5) making final determinations of the applicability of the law to specific employees or groups of employees;
>
> (6) studying and evaluating the operation and administration of the law and plans offered under it, and reporting to Congress thereon;
>
> (7) preparing and arranging for the issuance of brochures and other related material on approved plans;

---

[3] FPM Supp. 890-1 was a supplement to the Federal Personnel Manual, which was abolished effective on December 31, 1993. FPM Supp. 890-1, however, was retained until December 31, 1994. Effective on January 1, 1995, FPM Supp. 890-1 was re-issued by OPM as an "Operating Manual" titled "The Federal Employees Health Benefits Handbook for Personnel and Payroll Offices."

> (8) adjudicating employee requests for reconsideration of agency actions denying enrollment or change in enrollment;
>
> (9) auditing carriers' operations under the law[;]
>
> (10) resolving disputed health insurance claims between the enrollee and the insurance carrier.

FPM Supp. 890-1, § S2-2.

11. FPM Supp. 890-1 provides that the responsibilities of Federal agencies under the FEHB Program include, among others: (1) "designating a health benefits officer and, at the employing office levels, health benefits officials;" (2) "determining eligibility or ineligibility of employees and registering eligible employees (includes determining acceptability of belated enrollments and changes of enrollment);" (3) "insuring that registration forms are properly completed, including the employee's social security number;" (4) "processing health benefits actions and determining proper effective dates;" (5) "maintaining a controlled system of transmitting health benefits forms to carriers;" (6) "remitting and accounting for withholdings and contributions;" and (7) "maintaining and certifying necessary records." FPM Supp. 890-1, § S2-3a.

12. FPM Supp. 890-1 provides that "[e]ach carrier is responsible for–

> (1) adjudicating claims of, and providing health benefits to, enrollees and covered members of their families in accordance with its contract with OPM;
>
> (2) furnishing each person enrolled in its health plan identification card(s) or other evidence of enrollment;
>
> (3) contacting agency payroll offices to reconcile enrollment records;
>
> (4) maintaining financial and statistical records and reporting on operation of its plan;

> (5) developing and maintaining effective communication and control techniques to ensure compliance with regulations and instructions by subcontractors and local offices of the carrier.

FPM Supp. 890-1, § S2-4a.

F. Enrollment In The FEHB Program

13. Under the FEHB Program, an eligible employee must register either to enroll in a plan or not to enroll, which, with certain exceptions, must be done within 31 days after becoming eligible. FPM Supp. 890-1, § S5-1a. Each plan has two types of enrollment: self-only and self-and-family. A self-only enrollment "provides benefits only for the enrolled employee" and a self-and-family enrollment "provides benefits for the enrolled employee and eligible family members." Id., § S6-2a & b.

14. Except for a change from a self-and-family enrollment to a self-only enrollment, which may be made at any time, an employee may enroll or make other changes in enrollment only in connection with certain events enumerated in subchapter 7 of FPM Supp. 890-1, including, among others, a new appointment, a return from military service, the "open season" provided annually by OPM, or a change in marital or family status. FPM Supp. 890-1, §§ S7-1, S7-3a,d,e,f & g.

15. Upon retirement an enrollee is only eligible to continue coverage under a plan if the enrollee meets several requirements. The former employee must have been covered by a FEHB plan for the five (5) years of service immediately before retirement, or if less than 5 years, for all service since his or her first opportunity to enroll. 5 C.F.R. § 890.306.

16. Once an enrollee cancels his enrollment, he may not re-enroll until the next open season. 5 C.F.R. § 890.301 (f). An open season new enrollment takes effect on the first day of the first pay

period that begins in the next following contract year and which follows a pay period during any part of which the employee is in a pay status. 5 C.F.R. § 890.301(f)(4).

17. A subscriber may cancel his or her enrollment at any time by filing an appropriate request with the employing office. The cancellation takes effect on the last day of the pay period in which the appropriate request canceling the enrollment is received by the employing office. 5 C.F.R. 890.304(d)(1).

18. The SF 2810 "is the form initiated by the employing office to record changes in an enrollment not requiring the signature of the employee." FPM Supp. 890-1, § S13-2a(3). The SF 2810 "is used for terminations of enrollment (as opposed to employee-initiated cancellations), reinstatements, changes in appointing office or payroll office, and employee name changes." Id.

19. There are several copies of each SF 2809 and SF 2810, including one copy for the enrollee, one copy for the employing office, one copy for enrollee's payroll office, and one copy for the carrier.

20. The employing office copy of a SF 2809 or SF 2810 is filed in the enrollee's Official Personnel Folder (OPF) maintained by the employing office. FPM Supp. 890-1, § S13-4f, S13-8b(2) & c(5). The OPF contains "long-term records affecting the employee's status and service . . . ." 5 C.F.R. § 293.304. There is "only one OPF maintained for each employee regardless of service in various agencies." Id. at § 293.302. The OPF of an employee "is under the jurisdiction and control of, and is part of the records of, [OPM]." Id. at § 293.303. The employing agency, however, has custody of and is responsible for maintaining the OPF of an employee. Id. at §§ 293.302, 293.304.

21. The carrier copy of a SF 2809 or SF 2810 is sent to the carrier with a transmittal form, the Standard Form 2811 (SF 2811) ("Transmittal and Summary Report to Carrier"). FPM Supp.

890-1, § S19-1b. An original and two copies of the SF 2811 are prepared by the employing agency. Id. at § S19-3a. The original and one copy of the SF 2811 are sent to the carrier. Id. The second copy is retained by the payroll office pending return to the payroll office of the duplicate certified by the carrier. Id.

22. In addition to the transmittal function, prior to October 1994, the SF 2811 also was considered "a means for payroll offices to maintain a perpetual inventory of enrollees by plan and enrollment code based on the SF 2809's and SF 2810's transmitted to a particular carrier." FPM Supp. 890-1, § S19-1b. The SF 2811 served "the dual purpose of a transmittal document and a perpetual inventory report by enrollment code each time there is a change." Id. In October 1994, however, OPM discontinued the practice of using the SF 2811 to maintain a perpetual inventory of enrollees in a plan. See OPM Benefits Administration Letter No. 94-202 (10/19/94), at 3, appended to OPM Payroll Office Letter No. 94-07 (11/14/94).

23. After June 1995, OPM permitted the following transactions between OPM and carriers to be accepted by telephone without the need for "paper confirmations:" reinstatement actions; changes or corrections of enrollment effective dates; transfer-in actions from an employing agency to the retirement system; other actions when an enrollee is awaiting medical care; addition of family members to a family enrollment; and enrollment confirmations. FEHBP Letter No. 96-21 (4/10/96).

24. Beginning with the November 1996 FEHB program "Open Season," employees of certain agencies were given the option of using automated "Employee Express" transmissions instead of the SF 2809 to make Open Season enrollment changes and to make a cancellation of enrollment or change from self-and-family to self-only coverage (same plan) outside of Open Season. FEHBP Letter No. 96-33 (7/1/96).

III. The FEHB Program Contracts Between HIP-NY and OPM

A. HIP-NY's Participation In The FEHB Program

25. HIP-NY is a non-profit corporation that provides health care benefits to the private and public employment sectors in the Greater New York area.

26. There are two types of plans that participate in the FEHB Program: fee-for-service plans and prepaid plans. Prepaid plans are comprehensive medical plans also referred to as "health maintenance organizations" or "HMOs." A prepaid plan provides or arranges for health care by designated plan physicians, hospitals, and other providers in particular locations.

27. HIP-NY's FEHB plan is a community-rated, individual practice, prepaid health benefits plan. During the period from 1988 through 1996, HIP-NY entered into contracts, or renewals of contracts, with OPM under the FEHB Program. The FEHB Program Contracts and related extensions and amendments are standard form agreements prepared by OPM. Aside from negotiating covered benefits and premium rates, HIP-NY did not participate in drafting the 1988 through 1996 Contracts or Amendments.

B. The FEHB Program Contract In Effect During 1988-1990

28. Effective on January 1, 1985, HIP-NY and OPM entered into Group Health Benefits Contract No. CS 1040 ("1985 Contract"). The 1985 Contract was for a term of one year, and it renewed "automatically for a term of one year each January first, unless written notice of non-renewal is given by OPM or [HIP-NY] not less than sixty (60) calendar days before the renewal date, or unless modified by mutual agreement." 1985 Contract, page 85-1 & § 5.1(a). The 1985 Contract was renewed annually in 1986, 1987, 1988, 1989, and 1990.

29. The 1985 Contract provided that, "[i]n consideration of payments by the OPM of subscription charges set forth in Article III of this contract, [HIP-NY] agrees to provide Benefits to members." 1985 Contract, § 1.2. The 1985 Contract further provided that "[t]he subscription charges shall be paid to [HIP-NY] at regular intervals and shall consist of the enrollment charges received for [HIP-NY] under this contract by the [EHB Fund], less . . . the amounts set aside by the OPM for administrative and contingency reserves, plus . . . any payments made by the OPM from the contingency reserve, which shall constitute full satisfaction of the subscription charges due under this contract." Id., § 3.1(a). The 1985 Contract also provided that "Subscription charges shall be due and payable to the Carrier no later than thirty (30) days after being received by the Employees Health Benefits Fund." Id., § 3.1 (b).

30. The 1985 Contract also provided that "[a]ll applicable provisions of the Act and Regulations are incorporated herein by reference and constitute a part of this contract as if fully set forth" and that "[t]he provisions of this contract shall be construed to fully comply therewith." 1985 Contract, § 1.3. For purposes of the contract, the 1985 Contract, as amended effective on January 1, 1988, defined "Act" to mean the FEHB Act (5 U.S.C. § 8901 et seq.) and "Regulations" to mean OPM regulations codified at 5 C.F.R. Part 890, and chapters 1 and 16 of title 48, Code of Federal Regulations. Id., § 1.1.

31. In consideration of payments by the Government to HIP-NY of health benefits premiums, HIP-NY provided and made available various health care benefits to members of its FEHB Program plan.

C. The FEHB Program Contract In Effect During 1991-1995

32. Effective on January 1, 1991, HIP-NY and OPM entered a revised Contract No. 1040 (1991 Contract). As in the case of the 1985 Contract, the 1991 Contract was for a term of one year, and it renewed "automatically for a term of one (1) year each January first, unless written notice of non-renewal is given either by OPM or [HIP-NY] not less than 60 calendar days before the renewal date, or unless modified by mutual agreement." 1991 Contract, § 1.15(a). The 1991 Contract was renewed annually in 1992, 1993, 1994, and 1995.

33. The 1991 Contract provided that, "[i]n consideration of payment by [OPM] of subscription charges set forth in Appendix B, [HIP-NY] agrees to perform all of the services set forth in this contract." Id., Contract Signature Page. Appendix B to the 1991 Contract specified the periodic "net-to-carrier rates" charged for the services provided by the HIP-NY FEHB plan. The 1991 Contract further provided that "OPM will pay to [HIP-NY], in full settlement of its obligations under this contract, . . . the subscription charges received for the Plan by the [EHB Fund] . . . less the amounts set aside by OPM for the Contingency Reserve and for the administrative expenses of OPM, plus any payments made by OPM from the Contingency Reserve." Id., § 3.1(a). Section 3.1(c) of the 1991 Contract also provided that: "Recurring payments from premiums shall be due and payable not later than thirty (30) days after receipt by the Fund. The Contracting Officer may authorize special non-recurring payment from the Contingency Reserve in accordance with OPM's regulations." Id., § 3.1(c).

34. The 1991 Contract defined the term "regulations," "[f]or purpose of this contract," to mean "(1) The Federal Employees Health Benefits Regulations; Part 890, Title 5, Code of Federal Regulations, and (2) Chapters 1 and 16 of Title 48, Code of Federal Regulations." 1991 Contract,

§ 1.1. The 1991 Contract also provided that "applicable provisions" of the FEHB Act, 5 U.S.C. § 8901 et seq., and "OPM's regulations as contained in [5 C.F.R. Part 890]," and "chapters 1 and 16 of Title 48, Code of Federal Regulations" "constitute a part of this contract as if fully set forth herein, and the other provisions of this contract shall be construed so as to comply therewith." Id., § 1.4(a).

35. Regarding enrollment, the 1991 Contract provided that "[a] person's eligibility for coverage, effective date of enrollment, the level of benefits (option), the effective date of termination or cancellation of a person's coverage, the date any extension of a person's coverage ceases, and any continuance of benefits beyond a period of enrollment and the date any such continuance ceases, shall all be determined in accordance with regulations or direction of OPM given pursuant to chapter 89, title 5, United States Code." 1991 Contract, § 2.1(a)(2).

D. The FEHB Program Contract In Effect During 1996

36. Effective on January 1, 1996, HIP-NY and OPM entered a revised Contract No. 1040 (1996 Contract). As in the case of the 1985 and 1991 Contracts, the 1996 Contract was for a term of one year, and it renewed "automatically for a term of one (1) year each January first, unless written notice of non-renewal is given either by OPM or [HIP-NY] not less than 60 calendar days before the renewal date, or unless modified by mutual agreement." 1996 Contract, § 1.15(a).

37. The 1996 Contract provided that, "[i]n consideration of payment by [OPM] of subscription charges set forth in Appendix B, [HIP-NY] agrees to perform all of the services set forth in this contract." 1996 Contract, Contract Signature Page. Appendix B to the 1996 Contract specified the periodic "net-to-carrier rates" charged for the services provided by the HIP-NY FEHB plan. The 1996 Contract further provided that "OPM will pay to [HIP-NY], in full settlement of its obligations under this contract, . . . the subscription charges received for the Plan by the [EHB

Fund] . . . less the amounts set aside by OPM for the Contingency Reserve and for the administrative expenses of OPM, plus any payments made by OPM from the Contingency Reserve." Id., § 3.1(a). The 1991 Contract further provided that "recurring payments from premiums shall be due and payable not later than thirty (30) days after receipt by the Fund. The Contracting Officer may authorize special non-recurring payment from the Contingency Reserve in accordance with OPM's regulations." Id., § 3.1(c).

38. The 1996 Contract defined the term "regulations," "[f]or purpose of this contract," to mean "(1) The Federal Employees Health Benefits Regulations; part 890, title 5, Code of Federal Regulations, and (2) chapters 1 and 16 of title 48, Code of Federal Regulations." 1996 Contract, § 1.1. The contract also provided that "applicable provisions" of the FEHB Act, and "OPM's regulations as contained in [5 C.F.R. Part 890]," and "chapters 1 and 16 of title 48, Code of Federal Regulations" "constitute a part of this contract as if fully set forth herein, and the other provisions of this contract shall be construed so as to comply therewith." Id., § 1.4(a).

39. Regarding enrollment, the 1996 Contract provided that "[a] person's eligibility for coverage, effective date of enrollment, the level of benefits (option), the effective date of termination or cancellation of a person's coverage, the date any extension of a person's coverage ceases, and any continuance of benefits beyond a period of enrollment and the date any such continuance ceases, shall all be determined in accordance with regulations or direction of OPM given pursuant to chapter 89, title 5, United States Code." 1996 Contract, § 2.1(a)(2).

IV. FEHB Program Enrollment Records And Information

40. The FEHB Act provides that "[e]ach Government agency shall keep such records, make such certifications, and furnish [OPM] with such information and reports as may be necessary to enable [OPM] to carry out its functions under [the Act]." 5 U.S.C. § 8910(c).

41. In the 1985 Contract, OPM agreed to "maintain or cause to be maintained records from which may be determined the names and birth dates of all Subscribers" and that "[s]uch information shall be furnished to the Carrier by the OPM, or by other agencies of the Federal Government, at such times and in such form and detail as will enable the Carrier to maintain a currently accurate record of all Subscribers." 1985 Contract, § 3.3(a).

42. The 1985 Contract also provides the carrier is entitled to rely on the information furnished to it by OPM, and that OPM agrees that any liability incurred in reliance upon such information is a valid charge against the Contract. Errors or delays in keeping or reporting data relating to a members' coverage shall not invalidate coverage that would otherwise be in force or continue coverage which would otherwise be terminated. Upon discovery of such errors or delay, however, an equitable adjustment of charges was to be made. 1985 Contract, § 3.3(b).

43. The 1991 and 1996 Contracts contained essentially the same provisions with respect to information to be furnished by employing agencies (or OPM in the case of annuitants) to HIP-NY. See 1991 Contract, § 1.5(a) & (d); 1996 Contracts, § 1.5(a) & (d). Like the 1995 Contract, the 1991 and 1996 Contracts also provided that a Carrier is entitled to rely on the information furnished to it by OPM, and that any liability incurred under the contracts in reliance upon such information was a valid charge against the Contracts. The 1991-1996 Contracts further provided that errors or delays in keeping or reporting data relative to coverage shall not invalidate coverage which would otherwise

be in force or shall not continue coverage which would otherwise be terminated but, upon discovery of such errors or delays, an equitable adjustment was to be made. Id. at § 1.5(b).

44. OPM advised employing agencies and payroll offices that, "carrier copies of SF 2809s and SF 2810s should be sent to the appropriate carrier (with SF 2811) on a daily or weekly basis, depending on the volume in the payroll office. Under no circumstances should SF 2809's and 2810's be accumulated for longer than one week. . ." FPM Supp. 890-1, § S19-2(a).

45. The Government did not maintain a centralized file or database of enrollment records for those enrollees who participated in the HIP-NY Plan during the claim period of 1988 through 1996.

V. Reconciliation Of FEHB Program Enrollment Data

46. Nothing in the FEHB Act addresses reconciliation of enrollment data by a carrier or between a carrier and employing agencies. Initially, the Contracts did not address enrollment reconciliation either. Beginning in 1991, however, the Contracts provided that "[HIP-NY] shall at least annually reconcile its enrollment records with those provided by the Government." 1991 Contract, § 1.5(d).

47. FPM Supp. 890-1 provides that "[r]econciliations are an essential element of the enrollment system" the purpose of which is "to ensure that all participating carriers maintain an accurate and reliable inventory of enrollees eligible for benefits." FPM Supp. 890-1, § S19-4a. Three types of reconciliation are identified: (1) reconciliations within a payroll office; (2) reconciliations within a carrier; and (3) joint reconciliations between payroll offices and carriers. Id.

48. Regarding reconciliations within a payroll office, FPM Supp. 890-1 provides that a payroll office should reconcile upon a monthly basis or, if need be, more often, the number of enrollees reported to each carrier on the SF 2811 and its payroll records "to maintain the accuracy of the SF 2811." FPM Supp. 890-1, § S19-4b. A carrier performs reconciliations between the SF 2811 and its records, "and any discrepancies will be brought to the payroll office's attention by separate correspondence." Id., § S19-4c.

49. With respect to enrollment reconciliations between a carrier and a payroll office, FPM Supp. 890-1 provided:

> The names and numbers of employees enrolled in a particular plan and payrolled by an office must be reconciled with the carrier's records established on the basis of the SF 2809's and SF 2810's sent in support of SF 2811's. Payroll offices and carriers are urged to cooperate to the greatest extent possible to maintain accurate and up-to-date enrollment files.

FPM Supp. 890-1, § S19-4d(1). The carrier is "[responsible] for initiating reconciliations and doing the actual matching of names . . . , but performance of effective reconciliations will depend upon the responsiveness and cooperation of the payroll offices. When it is agreeable to both the carrier and the payroll office, it may be more advantageous for the payroll office to do the detailed reconciliation." Id., § S19-4d(3). Joint payroll office-carrier reconciliations "should be performed as often as feasible and necessary, but not less than annually." Id.

50. During the claim period, HIP-NY was not permitted to make an enrollment change until an employing agency (or OPM in the case of annuitants) notified HIP-NY of a change in the enrollment status of a member of HIP-NY's FEHB Program plan.

VI. HIP-NY's Computerized Enrollment Systems

51. During the period from 1988 until July 1994, HIP-NY's primary enrollment system was a computerized enrollment system called the "Insured Persons Master File" (IPMF).

52. In 1992, HIP-NY began a conversion of its computerized enrollment system from IPMF to a new computerized enrollment system called "Q/Care."

53. In 1992, HIP-NY transferred electronically ("migrated") enrollment data for FEHB plan members active on IPMF as of March 1, 1992, with two years of enrollment history to populate the Q/Care database. For example, if a member enrolled in the HIP-NY FEHB plan in 1978 and IPMF indicated that the member continued to be active in the plan as of March 1, 1992, enrollment data for that member were transferred to Q/Care, except that the member's first period of coverage in Q/Care would be in 1990 rather than in 1978. As a result, HIP-NY used a default start date of March 1, 1990, in Q/Care.

54. From 1992 until July 1994, HIP-NY entered enrollment data for members of its FEHB plan into IPMF and then transferred the data electronically to Q/Care through a process referred to by HIP-NY as "backbridging."

55. Beginning in July 1994, HIP-NY entered all enrollment data into Q/Care and then transferred the data to IPMF, through a same backbridging process.

56. Beginning in November 1995, HIP-NY entered and maintained enrollment data only in Q/Care. As of November 1995, enrollment data no longer were entered into IPMF.

VII. Payment Of Health Benefits Premiums Under The FEHB Program

57. Under the FEHB Program, OPM pays health benefits premiums to carriers such as HIP-NY from the EHB Fund on the second and fourth Thursday of each month. At all times material to

this litigation, OPM paid premiums to HIP-NY in that manner. OPM paid HIP-NY by lump-sum electronic wire transfers of funds from the EHB Fund to a bank account designated by HIP-NY. The wire transfers do not identify the paying payroll offices, the payroll periods covered by the payments, or the subscribers to HIP-NY's FEHB Program plan upon whose behalf the premium payments were made. When OPM wires a bi-monthly lump-sum payment of premiums to HIP-NY, OPM notifies HIP-NY of the payment by sending HIP-NY a payment advice that breaks out the payment by self only and self-and-family coverage but not by payroll office. During the claim period, HIP-NY was not permitted to submit a monthly bill to OPM for the subscribers enrolled in its FEHB Plan.

58. OPM provides carriers such as HIP-NY with computer-generated quarterly reports called "HB Recap By Plan" which identify payments made (deposits) or credits applied by OPM during the previous three months. The Recap Reports identify the payroll office and the pay period for which the payments or credits are made. They also identify payments made for self-only and self-and-family coverage. The Recap Reports do not, however, identify the HIP-NY subscribers on whose behalf premium payments were made.

59. With regard to subscribers on Temporary Continued Coverage or ("TCC"), the employee pays both the employee's and the Government's shares of the premium, plus a two percent administration fee. 5 C.F.R. § 890.1109(a). The premium is paid to the employing office. 5 C.F.R. 890.1109(c). The employing office must then forward these payments to OPM along with its regular health benefits payments. 5 C.F.R. § 890.1111(c).

VIII. Health Benefits Premiums Paid By The Government To HIP-NY

60. The Government paid HIP-NY a total of $37,278,970.80 in health benefits premiums for contract year 1988.

61. The Government paid HIP-NY a total of $46,026,907.67 in health benefits premiums for contract year 1989.

62. The Government paid HIP-NY a total of $52,728,555.87 in health benefits premiums for contract year 1990.

63. The Government paid HIP-NY a total of $58,844,817.05 in health benefits premiums for contract year 1991.

64. The Government paid HIP-NY a total of $61,789,367.62 in health benefits premiums for contract year 1992.

65. The Government paid HIP-NY a total of $64,108,116.20 in health benefits premiums for contract year 1993.

66. The Government paid HIP-NY a total of $64,051,813.78 in health benefits premiums for contract year 1994.

67. The Government paid HIP-NY a total of $59,392,302.09 in health benefits premiums for contract year 1995.

68. The Government paid HIP-NY a total of $55,621,326.83 in health benefits premiums for contract year 1996.

## IX. HIP-NY's Administrative Claims

69. On January 14, 1997, HIP-NY submitted to the OPM contracting officer a certified claim for "underpaid premiums" for contract years 1988 through 1994, contending that HIP-NY "is due $13,657,317.52 in unpaid premiums[.]" HIP-NY stated that OPM "should take immediate steps to pay [HIP-NY] the underpaid premiums" and that HIP-NY "also asserts and preserves its right to any

interest that may become due or accrue under the [Contract Disputes Act of 1978, as amended (41 U.S.C. §§ 601-13) (CDA)]." The contracting officer did not issue a decision upon that claim.

70. No OPM official has determined whether HIP-NY's claim that it was underpaid premiums as set forth in HIP's January 14, 1997 certified claim is accurate. OPM did not request any Employing Agency or Payroll Office to determine whether HIP-NY is due the premiums set forth in its certified claims.

71. On February 15, 2001, HIP-NY submitted to the OPM contracting officer a certified claim for "premiums due" for contract years 1995 and 1996, contending that HIP-NY "is due $1,352,112.39 in unpaid premiums[.]" HIP-NY stated that OPM "should take immediate steps to pay [HIP-NY] the underpaid premiums identified in this claim letter" and that HIP-NY "also asserts and preserves its right to any interest that may become due or accrue under the CDA." On March 6, 2001, the contracting officer issued a decision denying the claim.

X. Joint Trial Exhibits

72. The following documents are joint trial exhibits in this case admissible for any purpose:

JX1. HIP-NY Federal Employees Health Benefits Program ("FEHB Program") Contract, CS-1040 for 1985.

JX2. HIP-NY FEHB Program Contract, CS-1040, Amendment for 1988.

JX3. HIP-NY FEHB Program Contract, CS-1040, Amendment for 1989.

JX4. HIP-NY FEHB Program Contract, CS-1040, Amendment for 1990.

JX5. HIP-NY FEHB Program Contract, CS-1040, for 1991.

JX6. HIP-NY FEHB Program Contract, CS-1040, Amendment for 1992.

JX7. HIP-NY FEHB Program Contract, CS-1040, Amendment for 1993.

JX8. HIP-NY FEHB Program Contract, CS-1040, Amendment for 1994.

JX9. HIP-NY FEHB Program Contract, CS-1040, Amendment for 1995.

JX10. HIP-NY FEHB Program Contract, CS-1040, Amendment for 1996.

JX11. FPM Supplement 890-1 (3/10/89).

JX12. OPM Payroll Office Letter No. 91-11 ("September 1991 Headcount Reporting")(9/11/91)

JX13. OPM Benefits Administration Letter No. 94-202 ("Eliminating the Transfer-Out SF 2810 and Revising SF 2811 Requirements") (10/19/94)

JX14. OPM Benefits Administration Letter No. 97-202 ("FEHB Enrollment Reconciliation") (3/5/97)

JX15. Table 1 (Summary of FEHBP Enrollment) forms for quarter ended 12/31/87 through quarter ended 12/31/89.

JX16. Letter dated April 14, 1989, from Patricia Jacovina, Reconciliation Clerk, Enrollment and Billing, HIP, to Department of Health and Human Services, Personnel and Pay System Division.

JX17. Administrative Kit for 1992.

JX18. Administrative Kit for 1995.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JEFFREY W. KING, ESQ.
King, Pagano & Harrison
1730 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20006
Tele: (202) 371-6800

Attorney for Plaintiff

Dated: 9/12/03

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Rm 8012
Washington, D.C. 20530
Tele: (202) 307-0282

Attorneys for Defendant

Dated: 9/12/03

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 12th day of September, 2003, I caused a copy of the foregoing PRETRIAL STIPULATIONS to be delivered via facsimile and first class mail, postage pre-paid, to the following individual:

John Kosloske, Esq.
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W, 8th Floor
Washington, D.C. 20530

Counsel for Defendant

Andrew B. Dahlinghaus

Docket No. 97-187C

**UNITED STATES COURT OF FEDERAL CLAIMS**

**MEMORANDUM**

TO: JUDGE Allegra
FROM: CLERK'S OFFICE

The attached was received on 9-12-03
and the following defect(s) is/are noted:

1. ✓ Untimely, due to be filed by 9-10-03 [Rule 7.1]

2. ____ Proof of service: [Rule 5.1]
   ____ is missing; ____ is not signed and/or dated;
   ____ shows service on wrong attorney or of wrong item;
   ____ is not attached to each document or copy

3. ____ Not signed by the attorney of record [Rules 11 and 83.1(c)(2)]

4. ____ Does not comply with the provisions of Rule:

| | | |
|---|---|---|
| ____ | 5.2(a)(1)(A) | Re: table of contents or index to appendix is missing (or in wrong location) |
| ____ | 5.2(a)(1)(G) | Re: index to appendix is to be located in both the front of the brief and in front of the appendix |
| ____ | 5.2(b) | Re: length of briefs or memorandum |
| ✓ | 5.3(c) | Re: binding of original |
| ____ | 5.3(d) | Re: original/copies missing |
| ____ | 5.3(g) | Re: Judge's name on all filings |
| ____ | 24(c) | Re: motion to be accompanied by a pleading |
| ____ | 7(b) | Re: brief, supporting memorandum, affidavits shall be attached to motion |
| ____ | 56(h) | Re: proposed findings and/or response to proposed findings is missing or not a separate document |
| ____ | 56.1(b) | Re: statement of facts and/or counter-statement of facts is missing or not a separate document |
| ____ | 77.1(a) | Re: improper use of the night box |
| ____ | 83.1(c)(1) | Re: one attorney for a party; attorney to be an individual not a firm |
| ____ | ____ | Re: ____ |

5. ____ Original affidavit(s)/declaration(s) is/are missing
6. ____ No provision in the Rules for the filing of this item
7. ✓ This is an ECF case

[signature]
Deputy Clerk

To: **CLERK'S OFFICE**

**THE ATTACHED ITEM IS TO BE:**

✓ Filed by my leave, **OR**,

***PURSUANT TO THE ACCOMPANYING ORDER:***
(Note - This is a separately written order)

____ Filed by leave of the judge and party is being notified for correction of defect(s) as to future filings.

____ Returned to party for correction of defects, with the document to be filed by leave of the judge, if it is out of time, with opposing counsel's time to respond to run from the date of re-service.

____ Returned to party for correction of defect(s).

[signature]
Signature

9/16/03
Date