Nos. 97-187C, 01-148C
(Judge Allegra)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HEALTH INSURANCE PLAN OF GREATER NEW YORK, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S POST-TRIAL BRIEF**

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282

Attorneys for Defendant

OF COUNSEL:
SUSAN WHITMAN, ESQ.
Office of General Counsel
Office of Personnel Management
1900 E Street, N.W., Room 7353
Washington, D.C. 20410

DECEMBER 15, 2003

# TABLE OF CONTENTS

Page

DEFENDANT'S POST-TRIAL BRIEF . . . . . . . . . . 1

I. BACKGROUND . . . . . . . . . . 1

A. Nature Of The Case . . . . . . . . . . 1

B. Enrollment In The FEHB Program . . . . . . . . . . 3

C. HIP's Computerized Enrollment Systems . . . . . . . . . . 5

D. The Evolution Of HIP's Claims . . . . . . . . . . 7

(1) The Original Claim For Contract Years 1988-1994 ($13,657,317) . . . . . . . . . . 7

(2) The Revised Claim For Contract Years 1988-1996 ($14,421,140) . . . . . . . . . . 7

(3) The Response Of The Government Trial Expert To The Revised Claim For Contract Years 1988-1996 . . . . . . . . . . 8

(4) The February 2003 Revised Underpayment Claim For Contract Years 1990-1996 . . . . . . . . . . 10

(5) The New Contingency Reserve Claim ($477,794) . . . . . . . . . . 12

(6) The Revived Underpayment Claim For Contract Years 1988 And 1989 . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . 13

I. Introduction . . . . . . . . . . 13

## TABLE OF CONTENTS (CONT'D)

Page

II. The Underpayment Claim For Contract Years 1988 And 1989 ($2,816,676) . . . . 14

A. The Approach Used By HIP To Calculate An Underpayment For 1988 And 1989 . . . . . 14

B. HIP's Alternative Approaches For Estimating An Underpayment For 1988 And 1989 . . . . . 25

III. The Underpayment Claim For Contract Years 1990-1996 ($9,128,180) . . . . . 27

IV. The Contingency Reserve Claim ($477,794) . . . . . 32

A. Introduction . . . . . 32

B. The Court Lacks Jurisdiction To Entertain The Contingency Reserve Claim . . . . . 33

C. An Order Of Specific Performance Would Not Be Appropriate . . . . . 36

D. In Any Event, There Is No Contractual Duty To Deposit Funds Set Aside For The Administrative Reserve Into The Contingency Reserve. . . . . . 39

CONCLUSION . . . . . 40

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aeronautical Industrial District Lodge 91 of the International Association of Machinists and Aerospace Workers, AFL-CIO v. United Technologies Corp., Pratt & Whitney*, 87 F. Supp. 2d 116 (D. Conn.), aff'd, 230 F.3d 569 (2d Cir. 2000) ............................ 36

*Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Ervin & Associates, Inc. v. United States*, 44 Fed. Cl. 646 (1999) . . . . . . . . . . . . . . . . . 34

*Garrett v. General Electric Co.*, 987 F.2d 747 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . 35

*In re CSI Enterprises, Inc.*, 220 B.R. 687 (Bkrtcy.D.Colo. 1998), aff'd, 203 F.3d 834 (10th Cir. 2000) ........................................................ 17, 20

*In re Lake States Commodities, Inc.*, 271 B.R. 575 (Bkrtcy.N.D.Ill. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,20

*Luria Bros. & Co., Inc. v. United States*, 177 Ct. Cl. 676, 369 F.2d 701 (1966) ........... 13

*Nemer-Jeep Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430 (2d Cir. 1993) ........................................................................ 37

*Reflectone, Inc. v. United States*, 60 F.3d 1572 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . 35

*San Carlos Irrigation and Drainage District v. United States*, 877 F.2d 957 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Transamerica Insurance Corp. v. United States*, 973 F.2d 1572 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Vanalco, Inc. v. United States*, 48 Fed. Cl. 68 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Weaver-Bailey Contractors, Inc. v. United States*, 19 Cl. Ct. 474, 480 (1990) . . . . . . . 28

*Willems Industries, Inc. v. United States*, 155 Ct. Cl. 360, 295 F.2d 821 (1966), cert. denied, 370 U.S.

## TABLE OF AUTHORITIES (CONT'D)

### FEDERAL CASES (CONT'D)

*Witherington Construction Corp. v. United States*, 45 Fed. Cl. 208 (1999) . . . . . . . . . 34

### FEDERAL STATUTES

United States Code:

5 U.S.C. § 8902(a) .......... 2

5 U.S.C. § 8909(a) .......... 2

5 U.S.C. § 8909(b) .......... 33,39

5 U.S.C. § 8909(e) .......... 39

5 U.S.C. § 8913(a) .......... 2

28 U.S.C. § 2517 .......... 38

31 U.S.C. § 1304 .......... 38

41 U.S.C. § 605 .......... 34

41 U.S.C. § 605(a) .......... 34

41 U.S.C. § 605(c).......... 34

41 U.S.C. § 609(a)(1) .......... 34

41 U.S.C. § 612(a).......... 38

Public Laws:

Federal Employees Health Benefits Act, 5 U.S.C. §§ 8901-14 .......... 1

Contract Disputes Act of 1978, as amended, 41 U.S.C. §§ 601-13 .......... 2

### REGULATIONS

Code of Federal Regulations:

5 C.F.R. § 890.301(f)(4) .......... 5

# TABLE OF AUTHORITIES (CONT'D)

## REGULATIONS (CONT'D)

Code of Federal Regulations (cont'd):

5 C.F.R. § 890.503 .......... 33

5 C.F.R. § 890.503(b) .......... 33

48 C.F.R. § 52.233-1 (1987) .......... 35

## MISCELLANEOUS

12 Corbin, Contracts § 1170 (1979) .......... 38

Federal Personnel Manual Supplement 890-1:

§ S5-1a .......... 3

§ S6-2a .......... 3

§ S6-2b .......... 3

§ S7-1 .......... 4

§ S7-3a .......... 4

§ S7-3d .......... 4

§ S7-3e .......... 4

§ S7-3f .......... 4

§ S7-3g .......... 4

§ S13-2a .......... 4

§ S13-2a(2) .......... 4

§ S13-2a(3) .......... 4

§ S13-4f .......... 4

§ S13-8b(2) .......... 4

## TABLE OF AUTHORITIES (CONT'D)

### MISCELLANEOUS (CONT'D)

Federal Personnel Manual Supplement 890-1 (cont'd):

§ S13-8b(2) .......... 4

§ S13-8c(5) .......... 4

§ S19-1b .......... 5

§ S19-3a .......... 5

Restatement (Second) of Contracts § 359(1) (1981) .......... 36

Restatement (Second) of Contracts § 360(a) (1981) .......... 36

Restatement (Second) of Contracts § 357 comment *c* (1981) .......... 37

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HEALTH INSURANCE PLAN OF GREATER NEW YORK, INC., | ) | |
| Plaintiff, | ) | Nos. 97-187C, 01-148C |
| v. | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S POST-TRIAL BRIEF

I. BACKGROUND

A. Nature Of The Case

Plaintiff, Health Insurance Plan of Greater New York, Inc. (HIP), provides health care benefits to the private and public employment sectors in the Greater New York area. Stip. ¶ 25, JX 19, at 10.[1] HIP is a prepaid plan, also referred to as a "health maintenance organization" or "HMO," that participates in the Federal Employees Health Benefits (FEHB) Program Id. A prepaid plan provides or arranges for health care by designated physicians, hospitals, and other providers in particular locations. Id. HIP's FEHB plan is a community-rated, individual practice, prepaid benefits plan. Stip. ¶ 27, JX 19, at 10.

The FEHB Program is administered by the Office of Personnel Management (OPM). Stip. ¶ 1, JX 19, at 1. The Federal Employees Health Benefits Act (FEHB Act) authorizes OPM to contract with "qualified carriers" offering "health benefits plans," such as HIP, for a renewable

[1] In this post-trial brief, "Stip. ¶ ____" refers to the referenced paragraph(s) of the "Pretrial Stipulations" filed on September 10, 2003, a copy of which is included in the record of trial as Joint Exhibit No. 19; "JX ____" refers to the referenced joint trial exhibit(s); "PX ____" refers to the referenced plaintiff's trial exhibit(s); "DX ____" refers to the referenced defendant's trial exhibit(s); and "Tr. ____(____)" refers to the referenced page(s) and line(s) of the transcript of the trial in this case.

term of at least one year and to "prescribe regulations necessary to carry out" the Act. 5 U.S.C. §§ 8902(a), 8913(a). During the period from 1988 through 1996, HIP participated in the FEHB Program through a series of one-year contracts, each with an effective date of January 1 of the applicable year. Stip. ¶ 27, JX 19, at 10. HIP entered a contract effective on January 1, 1985, which was renewed annually in 1986, 1987, 1988, 1989, and 1990 (1985 Contract), Stip. ¶ 28, JX 19, at 10, a contract effective on January 1, 1991, which was renewed annually in 1992, 1993, 1994, and 1995, Stip. ¶ 32, JX 19, at 13, and a contract effective on January 1, 1996 (1996 Contract). Stip. ¶ 36, JX 19, at 13. Each of those contracts provided that, in consideration of the services or benefits provided by HIP to subscribers, the Government would pay HIP, from employee, annuitant, and Government contributions paid into the Employees Health Benefits Fund (EHB Fund)[2] for HIP's FEHB Program plan, the contractual premiums less the amounts set aside by OPM for the contingency reserve established for HIP in the EHB Fund and for OPM's administrative expenses. 1985 Contract, §§ 1.2, 3.1(a), JX 1, at pp. 85-4, 85-14; 1991 Contract, § 3.1(a), JX 5, at p. III-1; 1996 Contract, § 3.1(a), JX 10, at p. 20.

HIP brings these consolidated actions for damages for breach of contract as a result of the alleged underpayment by the Government of premiums to HIP for health care benefits made available to Federal employees and annuitants under the Federal Employees Health Benefits Program (FEHB Program) for the 1988-1996 interval. These actions are subject to the Contract Disputes Act of 1978, as amended (41 U.S.C. §§ 601-13) (CDA). The appeal in No. 97-187C is from the "deemed denial" by OPM of HIP's January 14, 1997 claim of $13,657,317.52 for

---

[2] The FEHB Act established in the United States Treasury the EHB Fund, which is administered by OPM. 5 U.S.C. § 8909(a). The contributions of employees or annuitants and the Government which make up the health benefits premiums are paid into the EHB Fund. Id.

alleged unpaid premiums for con-tract years 1988 through 1994. PX 60. The appeal in No. 01-148C is from the denial by OPM of HIP's claim of $1,352,112.39 for alleged unpaid premiums for contract years 1995 and 1996. PX 61; PX 62.

At trial, HIP contended that it has been "damaged" in the total amount of $12,422,651, a sum that includes $2,816,676 in alleged unpaid premiums for contract years 1988 and 1989, $9,128,181 in alleged unpaid premiums for contract years 1990 through 1996, and $477,794 for deposits to the contingency reserve for HIP that the Government allegedly should have made but did not make, i.e., four percent of the alleged unpaid premiums for contract years 1988 through 1996.

B. Enrollment In The FEHB Program

Under the FEHB Program, a Federal employee or annuitant selects the health benefits plan that he or she desires and is "enrolled" in the plan. Stip. ¶ 2, JX 19, at 2. An eligible employee must register either to enroll in a plan or not to enroll, which, with certain exceptions, must be done within 31 days after becoming eligible. Stip. ¶ 13, JX 19, at 7; FPM Supplement 890-1 ("Federal Employees Health Benefits") (FPM Supp. 890-1), § S5-1a, JX 11, at 17. Each plan has two types of enrollment: self-only (single) and self-and-family (family). A self-only enrollment "provides benefits for only for the enrolled employee" and a self-and-family enroll-ment "provides benefits for the enrolled employee and eligible family members." Stip. ¶ 13, JX 19, at 7; FPM Supp. 890-1, § S6-2a & b, JX 11, at 21.

Except for a change from a self-and-family enrollment to a self-only enrollment, which may be made at any time, an employee may enroll or make other changes in enrollment only in connection with certain events enumerated in subchapter 7 of FPM Supp. 890-1, including,

among others, a new appointment, a return from military service, the "open season" provided annually by OPM, or a change in marital or family status. Stip. ¶ 13, JX 19, at 7; FPM Supp. 890-1, §§ S7-1, S7-3a,d,e,f & g, JX 11, at 27-29.

Health benefits actions are recorded on either Standard Form 2809 (SF 2809) or Standard Form 2810 (SF 2810), each of which contains instructions explaining its use. FPM Supp. 890-1, § S13-2a(1), JX 11, at 55. The SF 2809 "is the form initiated and signed by an employee to register an election to enroll or not to enroll, to change enrollment, or to cancel." Id., § S13-2a(2), JX 11, at 55; see also id. at § S5-1b, JX 11, at 17 ("All registrations – to enroll, not to enroll, to change enrollment, or to cancel enrollment – must be made on Standard Form 2809.").

The SF 2810 "is the form initiated by the employing office to record changes in an enrollment not requiring the signature of the employee." Stip. ¶ 18, JX 19, at 8; FPM Supp. 890-1, § S13-2a(3), JX 11, at 55. The SF 2810 "is used for terminations of enrollment (as opposed to employee-initiated cancellations), reinstatements, changes in appointing office or payroll office, and employee name chan-ges." Id.

There are several copies of each SF 2809 and SF 2810, including one copy for the enrollee, one copy for the employing office, one copy for enrollee's payroll office, and one copy for the carrier. Stip. ¶ 19. The employing office copy of a SF 2809 or SF 2810 is filed in the enrollee's Official Personnel Folder (OPF) maintained by the employing office. Stip. ¶ 20, JX 19, at 8; FPM Supp. 890-1, § S13-4f, S13-8b(2) & c(5), JX 11, at 56, 57.

The carrier copy of a SF 2809 or SF 2810 is sent to the carrier with a transmittal form, the Standard Form 2811 (SF 2811) ("Transmittal and Summary Report to Carrier"). Stip. ¶ 21, JX 19, at 9; FPM Supp. 890-1, § S19-1b, JX 11, at 81. An original and two copies of the SF

2811 are prepared by the employing agency. Stip. ¶ 21, JX 19, at 9; FPM Supp. 890-1, § S19-3a, JX 11, at 81. The original and one copy of the SF 2811 are sent to the carrier. Id. The second copy is retained by the payroll office pending return to the payroll office of the duplicate certified by the carrier. Id.

After June 1995, OPM permitted the following transactions between OPM and carriers to be accepted by telephone without the need for "paper confirmations:" reinstatement actions; changes or corrections of enrollment effective dates; transfer-in actions from an employing agency to the retirement system; other actions when an enrollee is awaiting medical care; addition of family members to a family enrollment; and enrollment confirmations. Stip. ¶ 23, JX 19, at 9; FEHBP Letter No. 96-21 (4/10/96), PX 38(third page).

Beginning with the November 1996 FEHB program "Open Season," employees of certain agencies were given the option of using automated "Employee Express" transmissions instead of the SF 2809 to make Open Season enrollment changes and to make a cancellation of enrollment or change from self-and-family to self-only coverage (same plan) outside of Open Season. Stip. ¶ 24, JX 19, at 9; FEHBP Letter No. 96-33 (7/1/96), PX 39. An Open Season new enrollment, however, does not take effect until, at the earliest, the first day of the first pay period of the that begins in the next following contract year. Stip. ¶ 16, JX 19, at 7-8; 5 C.F.R. § 890.301(f)(4). Thus, any new enrollment in HIP's FEHB Program plan during the 1996 Open Season using an "Employee Express" transmission would not have taken effect until the 1997 contract year, which is outside the period of HIP's claims.

C. HIP's Computerized Enrollment Systems

The various estimates by HIP over the years of the amount of health benefits premiums to

which it allegedly is entitled for contract years 1988 through 1996 all are based upon enrollment data that were extracted by HIP from its computerized enrollment systems and provided by HIP to its damages expert, John W. Wills, who made adjustments to it. Wills Tr. 616(3-7); 619(1-7); 624(6-10); 630(21-25); 544(23-25)-545(1-8); 668(7). From 1988 until July 1994, HIP's primary enroll-ment system was a computerized enrollment system called the "Insured Persons Master File" (IPMF). Stip. ¶ 51, JX 19, at 18.

In 1992, HIP began a conversion of its computerized enrollment system from IPMF to a new computerized enrollment system called "Q/Care," which eventually replaced IPMF as HIP's enrollment system. Stip. ¶ 52, JX 19, at 18. At that time, HIP transferred electronically ("migra-ted") enrollment data for FEHB plan members active on IPMF as of March 1, 1992, with two years of enrollment his-tory. Thus, for example, if a member enrolled in the HIP FEHB plan in 1978 and IPMF indicated that the member continued to be active in the plan as of March 1, 1992, enrollment data for that member were transferred to Q/Care, except that the member's first peri-od of coverage in Q/Care would be in 1990 rather than in 1978. As a result, HIP used a default start date of March 1, 1990, in Q/Care. Stip. ¶ 53, JX 19, at 18.

From 1992 until July 1994, HIP entered enrollment data for members of its FEHB plan into IPMF and then transferred the data electronically to Q/Care through a process referred to by HIP as "backbridging." Stip. ¶ 54, JX 19, at 18. Beginning in July 1994, HIP entered all enrollment data into Q/Care and then "backbridged" the data to IPMF. Stip. ¶ 55, JX 19, at 18. Beginning in November 1995, HIP entered and maintained enrollment data only in Q/Care. Stip. ¶ 56, JX 19, at 18. As of November 1995, enrollment data no longer were entered into IPMF.

The electronic enrollment data relied upon by Mr. Wills for his underpayment analysis were extracted by HIP from IPMF and Q/Care and "downloaded" to two databases created by the HIP underpayment engagement team: IHISTORY.DB and TIMELINE.DB. IPMF data are contained in IHISTORY.DB and Q/Care data are contained in TIMELINE.DB. Wills Tr. 615(4-13).

D. The Evolution Of HIP's Claims

(1) The Original Claim For Contract Years 1988-1994 ($13,657,317)

The original premium underpayment claim was for contract years 1988 through 1994. HIP sought a payment to it of for $13,657,317.52 for "unpaid premiums," PX 60, at 1, 6, i.e., the difference between total premiums allegedly due HIP for the 1988-1994 contract years and the amount of premiums paid by the Government to HIP for the same period. Wills Tr. 616(12-15). The premiums allegedly due HIP for contract years 1988 through 1994 were calculated by HIP's designated trial expert, John W. Wills, C.P.A., using enrollment information contained in IHISTORY.DB. Wills Tr. 616(3-7); DX 67, at 67/2.[3/]

(2) The Revised Claim For Contract Years 1988-1996 ($14,421,140)

In January 2002, Mr. Wills issued a report in which he concluded that, for contract years

---

[3] DX 67 is a work paper prepared by Brian Hoyt of Fountainhead LLC for Mr. Wills some time after October 2002. Wills Tr. 610(21-23). Among other things, this document "provides a summary background of previous underpayment analyses." DX 67, at 67/1. Mr. Wills does not disagree with any statement contained in DX 67. Wills Tr. 612(13-16). Mr. Hoyt was an associate of Mr. Wills at Arthur Anderson (AA) and member of its HIP underpayment claim engagement team from 1996 until November 1999, at which time Mr. Hoyt left AA for a position with King, Pagano & Harrison (KPH), the law firm of plaintiff's counsel where he continued to "provide some services" on the HIP underpayment claim. Wills Tr. 608(13-19), 609(21-25)-610(1-5). Mr. Hoyt was employed by KPH until October 2002, at which time he left the law firm and established Fountainhead LLC. Wills Tr. 610(6-10).

1988 through 1996, the Government underpaid premiums by $14,421,140. PX 92, at 2 ("Expert Report of John Wills, CPA" dated January 17, 2002, at 2). He arrived at that figure by subtracting the amount of premiums that he computed the Government paid HIP for the 1988-1996 contract years from the amount of premiums to which he determined HIP was entitled for those years. Wills Tr. 618(20-25); PX 92, at 10, 12. The premiums allegedly due HIP for the 1988-1996 interval were calculated based upon a combination of enrollment information contained in IHISTORY.DB and TIMELINE.DB. Wills Tr. 619(1-12).

(3) The Response Of The Government Trial Expert To The Revised Claim For Contract Years 1988-1996

The Government's trial expert, Thomas F. Grogan, C.F.E.,[4] tested the integrity of the HIP electronic enrollment data relied upon by Mr. Wills by comparing, for a randomly-selected sample of 197 subscribers to HIP's FEHB Program plan, Federal enrollment documents (i.e., SF-2809s and SF-2810s and other comparable documentation) with the HIP electronic enroll-

[4] Mr. Grogan was offered and certified at trial as an expert in the fields of damages and the evaluation of premium-underpayment calculations. Grogan Tr. 1116(20-25)-1117(1-4). Mr. Grogan is a principal in the forensic services practice of KPMG LLP in Philadelphia, Pennsylvania, an international accounting and consulting firm, Grogan Tr. 1108(11-20), where he performs (and directs others in performing) accounting, financial, and statistical analyses to quantify liability and damages issues relating to business disputes and incidents of fraud. Grogan Tr. 1108(24-25)-1109(1-5). Mr. Grogan is a Certified Fraud Examiner, a professional certified in the use of tools of accounting, financial analysis, statistical analysis, and data base analysis for the purpose of investigating, quantifying, and reporting on business disputes and incidents of fraud. Grogan Tr. 1111(22-25)-1112(1-4). He has a B.A. degree in Economics and a M.S. degree in Finance. Grogan Tr. 1109(6-9). Mr. Grogan has testified as an expert on numerous occasions in Federal and state courts. Grogan Tr. 1112(16-25)-1113(1). For the past three years, Mr. Grogan has served as a court-appointed Special Master and Auditor in Federal district court in litigation that concerns a premium underpayment dispute between a managed care plan similar to HIP and a provider of radiology services in which he was asked to resolve a wide variety of liability and damages issues of the type that are involved in the present litigation between HIP and the Government. Grogan Tr. 1114(8-25)-1115(1-23).

ment data relied upon by Mr. Wills. DX 34, at 34/8-34/12. On May 28, 2002, Mr. Grogan issued a report in which he opined that, based upon the results of the sample analysis and a related statistical analysis, that the electronic enrollment data relied upon by Mr. Wills to estimate premiums due for the 1988-1996 contract years are "inaccurate" and that "[HIP's] reliance on this inaccurate data results in an overestimate of [its] estimate of underpaid premiums." DX 34, at 34/16. Mr. Grogan also opined that, "[b]ased on the data we have evaluated, properly accounting for the errors in [HIP's] data would result in an estimate of underpaid premiums ranging from ($3,000,166) to $5,907,810, with a midpoint of $1,453,322 (at the 95 percent confidence level.)." Id.

On September 27, 2002, Mr. Grogan issued an addendum to his May 28, 2002 report. The addendum updated the analysis described in Mr. Grogan's May 2002 report "to reflect our review of additional Federal enrollment documentation (SF-2809s and SF-2810s) produced by [HIP] on September 6, 2002 . . . ." DX 35, at 35/1. The additional Federal enrollment documents related to 140 subscribers in HIP's FEHB Program plan, 21 of whom were not included by Mr. Grogan in the results of the sample testing procedures described in his May 2002 report "because no enrollment documents were available for review at that time." Id. As a result of the documentation produced by HIP for the 21 additional subscribers, Mr. Grogan expanded his testing procedures to include them and that expanded the size of the sample to 218 subscribers. Id., at 35/1-35/2.

Mr. Grogan opined that the additional documentation produced by HIP "further supports our conclusion that the [HIP] enrollment data relied upon by [HIP] in preparing [its] claim is inaccurate" and that, "[b]ased on the expanded sample of 218 subscribers, properly accounting

for the errors in [HIP's] data would result in an estimate of underpaid premiums ranging from ($1,953,748) to $6,673,578, with a midpoint of ($3,640,085) (at the 95 percent confidence level.)." DX 35, at 35/2.

On October 11, 2002, Mr. Grogan issued a second update to his May 2002 report to reflect his review of additional Federal enrollment forms (SF-2809s and SF-2810s) produced by OPM on October 11, 2002, relative to Lynn Giovanniello, a member of the subscriber sample analyzed by Mr. Grogan. DX 36, at 36/1. Mr. Grogan opined that "[t]he additional documentation made available by OPM supports our conclusion that the [HIP] enrollment data relied upon by [HIP] in preparing [its] claim is inaccurate" and that, "[b]ased on the sample of 218 subscribers, properly accounting for the errors in [HIP's] data would result in an estimate of underpaid premiums ranging from ($7,595,876) to $6,750,258, with a midpoint of ($422,809) (at the 95 percent confidence level.)." DX 36, at 36/2.

(4) The February 2003 Revised Underpayment Claim For Contract Years 1990-1996

Mr. Wills testified that he "looked at" Mr. Grogan's May 2002 report and the two updates to it and concluded that Mr. Grogan had raised valid issues about the accuracy of the HIP enrollment data upon which Mr. Wills' January 2002 formulation of the HIP underpayment claim was based. Wills Tr. 619(13-24); 620(6-10). Mr. Wills then investigated the discrepancies between Federal enrollment documentation and the HIP enrollment database identified by Mr. Grogan at the individual subscriber level. This investigation included discussions in December 2002 with HIP officials Valerie Reardon (HIP's Senior Vice President of Compliance and Internal Audit, Reardon Tr. 85(21-23), Janet Pinto (HIP's Managing Director of Enrollment, DX 114 (Pinto deposition transcript, at 5(7-10), 6(9-11)), and Harold Wilson about the enrollment discrepancies.

Wills Tr. 620(11-24). Following Mr. Wills' discussions with the HIP personnel, he "re-ran" the HIP underpayment claim by combining or merging the HIP enrollment databases, i.e., IPMF (IHISTORY.DB) and Q/Care (TIMELINE.DB), to create the HIP__MAST.DB. Wills Tr. 622(3-23).

On February 28, 2003, Mr. Wills issued a "supplemental report" that contained a revised premium underpayment claim for contract years 1990 through 1996 and no claim for contract years 1988 or 1989. PX 93 (second page) ("Supplemental Expert Report of John Wills, CPA" dated February 28, 2003 (second page)). The underpayment claim for 1988 and 1989 was "dropped from the calculation" at that point. Wills Tr. 624(3-5). According to Mr. Hoyt, the IPMF enrollment data for 1988 and 1989 had been "purged" and thus were "likely incomplete." DX 67, at 67/10. Therefore, "claims for these two years were not calculated." Id.; see also Wills Tr. 613(13-17, 24-25)-614(1-4).

In the February 2003 report, Mr. Wills noted that Mr. Grogan “pointed out differences in effective dates of enrollment coverage for certain subscribers from the enrollment database from which the initial claim was computed.” PX 93 (second page). Mr. Wills stated that “[t]hese differences were investigated” and that, “[a]s a result, the [HIP] enrollment database was revised and the premiums for 1990 through 1996 were recalculated” and that "[t]he recalculation was based on combining the two enrollment databases used by [HIP], IPMF and Q/Care, into one enrollment database." Id. The claim for 1990-1996 was based upon the new HIP__MAST.DB. Wills Tr. 624(6-10). Using this "revised" data base, Mr. Wills concluded that there was a premium underpayment of $12,320,379 for the 1990-1996 contract years, “assuming that the payment information included in Defendant’s Responses to Plaintiff’s Requests for Admission is correct,”

and, "[i]n the event that the admission is not correct with respect to the payments, then the premium underpayment is calculated to be $9,708,388." PX 93 (second page).

(5) The New Contingency Reserve Claim ($477,794)

In addition to the premium underpayment calculation for contract years 1990-1996, Mr. Wills' February 2003 report contained a contingency reserve claim for $477,794 that was not included in his January 2002 report or raised in either of HIP's certified claims. PX 93 (fourth page). Mr. Wills testified that, as of January 2002, he was not aware of a desire by HIP to assert a contingency reserve fund claim, Wills Tr. 654(10-14), and that he had not been asked by plaintiff's counsel to address a contingency reserve claim. Wills Tr. 654(15-18). It was not until after January 2002 that plaintiff's counsel informed Mr. Wills of his desire to bring the contingency reserve claim at which time plaintiff's counsel requested that Mr. Wills calculate the value of the loss to the contingency reserve fund established for HIP. Wills Tr. 654(19-25)-655(1-7).

(6) The Revived Underpayment Claim For Contract Years 1988 And 1989

In June 2003, HIP's trial expert issued a new report in which he estimated a premium under-payment to HIP of $2,816,676 for contract years 1988 and 1989 based upon a different method of estimating premiums due than that used by him to estimate premiums due for the 1990-1996 contract years. "Supplemental Expert Report of John Wills, CPA" dated June 2, 2003, DX 103. Mr. Wills developed this alternate method of estimating a premium underpayment at the request of plaintiff's counsel in May 2003. Wills Tr. 646(8-17). The methodology developed by Mr. Wills to estimate premiums due for 1988 and 1989 is not based upon the identification of enrollment time lines for indi-vidual subscribers as in the case of the method used by Mr. Wills to estimate premiums due for con-tract years 1990-1996. Instead, Mr. Wills relied

upon summary enrollment statistics for HIP's FEHB Program plan contained in quarterly head-count reports prepared by HIP for 1988 and 1989 called a "Table 1 Report (Summary of FEHB Enrollment)," DX 103, at DX 103/2-103/3, the source of which is HIP's internal enrollment system. Strassberg Tr. 515(19-22). From the Table 1 Reports, which do not identify subscribers, Mr. Wills was only able to calculate a "composite enrollment" without enrollment time lines for that was not tied to individual subscribers as he had done in the case of the under-payment estimate for contract years 1990-1996. Wills Tr. 637(12-23).

ARGUMENT

I. Introduction

To recover for a breach of contract, HIP must "establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." San Carlos Irrigation and Drainage District v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). HIP "bears the burden of proving the fact of loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty so that the determination of the amount will be more than mere speculation." Willems Industries, Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961), cert. denied, 370 U.S. 903 (1962); accord Luria Bros. & Co., Inc. v. United States, 177 Ct. Cl. 676, 698, 369 F.2d 701, 714 (1966) ("Proof of damage is essential before estimates can be received of the amount thereof.").

In the present case, the issues of breach of contract, fact of loss, and amount of loss converge because the evidence offered by HIP to establish all three is the same. It consists of an estimate, in the aggregate, of premiums due under HIP's plan for each contract year in the claim interval (1988-1996), compared with the premiums paid by the Government to HIP, in the aggre-

gate, for each contract year in the claim period. If the estimates are competent, then HIP has established both a breach of contract and damages. By contrast, if the estimates are flawed, HIP has failed to demonstrate a breach of con-tract, much less that it has been harmed. Because of this convergence of liability and damages in the proofs, the competence of HIP's calculations of premiums due should be evaluated under the more exacting standard of proof required to establish the breach of an obligation or duty arising under a con-tract and the fact of loss rather than the lenient "fair-and-reasonable-approximation" standard used by courts[5/] to determine the amount of damages once breach of contract, fact of loss, causation, and foreseeability are established.

II. The Underpayment Claim For Contract Years 1988 And 1989 ($2,816,676)

A. The Approach Used By HIP To Calculate An Underpayment For 1988 And 1989

The method relied upon by HIP at trial for its premium underpayment calculations for contract years 1988 and 1989 was developed by its trial expert, John Wills, in May 2003, six years after the complaint in Case No. 97-187C was filed and just three months before the trial of this case. Wills Tr. 646(8-17). Under this method, identified as "Approach Number One" in Mr. Wills's June 2, 2003 report, see DX 103, at 103/2,[6/] summary statistics for self-only and self-and-

---

[5] E.g., Bluebonnet Savings Bank, F.S.B. v. United States, 266 F.3d 1348, 1356-57 (Fed. Cir. 2001) ("If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery, and the court's duty is to make a fair and reasonable approximation of the damages.") (internal quotation marks omitted)).

[6] Mr. Wills's June 2, 2003 report contains two additional methods for estimating premiums due, discussed below, neither of which was addressed by Mr. Wills during his direct examination at trial or mentioned in Mr. Wills's final report in this case issued on September 8, 2003, see PX 121, one week before the start of trial. These additional methods are "Approach Number Two" (the "HIP Percent" method) and "Approach Number Three" (the "National
(continued...)

family enrollment in HIP's FEHB Program plan contained in quarterly "Table 1 Reports" were averaged by quarter. DX 103, at 103/2-103/3; PX 121, at 4. The averaged self-only and self-and-family "composite enrollments" were then multiplied by the applicable daily premium rates and totaled by year to produce an estimate of premiums due for the contract year. Id. Next, the estimate of premiums due and premiums paid by the Government for that year were compared to determine whether there was an underpayment and, if so, the amount of the underpayment. Id. The aggregate underpayment determined by Mr. Wills for 1988 and 1989 is $2,816,676. Id.[7]

Approach Number One is a flawed method of determining the existence of an underpayment for contract years 1988 and 1989. As Mr. Wills acknowledged, under this method, the enrollment statistics contained in the Table 1 Reports are an "essential component" of estimating premiums due. Wills Tr. 630(21-25). Prior to issuing the June 2003 report that unveiled this method of determining an underpayment, Mr. Wills did not speak with any HIP employee about any aspect of the engagement to calculate an underpayment for 1988 and 1989 based upon the Table 1 Reports. Wills Tr. 632(3-16). Mr. Wills did not discuss the content of the Table 1 Reports relied upon by him with any HIP personnel or even attempt to ascertain the source of enrollment statistics contained in the Table 1 Reports. Wills Tr. 633(11-25)-634(1-2). As of the time he issued the June 2, 2003 report, Mr. Wills was not aware of the source of the enrollment statistics contained in the Table 1 Reports, other than that they "came from HIP enrollment,"

[6](...continued)
Average Percent" method). See DX 103, at 103/3-103/4.

[7] The underpayment determined for 1988 is $1,186,196 ($38,465,166.81 (premiums due) less $37,278,970.80 (premiums paid)). DX 103, at 103/5; PX 121, at Exhibit A. The underpayment determined for 1989 is $1,630,480 ($47,657,387.85 (premiums due) less $46,026,907.48 (premiums paid)). Id.

Wills Tr. 634(9), and he had taken no steps to confirm that the source of those statistics was the IPMF enrollment system. Wills Tr. 634(10-21).

The accuracy of the enrollment statistics contained in the Table 1 Reports relied upon by Mr. Wills to estimate premiums due is dependent upon the accuracy of the underlying data base from which those statistics apparently were generated – the IPMF enrollment system. In marked contrast to his assertions about the "rigorous analyses" employed to ensure the accuracy of the enrollment data relied upon by him to estimate premiums due for contract years 1990-1996, see PX 121, at 8, Mr. Wills did nothing to test the accuracy of the enrollment data contained in the Table 1 Reports upon which his estimates of premiums due for 1988 and 1989 are based.[8] When confronted with that fact at trial, the only justifications offered by Mr. Wills for his reliance upon the Table 1 Reports are that the reports were "generated contemporaneously" and "produced [by HIP] in response to a requirement by the OPM" and that he therefore "viewed [the Table 1 Reports] as relevant data in compiling the claim and didn't ask beyond what was on the

[8] The June 2, 2003 report contains no discussion whatsoever of anything that Mr. Wills did to test or otherwise satisfy himself as to the accuracy and reliability of the enrollment statistics contained in the Table 1 Reports he used to estimate premiums due. See DX 103; Wills Tr. 634(22-25)-635(1-2). The September 2003 report does not describe any testing of the enrollment statistics contained in the Table 1 Reports either. See PX 121, at 3-5. Mr. Wills justified his reliance upon those data by stating that the Table 1 reports are based upon actual enrollment data rather than estimates and his assumption that OPM uses Table 1 Reports to adjust every plan's rates annually and as a factor in auditing each plan's rates. Id., at 4. At trial, however, Mr. Wills retreated from the statement contained in his September 2003 report: "[T]he primary factor was that they were contemporaneously produced from HIP enrollment at each quarter and produced to OPM in response to OPM requirements. My understand-ing of how they were used within OPM may or may not be correct, but the primary purpose of using the reports was that they had the data from the historical period by quarter and it done in response to OPM requirements." Wills Tr. 642(21-25)-643(1-6).

report themselves." Wills Tr. 635-(17-25)-636(1).[9] When asked on cross-examination to admit that the reason he had not tested the enrollment statistics contained in the Table 1 Reports is that he had no way of testing the accuracy of those data, Mr. Wills responded: "I don't know if I could test the accuracy or not." Wills Tr. 636(2-8).

In similar circumstances, courts have given no evidentiary weight to expert testimony. In In re Lake States Commodities, Inc., 271 B.R. 575, 587-88 (Bkrtcy.N.D.Ill. 2002), the court gave "no weight" to an expert's report "due to the lack of meaningful testing of the information upon which it is based and the insufficient validation of the underlying sources." In that case, the expert had opined that a report prepared by another consultant, which contained a summary of 11,598 business transactions obtained from banking and other business records relating to the debtor, was accurate, without having performed a statistical sampling of those transactions. Id. at 587. And, in In re CSI Enterprises, Inc., 220 B.R. 687, 696-97 (Bkrtcy.D.Colo. 1998), aff'd, 203 F.3d 834 (10th Cir. 2000), the court gave no weight to the opinion of an expert as to the amount of debt owed by a party where the opinion was based upon a financial statement and other sources of information which had not been audited or other-wise tested to establish their accuracy.

The explanation offered by Mr. Wills for estimating premiums due for contract years 1988 and 1989 based upon summary enrollment statistics contained in Table 1 Reports instead of electronic data contained in the computerized enrollment system used by HIP at that time (IPMF) is that "certain of the [HIP] archived data for the pre-1990 period was not retrievable." PX 121, at 3; see also Wills Tr. 613(9-12) ("It was clear that the production system of IPMF omitted some

[9] On direct examination, Mr. Wills testified that the Table 1 Reports "would be a reliable basis for taking a snapshot of enrollment for each quarter" "[b]ecause it's information that was produced con-temporaneously and it was actually sent to OPM." Wills Tr. 545(23-25)-546(1-5).

records and that some records had been pulled off and put on what they called their purge system."). The notion that IPMF enrollment records for 1988 and 1989 are incomplete, however, was seemingly contradicted by the trial testimony two HIP officials. Ms. Carmen Bynum, HIP's Managing Director of Information Services for Application Development and Support Services and an employee of HIP's Information Services organization during 1988-1996, testified that she could not recall having ever had any difficulty locating material from the IPMF system that had been archived. Bynum Tr. 336(23-25). Mr. Jay Steinberger, HIP's Director of System Development for Enrollment and Billing, which is in the "computer software area" of HIP, testified that, when FEHB Program plan enrollment data were downloaded from IPMF for purposes of HIP's claims, to the best of his knowledge, HIP was able to retrieve "all archived data from the IPMF system." Steinberger Tr. 522(25)-523(1-6).[10] If in fact HIP's IPMF enrollment data for 1988 and 1989 are complete, as the testimony of Ms. Bynum and Mr. Steinberger would suggest, then Mr. Wills does not have an excuse for not employing the same methodology to evaluate an underpayment for contract years 1988 and 1989 that he has used for the 1990-1996 interval, under which enrollment time lines for individual subscribers can be developed based upon electronic data and the validity of the computerized enrollment data can be tested.

[10] At trial, Mr. Wills appeared somewhat flustered by this testimony. He agreed with the statement that he could not test the accuracy of enrollment statistics contained in Table 1 Reports because he did not have complete enrollment data for 1988 and 1989 from the IPMF enrollment system used to generate the Table 1 Reports, Wills Tr. 636(9-16), but added: "However, the IPMF database, as I've found over the course of the last few days, apparently there's some backup available and I don't know to what extent that has new information, but it may be able to test enrollment in the Table 1s to some archived version, I just don't know, sitting here." Wills Tr. 636(16-21).

Mr. Wills's opinion that Table 1 Reports are a reliable basis upon which to estimate premiums due is undercut by the fact that Mr. Wills has not used anything similar to Approach Number One in any of his numerous other premium underpayment engagements, Wills Tr. 645(3-7), and it is inconsis-tent with his prior deposition testimony that the one time he had determined that a plan's enrollment data were not a reliable basis upon which to calculate premiums due was where "the method they used to retain their records did not allow for the historical creation of time lines to enable the calculation of premiums." Wills Tr. 638(7-25)-639(1-21).

The Table 1 Reports used in Approach Number One were available to Mr. Wills at the time he determined that the premium underpayment methodology relied upon for the 1990-1996 contract years could not be used for 1988 and 1989. In fact, the Table 1 reports have been a part of his work papers since 1997. Wills Tr. 632(17-24), 676(17-19). The analysis reflected in Approach Number One required a "fairly short" time to complete. Wills Tr. 645(8-13). When Mr. Wills concluded that he did not have sufficient information to create reliable time lines for individual subscribers for 1988 and 1989, nothing prevented him from including a claim for 1988 and 1989 based upon Approach Number One in his February 2003 report (PX 93), Wills Tr. 645(17-23), but he did not do so. The claim for 1988 and 1989 based upon Approach Number One is in the case because plaintiff's counsel requested that Mr. Wills prepare a claim for those years upon that basis, not because Mr. Wills believes that it is an adequate basis upon which to determine an underpayment for those years.

The assertion that enrollment statistics contained in Table 1 Reports should be deemed reliable because OPM supposedly relies upon them hardly demonstrates that those statistics are

accurate.[11] There is nothing in the record to suggest that OPM has ever tested the enrollment system of HIP from which its Table 1 Reports are generated and concluded that the HIP enrollment system was accurate. The situation is just the opposite. On July 25, 1991, the OPM Inspector General reported the results of an audit of HIP's enrollment system in the course of an audit of HIP's operations for the 1986-1989 contract years. OPM OIG Audit Report No. 51-00-89-19 dated July 25, 1991, DX 109. Among other things, the Inspector General (IG) reviewed HIP's enrollment system "to verify the accuracy of its Federal enrollment statistics reported to OPM." Id., at 109/14. The "verification consisted of matching HIP's Table 2 Report (Enrollment by Payroll Office)[[12]] to OPM's Headcount Report for March 31, 1989." Id. The OPM IG found that "[t]he enrollment variance between the two was at a high level, with HIP showing significantly more enrollees than OPM." Id. The IG concluded that "HIP's enrollment system does not appear to be producing reliable FEHBP enrollment statistics." Id., at 109/9. Moreover, Ms. Nancy Kichak, OPM's Deputy Associate Director, Center for Work Force Planning and Policy Analysis, who since 1982 has been responsible for actuarial work relative to health and life insurance programs, including the negotiation of rates and rate reconciliation under the FEHB Program, testified that OPM views the accuracy of enrollment statistics contained in Table 1 Reports as "very bad" and that OPM has reduced its reliance upon those reports over the years.

---

[11] HIP apparently contends that the enrollment information contained in the Table 1 Reports should be deemed accurate or reliable merely because those reports are business records of the firm. See Wills Tr. 549(9-17); 676(22-23). We disagree. The documents that contained the untested in-formation that formed the basis for the testimony of the experts rejected by the courts in Lake States Commodities and CSI Enterprises also were business records.

[12] The enrollment statistics contained in the Table 2 Report (Enrollment by Payroll Office) roll up to the summary enrollment levels reported in the Table 1 Report (Summary of FEHBP Enrollment).

Kichak Tr. 928(24-25)-929(1-2).

At any rate, OPM does not place significant reliance upon the Table 1 Reports. Mr. Dennis Black, OPM's Deputy Assistant Inspector General for Audits, testified that for purposes of calculating the amount of an adjustment due a plan of the FEHB Program as a result of questioned health benefits rates, OPM IG uses enrollment from OPM headcount reports, which is based upon enrollment reported to OPM by Federal agencies, not enrollment in the Table 1 Reports submitted by plans to OPM. Black Tr. 706(1-9); 715(9-19). The OPM IG did just that in its 1991 audit of HIP. It used enrollment in the HIP FEHB Program plan set forth in OPM headcount reports to compute the amounts by which the FEHB Program was overcharged in 1987, 1988, and 1989, and to compute the amount by which the FEHB Program was undercharged in 1990. See DX 109, at 109/10-109/11, 109/19-109/22; Black Tr. 703(12-25)-705(1-14).[13]

Moreover, as Ms. Kichak testified, OPM uses OPM headcount reports, not Table 1 Reports, to determine a plan's enrollment when computing adjustments to community rates as part of the annual rate reconciliation process. Kichak Tr. 863(2-25)-864(1-8). For the reconciliation of 1988 and 1989 community rates, all plans were required to submit a rate reconciliation worksheet ("Attachment III" in OPM rate reconciliation instructions for community-rated plans),

---

[13] This can be demonstrated by comparing, for example, of the enrollment used by the OPM IG to calculate the questioned charges for 1989 and the enrollment set forth in HIP's Table 1 Reports for 1989. The detail provided by the OPM IG for its calculation of questioned charges for 1989 reflects that the OPM IG used "headcount" values of 7,709 for "single" enrollment (self-only coverage) in the HIP plan and 12,401 for "family" enrollment (self-and-family coverage) in the HIP plan. DX 109, at 109/20. By contrast, the Table 1 Reports for 1989 (quarters ended 12/31/88, 3/31/89, 6/30/89, 9/30/89, and 12/31/89) reflect a range of enrollment from 9,763 to 10,248 and an average enrollment of 9,896 for self-only enrollment in the HIP plan and a range of enrollment from 11,870 to 12,240 and an average enrollment of 11,982 for self-and-family enrollment in the HIP plan. See JX 15 (Bates Nos. HIPNY01457-HIPNY01461).

leaving the enrollment portion of the form to be filled in by OPM using OPM headcount enrollment statistics. See Kichak Tr. 865(3-7; 17-25)-869(1-19); "1989 Reconciliation Instructions Community-Rated Plans," DX 112, at 112/1 & 112/9 ("Enrollment will be based on the March 31, 1988 semi-annual headcount."); "1990 Reconciliation Instructions Community-Rated Plans," DX 113, at 113/1 & 113/9 ("Enrollment will be based on the March 31, 1989 semi-annual headcount.").

After 1990, OPM divided plans into small and large plans and gave small plans (i.e., plans with fewer than 1,500 subscribers) the option of completing the worksheets themselves, including enrollment numbers, and a plan that chose to do would retain the completed worksheet rather than submitting it to OPM. Kichak Tr. 869(20-25)-870(1-22). In that case, OPM rate reconciliation instructions allowed small plans to use enrollment statistics from Table 1 Reports because relevant OPM headcount enrollment data were not available at the time the small plans completed the rate reconciliation worksheet.[14/]

Apart from that case, the only use made of Table 1 Reports by OPM is in reporting to the public the number of persons covered by the FEHB Program, including dependents, and, for community-rated plans that use an "age-set, family-size adjustment," to "view their rates[.]" Kichak Tr. 922(25)-924(1-6). However, OPM uses the Table 1 Reports for these limited purpo-

---

[14] See OPM Administrative Kit (May 1992), JX 17, at 17/301 ("Normally, OPM would put the March 31, 1992 Headcount enrollment figures on Line 8 [of Attachment III]. Since these figures will not be available at the time the small plan does the calculation, the plan may use its March 31, 1992 Table 1 enrollment figures."); OPM Administrative Guide for Health Plans (September 1995), JX 18, at 18/237-18/238 ("Normally, OPM would put the March 31, 1995 Headcount enrollment figures on Line 8 [of Attachment III]. Since these figures will not be available at the time the small plan does the calculation, the plan may use its March 31, 1995 Table 1 enrollment figures." (emphasis in original)).

ses not because it perceives the Table 1 Reports as accurate, but rather because those reports are the only available source of family size data (i.e., number of dependents) for the FEHB Program. Kichak Tr. 931(15-19).[15]

HIP's position that the Table 1 Reports for 1988 and 1989 are a reliable basis upon which to estimate premiums due for those years also is undermined by its own statements about the quality of the enrollment statistics contained in those reports. In response to the finding contained in the 1991 OPM Inspector General audit report that HIP's enrollment system does not appear to be producing reliable enrollment statistics, HIP's management acknowledged that its enrollment file was significantly oversta-ted, a condition that HIP attributed to untimely notification by the Government of terminations of enroll-ment in HIP's FEHB Program plan. See DX 109, at 109/23, 109/28-109/29. Specifically, in the res-ponse to the audit report transmitted by Bernard J. Neeck, HIP's Executive Vice President and Chief Financial Officer,[16] HIP stated that enrollment "terminations are routinely reported to HIP exceptionally late, resulting in significant overstatements of the HIP enrollment file," and that, "[i]n 1990 alone, HIP wrote off more than $3 million due to FEHBP enrollment differences." DX 109, at 109/28-109/29.

At the time HIP's trial expert developed the underpayment calculations for 1988 and 1989 based upon the Table 1 Reports, he did not consider either the 1991 OPM IG audit report finding

---

[15] Mr. Wills testified that the source of his understanding, set forth in his September 2003 report, that "Table 1 reports are used by [the Government] to adjust every plan's rates and as a factor in auditing each plan's rates, PX 121, at 4, is HIP personnel, "based on discussions they had had with counsel for HIP." Wills Tr. 643(7-13). When asked on cross examination whether his understanding had changed, Mr. Wills backed away from the statement contained in the September 2003 report. He testified: "[Table 1 Reports] may not be used in every case for determining rates and audits. I don't know sitting here today." Wills Tr. 643(17-19).

[16] Mr. Neeck was part of HIP's "top management." Reardon Tr. 126(19-25)-127(1-10).

that HIP's enrollment system did not appear to be producing reliable enrollment information or HIP's response to that finding, including its acknowledgment that the HIP enrollment file was significantly overstated. Wills Tr. 640(16-25)-641(1-9). In point of fact, Mr. Wills was not even aware of that information when he developed the estimates of premiums due for 1988 and 1989 based upon the Table 1 Reports. Wills Tr. 641(10-17). The first time that Mr. Wills "focused" upon the 1991 OPM IG audit report finding regarding the reliability of HIP's enrollment system and HIP's acknowledgment that it was overstated was when Mr. Wills was examined by defendant's counsel about those matters at a deposition of Mr. Wills in July 2003, several weeks after Mr. Wills issued the June 2003 report that embraced Approach Number One. Wills Tr. 641(22-25)-642(1-4).

HIP's admission of a significant overstatement of its enrollment file during the period covered by the 1991 OPM IG audit report (including 1988 and 1989), attributed to tardy reporting by employing agencies of termination of enrollments in HIP's FEHB Program plan, is consistent with contemporaneous enrollment reconciliation correspondence from HIP to the Government, specifically, an April 16, 1989 letter from Ms. Patricia Jacovina, a Reconciliation Clerk in HIP's Enrollment and Billing Depart-ment, to the Department of Health and Human Services (DHHS). JX 16; Mulryan Tr. 358(12-25). This correspondence, which concerned enrollment discrepancies between HIP's internal enrollment system and a November 5, 1988 DHHS Reconciliation Report, indicates that there were twenty-nine "terminations" (i.e., "[p]ersons listed on HIP's files, but not on DHHS files") and only one "enrollment" (i.e., "[p]ersons listed on [DHHS's] files but not on HIP's files"). JX 16, at 1-2.

B. HIP's Alternative Approaches For Estimating An Underpayment For 1988 And 1989

As noted above, the June 2, 2003 report issued by HIP's trial expert contains two additional methods of calculating a premium underpayment for contract years 1988 and 1989, neither of which was addressed by Mr. Wills during his direct examination or mentioned in his final, September 2003 report. Nevertheless, on cross examination, Mr. Wills testified that, if the Court were to find Approach Number One not an acceptable method of determining the existence and extent of an underpayment of premiums for 1988 and 1989, either of the other two approaches addressed in his June 2, 2003 report would constitute "an acceptable alternative." Wills Tr. 649(25)-650(1-11). These alternative methods of determining an underpayment for 1989 and 1989 are also flawed.

Approach Number Two ("HIP Percent" method) and Approach Number Three ("National Average Percent" method) are not based upon enrollment data of any type for HIP's FEHB Program plan for the 1988 and 1989 contract years – the period for which an underpayment of premiums ostensibly is being evaluated. Under the HIP Percent method, an underpayment percentage was calculated by dividing the underpayment determined by Mr. Wills for contract years 1990-1996 by total premiums paid to HIP for those years. DX 103, at 103/3; Wills Tr. 647(12-18). That underpayment percentage (2.33 percent) was then applied to premium payments received by HIP for 1988 and 1989, which yielded an aggregate underpayment of $1,941,026 for those years, DX 103, at 103/3, which is $875,650 lower than the underpayment calculated by Mr. Wills under Approach Number One.

Under the National Average Percent method, underpayment percentages were calculated for 1988 and 1989 based not upon any HIP enrollment data, but rather upon the "experience" of other plans participating in the FEHB Program during 1988 and 1989 for which, pursuant to an engagement by plaintiff's counsel, Mr. Wills previously determined had been underpaid health benefits premiums. DX 103, at 103/3-103/4; Wills Tr. 650(12-20). The underpayment percentages were then applied to payments received by HIP for 1988 and 1989, yielding an aggregate underpayment of $2,379,631 for those years, see "Supplemental Expert Report of John Wills, CPA" dated June 12, 2003, DX 104, at 104/4,[17] which is $437,045 lower than the underpayment calculated by Mr. Wills under Approach Number One.

The HIP Percent and National Average Percent methods for determining an underpayment are not neutral. They are biased towards finding an underpayment for the 1988 and 1989 contract years. Under each approach, there is a built-in assumption that there was in fact an underpayment of premiums to HIP for those years, with only the amount to be calculated. Wills Tr. 647(19-22); 651(12-16). In both instances, the possibility of finding that an underpayment did not occur is foreclosed. Wills Tr. 647(23-25)-648(1); 651(17-20).

In addition to the defects discussed above, the HIP Percent method assumes, without justification, that the *average* experience of the HIP FEHB Program plan for the 1990-1996 period is an ac-curate measure of the extent of an underpayment in 1988 and 1989. Mr. Wills admitted that he used the average experience of the plan during the 1990-1996 interval only

---

[17] The June 12, 2003 report reflects an adjustment of the underpayment percentages under the National Average Percent method, which resulted in a modest reduction of the underpayment for 1988 and 1989 calculated in the June 2, 2003 report from $2,458,722 (DX 103, at 103/4) to $2,379,631 (DX 104, at 104/4).

because he could not correlate the experience for any one year included in the 1990-1996 claim to either 1988 or 1989. Wills Tr. 648(9-16).

The National Average Percent method, which is based upon the experience of other plans, is further undermined by the fact that Mr. Wills could not even identify a common cause for underpayment in the FEHB Program that could be expected to result in an underpayment of premiums to all prepaid plans, including HIP's plan. He testified: "I don't know specifically what causes the underpayments. . . . I haven't had the ability to compare subscriber specific premiums and payments to make a calculation as to what the specific causal factors are." Wills Tr. 652(9-15).

None of the three methods developed by Mr. Wills to evaluate underpayment of health benefits premiums to HIP for contract years 1988 and 1989, therefore, is a competent method of determining whether and, if so, the extent to which there was an underpayment for those years. HIP thus has failed to carry its burden of demonstrating that there was an underpayment of premiums for those years and its claim for that period should be rejected.

III. The Underpayment Claim For Contract Years 1990-1996 ($9,128,180)

HIP contends that, for contract years 1990-1996, there was an underpayment of premiums by the Government to HIP in the total amount of $9,128,181, which is the difference between premiums allegedly due HIP for that period ($425,664,480) and the amount of premiums paid for that period ($416,536,299). This claim also is based upon the analysis and opinions of HIP's trial expert, John Wills. See PX 121, at 2(§ II.3), 5.

There are three components to the 1990-1996 underpayment claim: (1) enrollment in the HIP FEHB Program plan during 1990-1996; (2) contractual premium rates for the two types of

coverage in effect during each year of the claim interval; and (3) premiums paid by the Government to HIP for contract years 1900-1996. HIP's estimate of premiums due is calculated by applying the appropriate contractual premium rates, expressed as daily rates, to days of enrollment coverage in the HIP FEHB Program plan during the claim period, as reflected by the HIP__MAST.DB. The parties have stipula-ted the premiums paid, see Stip. ¶¶ 62-68, JX 19, at 20, and the Government does not question the daily premium rates calculated by Mr. Wills.

We do take issue, however, with Mr. Wills's determination of the cumulative enrollment in the HIP FEHB Program plan during the claim period and, consequently, the estimate by Mr. Wills of the total premiums due, which, in turn, has an impact upon the claimed underpayment for 1990-1996. Mr. Wills quantified the enrollment in HIP's plan during 1990-1996 by constructing enrollment "timelines" for individual subscribers to the plan during that time frame based upon enrollment information contained in the HIP__MAST.DB, an electronic data file derived from enrollment information for the HIP FEHB Program plan entered and maintained by HIP in two computerized enrollment systems operated by HIP during the claim period (i.e., IPMF and Q/Care). Testing of the HIP__MAST.DB performed by the Government's trial expert, Mr. Grogan, demonstrates that it overstates enrollment in HIP's plan during 1990-1996 and, as a result, the premium underpayment claim for contract years 1990-1996 is overstated.

A "computer-generated analysis is no better than the data which is entered into the computer." Weaver-Bailey Contractors, Inc. v. United States, 19 Cl. Ct. 474, 480 (1990). To evaluate a claim that is based upon an electronic data base, such as HIP's premium underpayment claim for 1990-1996, it is entirely appropriate and necessary to test the accuracy or reliability of the information contained in the data base by comparing it with documentation or other evidence

that is independent of and not derived from the data base itself. Grogan Tr. 1124(25)-1125(1-4), 1133(14-18). HIP's trial expert conceded as much.[18]

Mr. Grogan tested the accuracy of the data base used by HIP's trial expert to determine the level of enrollment in the HIP FEHB Program plan during 1990-1996 by comparing that enrollment data with the FEHB Program enrollment documents (SF 2809s and SF 2810s) that actually initiate, change, and terminate subscriber coverage in HIP's plan. Grogan Tr. 1125(24-25)-1126(1-2), 1133(18-20), 1135(19-22); DX 37, at 37/9.[19] The idea of testing HIP's internal enrollment system by comparing the information contained in that system with Federal enrollment forms is a reasonable one that did not originate with Mr. Grogan. HIP employed the same kind of verification procedure in its daily operations. See Pinto Depo. Tr. 29(4-25), DX 114. And, except for the current claim for the 1988 and 1989 contract years which is not amenable to this type of testing,[20] HIP's trial expert undertook a similar comparative analysis, referred to as "transaction testing," with respect to each iteration of HIP's premium underpayment claim as well

---

18 In his September 2003 report, Mr. Wills states that Mr. Grogan "ignores the rigorous procedures [HIP] established to ensure the accuracy of their enrollment data for both the IPMF and Q/Care information systems." PX 121, at 21. At trial, however, Mr. Wills conceded that he does not contend that Mr. Grogan should simply have accepted assertions about "rigorous procedures" established by HIP to ensure the accuracy of its enrollment systems without testing the outcome of those procedures in the HIP enrollment data base." Wills Tr. 674(5-10).

19 Initially, Mr. Grogan also considered data from OPM annuity roll print screens for sample members who were annuitants, but he subsequently determined that he did not need to rely upon the print screen data because the information contained in FEHB Program enrollment forms support his determinations in that comparative analysis. Grogan Tr. 1170(15-25)-1171(1-4), 1233(16-24).

20 As Mr. Grogan testified, the Table 1 Reports relied upon by Mr. Wills to make his current estimate of premiums due for 1988 and 1989 provide enrollment totals without identifying individual subscribers, which "forestalls any opportunity to test those reports against individual [F]ederal enrollment forms, or something independent like that." Grogan Tr. 1136(15-21).

as underpayment claims prepared by Mr. Wills for other HMOs pursuant to engagements by plaintiff's counsel. See Wills Tr. 656(6-18, 662(12-18); PX 92, at 11; DX 67, at 67/10-67/11; PX 121, at 11.

Mr. Grogan tested the accuracy of the HIP__MAST.DB by preparing a randomly-selected sample of subscribers to the HIP FEHB Program plan any part of whose enrollment fell within the 1990-1996 claim interval and then compared FEHB Program enrollment forms for sample members to the HIP__MAST.DB.[21/] The operating assumption in these comparisons was that "the HIP data was correct, unless there was a specific [F]ederal form which showed a specific contradiction of an enrollment transaction in HIP's data." Grogan Tr. 1138(20-23). Mr. Grogan found no discrepancies for 167 members of the sample and discrepancies for 29 members of the sample. Grogan Tr. 1145(8-10); DX 37, at Appendices 12 and 13. A comparison of pre-audit revenue (premiums) and post-audit revenue (premiums) reflected a net overstatement of premiums in the HIP__MAST.DB for the sample of $37,789.22. DX 37, at 37/55, 37/62.

Mr. Grogan next employed a statistical analysis to extrapolate his findings for the sample to the entire subscriber population. Grogan Tr. 1146(10-12); DX 37, at 37/9. Specifically, he performed a statistical test known as "interval estimation for means of paired observations,"

---

[21] The procedures used by Mr. Grogan to select the subscriber sample are described in his May 2002 report. See DX 34, at 34/10. The sample included only those randomly-selected subscribers for which any FEHB Program enrollment form(s) could be found. See Grogan Tr. 1226(21-23), 1228(15-23), 1230(18-24). When HIP revised its claim in February 2003 by making an estimate of premiums due based upon computer-generated enrollment time lines for individual subscribers limited to the 1990-1996 period, Mr. Grogan removed from his sample those members whose premiums related only to 1988 and 1989. Grogan Tr. 1221(10-15), 1227(1-6). HIP's trial expert made the same adjustment to the sample analyzed by him as part of his "transaction testing." See Wills Tr. 663(23-25)-664(1-4); DX 67, at 67/10.

which is "an appropriate test for this kind of circumstance." Grogan Tr. 1146(16-19).[22] This statistical test "identif[ies] and quanti[fies] the extent of discrepancy between the true enrollment periods and the true premiums due, as evidenced by the [F]ederal-enrollment forms, and HIP's version of what premiums would be due based on their own enrollment data" and "it is expressing that difference in the form of a range of values from low to high." Grogan Tr. 1150(8-15). Application of this test by Mr. Grogan indicated a range of premiums due of from $1,159,722 to $8,229,152 at the 95 percent confidence level, with a midpoint estimate of potential underpaid premiums of $4,694,437. DX 37, at 37/9.

After issuing his March 2003 report (DX 37), Mr. Grogan received and reviewed additional enrollment documents that affected his sample analysis in two ways. First, the sample size increased from 194 to 196. Grogan Tr. 1156(16-25)-1157(1-9). Second, Mr. Grogan revised his findings of discrepancies between the HIP__MAST.DB and FEHB Program enrollment forms for sample members Kenneth Iadarola, Hazelle Byrd, and Maria Jacquez, the effect of which was to reduce the amount of the net premium overstatement in the HIP enrollment data base from $35,789 to $24,000. Grogan Tr. 1252(17-25)-1253(1-4), 1268(13-17), 1362(11-25)-1363(1-12). With those modifications, the range of premiums due, at the 95% confidence level, is from $3.2 million to $9.4 million, resulting in a midpoint estimate of $6.3 million. Grogan Tr. 1279(8-25)-1280(1-12), 1356(15-25).

Within a range in a confidence interval, once a level of confidence is established, one can say that certain values are within the range while others are outside of it, but one cannot further

---

[22] In "transaction testing" by HIP's trial expert, a subscriber sample was analyzed by means of the same statistical test that Mr. Grogan used. <u>See</u> Wills Tr. 658(13-25)-659(1-7).

discriminate between values within the range. Grogan Tr. 1152(23-25)-1153(1-6). Nevertheless, the midpoint of a confidence interval is the one value within the range of a confidence interval for which, if the interval were constructed narrowly enough that it contained only the midpoint, there is an equal probability that the midpoint value is too high as there is that the midpoint is too low. Grogan Tr. 1155(18-22). The midpoint of $6.3 million for the range of premiums due calculated by Mr. Grogan, thus, is the only value within that range for which, if the confidence interval were narrowed to the extent that it contained just the midpoint, there is an equal chance that the midpoint value is too high as there is that it is too low.

The statistical analysis performed by Mr. Grogan demonstrates that the HIP__MAST.DB continues to overstate the amount of premiums due HIP for contract years 1990-1996, even with the adjustments to the sample made by Mr. Grogan subsequent to issuing his March 2003 report. Grogan Tr. 1359(7-12). HIP's $9.13 million underpayment claim for 1990-1996, therefore, is overstated.

## IV. The Contingency Reserve Claim ($477,794)

### A. Introduction

HIP contends that OPM should be required to deposit $477,794 into the contingency reserve set aside for HIP in the EHB Fund, which represents four percent of the alleged total premium under-payment of $11,944,857 for contract years 1990-1996. See PX 121, at 2(§ II.5), 10-11. The FEHB Act provides that a subscriber to a FEHB Program plan and the Government contribute, in addition to health benefits premiums, amounts for OPM's administrative expenses and for the contingency reserve established by OPM for the plan in the EHB Fund. 5 U.S.C. § 8909(b).

OPM regulations implementing the FEHB Act provide that "[t]he enrollment charge consists of the rate approved by OPM for payment to the plan for each enrollee, plus 4 percent, of which one part is for an administrative reserve and 3 parts are for a contingency reserve for the plan." 5 C.F.R. § 890.503 (see Stip. ¶ 8, JX 19, at 3-4). The administrative reserve is "credited" with 1/104 of the enrollment charge and the contingency reserve for a plan is "credited" with 3/104 of the enrollment charge. Id. at § 890.503(b) & (c)(1)(i). "From time to time and in amounts it considers appropriate," OPM "may transfer unused funds for administrative expenses to the contingency reserves of the plans then under contract with [OPM]," in which case, each contingency reserve is credited with an amount proportionate to the subscription charges paid and accrued to the plan for the contract term immediate-ly preceding the contract term in which the transfer from the administrative reserve is made. 5 U.S.C. § 8909(b) (see Stip. ¶ 8, JX 19, at 3-4).

### B. The Court Lacks Jurisdiction To Entertain The Contingency Reserve Claim.

In contrast to HIP's premium underpayment claims, which seek a judgment for the payment of money to HIP (i.e., money damages), the contingency reserve claim is one for specific performance of an alleged contractual duty: HIP requests that the Court direct OPM to deposit a sum of money equal to four percent of the claimed premium underpayment amount into the contingency reserve established in the EHB Fund for HIP's FEHB Plan. The Court lacks jurisdiction to entertain that claim, however, because it was not presented to the contracting officer for a decision prior to this litigation, as required by the Contract Disputes Act, 41U.S.C. §§ 601-13 (CDA).

Section 1491(a)(2) of title 28, United States Code, provides that "[t]he Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the [CDA][[23]], including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act [41 U.S.C. § 605]."

For this Court to entertain a claim governed by the CDA, the statute imposes two pertinent jurisdictional prerequisites. First, the contractor must have presented a written "claim" to the contracting officer for decision. The CDA mandates that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). Second, there must be either an actual contracting officer's decision upon the claim or the contracting officer must have failed to issue a decision upon the claim within the statutory time period, in which case the CDA provides that the contracting officer is deemed to have made a decision denying the claim. 41 U.S.C. § 605(c). See, e.g., Witherington Construction Corp. v. United States, 45 Fed. Cl. 208, 210 (1999); Ervin & Associates, Inc. v. United States, 44 Fed. Cl. 646, 653 (1999). Absent a "claim," no decision is possible and, thus, there is no basis for jurisdiction in this Court. Vanalco, Inc. v. United States, 48 Fed. Cl. 68, 76 (2000).

The term "claim" is not defined in the CDA itself. To determine the meaning of that term, the courts have looked to the definition of "claim" supplied by the Federal Acquisition

[23] Section 10(a)(1) of the CDA provides that "a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary." 41 U.S.C. § 609(a)(1) (2000).

Regulations (FAR), the language of the contract in dispute, and the facts of the particular case. Reflectone, Inc. v. United States, 60 F.3d 1572, 1575 (Fed. Cir. 1995); Garrett v. General Electric Co., 987 F.2d 747, 749 (Fed. Cir. 1993).

The FAR defines "claim," in relevant part, as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48 C.F.R. § 33.201. The identical definition of "claim" appears in the "Disputes" clauses contained in the 1985, 1991, and 1996 Contracts.[24/]

The claim letters submitted by HIP to OPM do not contain a demand that OPM deposit any sum of money into the contingency reserve established in the EHB Fund for HIP's FEHB plan. The claim letters do not even mention the contingency reserve, much less complain that it was underfunded. The claim letters contain a demand for the payment to HIP of health benefits premiums allegedly owed HIP, not equitable relief, such as the performance of a contractual duty relative to funding of the contingency reserve for HIP's FEHB plan.

Although the CDA does not require that a claim be submitted in any particular form or that it use any particular wording, Transamerica Insurance Corp. v. United States, 973 F.2d 1572,

[24] The 1988 amendment to the 1985 Contract incorporated by reference the FAR Clause 52.233-1 ("DISPUTES (APR 1984)"). 48 C.F.R. § 52.233-1 (1987). JX 2. The 1991 Contract also contained the "DISPUTES (APR 1984)" clause. 1991 Contract, Part V, § 5.36. JX 5, at 27-28. In 1993, the 1991 Contract was amended by, among other things, replacing the "DISPUTES (APR 1984)" clause with the alternate "DISPUTES (DEC 1991)" clause. 1993 Amendment to 1991 Contract, Part V, § 5.36. JX 7, at 12-13. This alternate version of the "Disputes" clause contains a definition of "claim" identical to that contained in the earlier 1984 version of that clause. The 1996 Contract contains the "DISPUTES (OCT 1995)" clause, which defines "claim" in the same manner as the "DISPUTES (APR 1984)" and the "DISPUTES (DEC 1991)" clauses. JX 10, at 45-46.

1578 (Fed. Cir. 1992), the contractor must provide adequate notice of the claim. In Contract Cleaning Maintenance, Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987), a CDA case that involved a demand for monetary relief, the Federal Circuit opined that the contractor must "submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." No such "clear and unequivocal" statement regarding an underfunded contingency reserve or demand for specific performance, i.e., that OPM deposit a sum of money into the contingency reserve, appears in either of HIP's certified claims. See PX 60, PX 61. Adjudication of the contingency reserve claim thus would inappropriately circumvent the statutory role of the contracting officer to receive and pass judgment upon HIP's claim for specific performance of an alleged contractual duty.

C. An Order Of Specific Performance Would Not Be Appropriate.

Even assuming that the Court has jurisdiction to entertain the contingency reserve claim, the requested specific performance should not be ordered. A party seeking specific performance "must show equitable factors in its favor, for example, the lack of an adequate remedy at law,[[25/]] and must also demonstrate that its risk of injury, *if* the injunction is denied, is one that after balancing the equities entitles it to relief." Nemer-Jeep Eagle, Inc. v. Jeep-Eagle Sales Corp.,

[25] Specific performance "will not be ordered if damages would be adequate to protect the expectation interest of the injured party." Restatement (Second) of Contracts § 359(1) (1981). In determining whether a damages remedy would be adequate, a "significant factor" is "the difficulty of proving damages with reasonable certainty." Id., § 360(a); see e.g., Aeronautical Industrial District Lodge 91 of the International Ass'n of Machinists and Aerospace Workers, AFL-CIO v. United Technologies Corp., Pratt & Whitney, 87 F.Supp. 2d 116, 134 (D. Conn.) (injunctive relief appropriate where "monetary damages would be extremely difficult, if not impossible, to ascertain"), aff'd, 230 F.3d 569 (2d Cir. 2000).

992 F.2d 430, 433 (2d Cir. 1993) (emphasis in original). One of the factors balanced is irreparable harm. Id.

While it does not appear that HIP has an adequate remedy at law for the alleged failure by the Government to fully fund the contingency reserve, inasmuch as HIP cannot establish either the fact or the amount of loss with a reasonable degree of certainty,[26] the equitable relief requested by HIP would nevertheless be inappropriate.

The granting of equitable relief "is subject to principles of common sense so that, for example, a court will not order a performance that is impossible." Restatement (Second) of Contracts § 357 comment *c* (1981); see also 12 Corbin, Contracts § 1170 (1979) ("The court will not attempt to compel that which cannot in fact be done . . . ."). HIP seeks an order that would require OPM to deposit in the contingency reserve money that OPM does not have – an amount equal to four percent of the alleged unpaid premiums for the 1988-1996 contract years,

---

[26] According to HIP's trial expert, if it had been paid the full amount of the health benefits premiums allegedly due HIP, the amount of funds set aside in the contingency reserve would have increased by an additional four percent of such premiums and such funds would have become available "to allow [HIP] to lower its premium rates or enhance its benefits pursuant to negotiations with OPM." PX 93, at § III(2). The use of funds from the contingency reserve for those purposes, the argument goes, may have made HIP's FEHB plan more attractive to potential subscribers, thereby increasing membership and, correspondingly, the profitability of HIP's participation in the FEHB Program. Id.
A claim for such lost profits, to say the least, would be speculative, especially considering that, as noted above, a distribution of funds to HIP from the contingency reserve was (and is) a matter committed to the discretion of OPM. Moreover, at trial, HIP did not attempt to establish or quantify a financial loss resulting from the alleged shortfall in deposits to the contingency reserve. Mr. Wills acknowledged that he has not performed any studies or analyses to determine or estimate the extent to which, historically, (1) any distribution of funds to HIP from the contingency reserve increased the profitability of the HIP FEHB Program plan or (2) any such distribution of funds that was used to reduce premium rates or to enhance health benefits had the effect of increasing enrollment in HIP's plan. Wills Tr. 655(8-20). Mr. Wills also acknowledged that there is no correlation between the contingency reserve shortfall amount that he calculated, i.e., $477,794, and lost profits. Wills Tr. 655(21-25)-656(1-2).

i.e., $477,794.

Under the FEHB Program, appropriations of employing agencies are the source of the contributions to the EHB Fund from which the largest part of the contingency reserve is funded. Thus, even assuming that each employing agency's representative share of the alleged underpaid funds to the contingency reserve for the 1988-1996 period could be ascertained, which is doubtful, *and* that the employing agencies presently have available to them appropriations from which a retroactive contribution to the EHB Fund could be made, OPM does not have the authority to compel the employing agencies to make any such retroactive payments into the EHB Fund. To require that OPM make a retroactive deposit to the EHB Fund for HIP's contingency reserve would be asking the impossible of OPM. The Court, therefore, should refrain from doing so.[27/]

A second factor weighing against ordering the requested specific performance is the lack of anything to indicate that, if the Court were to deny the injunction, HIP would be harmed, let alone irreparably harmed. The funds in the contingency reserve do not belong to HIP.[28/] They

---

[27] The CDA provides that "[a]ny judgment against the United States on a claim under this chapter shall be paid promptly in accordance with the procedures provided by [31 U.S.C.§ 1304]." 41 U.S.C. § 612(a) (2000). Section 1304 of title 31, United States Code, provides that "[n]ecessary amounts are appropriated to pay final judgments" when "payment is certified by the Secretary of the Treasury" and "the judgment is payable . . . under . . . [28 U.S.C. § 2517] . . . ." These provisions of law authorize payment of funds *to claimants* in satisfaction of money judgments against the United States. They do not make funds available for an intra-governmental transfer of funds, which is what a deposit of money into the contingency reserve established for HIP in the EHB Fund would be.

[28] When a FEHB contract between a carrier and OPM is discontinued, i.e., not renewed or otherwise terminated, funds credited to the contingency reserve for the plan are not paid to the carrier. They are distributed among contingency reserves for plans continuing under the FEHB Act for the contract term following that in which the termination occurred "in proportion to the amount of the subscription charges paid and accrued to the plan for the year of termination." 5 U.S.C. § 8909(e).

may be used only for the purposes specified in the FEHB Act and OPM regulations and only as OPM "from time to time shall determine." 5 U.S.C. § 8909(b). Thus, even if the alleged underpaid amount had been deposited into the contingency reserve over the nine-year period covered by HIP's claim, the additional funds would not necessarily have been made available to HIP. There is, moreover, no evidence that OPM ever denied a request by HIP for access to funds from the contingency reserve that, if the alleged funding shortfall had not occurred, OPM would have approved. The Court, therefore, should not order OPM to deposit funds into the contingency reserve established in the EHB Fund for HIP's FEHB plan.

### D. In Any Event, There Is No Contractual Duty To Deposit Funds Set Aside For The Administrative Reserve Into The Contingency Reserve.

Even assuming that the Court has jurisdiction to entertain the contingency reserve claim, that HIP prevails upon its premium underpayment claim, and that specific performance is appropriate, the amount to be deposited in the contingency reserve should not exceed a figure equal to 3 percent of any premium underpayment found by the Court. That is because only three parts of the 4 percent sum over and above the health benefits premium paid into the EHB Fund is required to be credited to the contingency reserve for the plan to which the premium relates. The other quarter of the 4 percent sum is credited to an administrative reserve to cover expenses incurred by OPM in administering the FEHB Program. While OPM has the discretion to transfer unused funds from the administrative reserve into "contingency reserves of the plans then under contract with [OPM]," 5 U.S.C. § 8909(b), there is no requirement in the FEHB Act or regulations that such funds be transferred to the contingency reserves.

## CONCLUSION

For the foregoing reasons, HIP's premium underpayment claim for contract years 1988 and 1989 is without merit and its underpayment claim for contract years 1990-1996 is overstated. HIP's contingency reserve claim should be dismissed for lack of subject matter jurisdiction. Even assuming that the Court has jurisdiction to entertain the contingency reserve claim, the requested specific performance should not be ordered. Even if an order of specific performance were appropriate, the amount of the deposit in the contingency reserve should not exceed a figure equal to three percent of any premium underpayment determined by the Court.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282

Attorneys for Defendant

OF COUNSEL:
SUSAN WHITMAN, ESQ.
Office of General Counsel
Office of Personnel Management
1900 E Street, N.W., Room 7353
Washington, D.C. 20410

DECEMBER 15, 2003