Nos. 97-187C, 01-148C
(Judge Allegra)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HEALTH INSURANCE PLAN OF GREATER NEW YORK, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S REPLY TO PLAINTIFF'S POST-TRIAL MEMORANDUM OF LAW**

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282

Attorneys for Defendant

OF COUNSEL:
SUSAN WHITMAN, ESQ.
Office of General Counsel
Office of Personnel Management
1900 E Street, N.W., Room 7353
Washington, D.C. 20410

JANUARY 22, 2004

# TABLE OF CONTENTS

Page

DEFENDANT'S REPLY TO PLAINTIFF'S POST-TRIAL MEMORANDUM OF LAW . . . . . 1

A. The Database Upon Which The Premium Underpayment Claim For Contract Years 1990-1996 Is Based Is Not A "Business Record." . . . . . 1

B. HIP's Use Of Enrollment Statistics Contained In Table 1 Reports As A Basis For Estimating Premiums Due HIP For 1988 And 1989 . . . . . 3

C. HIP's Contingency Reserve Claim . . . . . 7

D. HIP's Challenge To The Testimony Of The Government's Trial Expert . . . . . 9

(1) HIP's Contention That Mr. Grogan's Analysis Is Incomplete . . . . . 9

(2) HIP's Contention That Mr. Grogan's Analysis Is Inconsistent . . . . . 17

(3) HIP's Contention That Mr. Grogan's Analysis Supports HIP's Claim . . . . . 18

E. The Measure Of Interest Upon Any Award Of Damages To HIP . . . . . 19

CONCLUSION . . . . . 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627 (2d Cir. 1994) . . . . . . 3

*Rumsfeld v. Applied Companies, Inc.*, 318 F.3d 1317 (Fed. Cir. 2002) . . . . . . . . . . . . . 9

*United Healthcare Corp. v. American Trade Insurance Co., Ltd.*, 88 F.3d 563 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012 (Fed. Cir. 1996) ........................................................................ 9

*White v. Delta Construction International, Inc.*, 285 F.3d 1040 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## FEDERAL STATUTES

United States Code:

41 U.S.C. § 611 ........................................................................................................ 20

Public Laws:

Contract Disputes Act of 1978, as amended (41 U.S.C. §§ 601-13) ...................... 8,19,20

## FEDERAL REGULATIONS

Code of Federal Regulations:

48 C.F.R. § 1602.170-11 ......................................................................................... 4

Federal Register:

55 Fed. Reg. 27,414 (July 2, 1990) ........................................................................ 4

## MISCELLANEOUS

Federal Rules of Evidence:

Rule 803(6) ............................................................................................................ 1,2,3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HEALTH INSURANCE PLAN OF GREATER NEW YORK, INC., | ) | |
| Plaintiff, | ) | Nos. 97-187C, 01-148C |
| v. | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S POST-TRIAL MEMORANDUM OF LAW

Pursuant to the Court's October 31, 2003 Order, defendant, the United States, respectfully submits this reply to "Health Insurance Plan of Greater New York's Post-Trial Memorandum of Law" dated December 15, 2003.[1]

A. The Database Upon Which The Premium Underpayment Claim For Contract Years 1990-1996 Is Based Is Not A "Business Record."

HIP argues that the computerized enrollment data used by its trial expert, John W. Wills, to estimate health benefits premiums due HIP is an adequate basis upon which to calculate damages because, according to HIP, those data constitute "business records" within the meaning of Fed.R.Evid. 803(6). HIP Br. 4-6, 14-15. Rule 803(6) provides that "records of a regularly conducted activity," including a "data compilation, in any form," are not excluded by the hearsay rule if "made at or near the time by, or from information transmitted by, a person with knowledge, if

---

[1] In this post-trial brief, "HIP" refers to the plaintiff, Health Insurance Plan of Greater New York, Inc.; "HIP Br. ____" refers to the referenced page(s) of Health Insurance Plan of Greater New York's Post-Trial Memorandum of Law" dated December 15, 2003; "Stip. ¶ ____" refers to the referenced paragraph(s) of the "Pretrial Stipulations" filed on September 10, 2003, a copy of which is included in the record of trial as Joint Exhibit No. 19; "JX ____" refers to the referenced joint trial exhibit(s); "PX ____" refers to the referenced plaintiff's trial exhibit(s); "DX ____" refers to the referenced defendant's trial exhibit(s); and "Tr. ____(____)" refers to the referenced page(s) and line(s) of the transcript of the trial in this case.

kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the . . . data compilation . . . ."

HIP's estimate of premiums due for contract years 1990-1996 is based upon enrollment "timelines" that were developed by HIP's litigation consultants under the direction of HIP's trial expert, Mr. Wills, from a database known as the "HIP__MAST.DB." HIP's consultants created the HIP__MAST.DB from two separate databases also created by them – "IHISTORY.DB" and "TIMELINE.DB." Those databases, in turn, were derived from information extracted by HIP from two databases maintained by HIP in the regular course of business, the "Insured Persons Master File" (IPMF) and Q/Care. Prior to combining IHISTORY.DB and TIMELINE.DB, HIP's consultants made a series of "adjustments" to each of those databases. DX 67, at 67/4-67/5;[2] see also PX 121, at 8. After IHISTORY.DB and TIMELINE.DB were combined, HIP's consultants made numerous additional "contractual adjustments" to the resulting HIP__MAST.DB. DX 67, at 67/6-67/9; see also PX 121, at 8.

While the IPMF and Q/Care enrollment databases from which the HIP__MAST.DB was derived may constitute "business records" within the meaning of Fed.R.Evid. 803(6),[3] the HIP__MAST.DB itself is not. The HIP__MAST.DB was created by HIP's consultants for use in this litigation. It is not simply a downloading of information previously computerized in the regular course of business. Data prepared or compiled for use in litigation are not admissible as

---

[2] The architect of the IHISTORY.DB, TIMELINE.DB, and HIP__MAST.DB databases appears to have been Brian Hoyt, a HIP consultant who was an associate of Mr. Wills at Arthur Anderson. Mr. Hoyt's services in that regard are described in DX 67, a work paper that Mr. Hoyt prepared for HIP's trial expert, Mr. Wills. See Wills Tr. 610(21-23).

[3] The IPMF and Q/Care databases, as they were kept in the regular course of business, are not part of the trial record. HIP did not seek to have them admitted into evidence.

business records. Potamkin Cadillac Corp. v. B.R.I. Coverage Corp., 38 F.3d 627, 632 (2d Cir. 1994).[4] HIP, therefore, cannot demonstrate that the HIP__MAST.DB constitutes an adequate basis for estimating premiums due HIP by asserting that it is a business record within the meaning of Rule 803(6).[5]

B. HIP's Use Of Enrollment Statistics Contained In Table 1 Reports As A Basis For Estimating Premiums Due HIP For 1988 And 1989

In support of its contention that the so-called "Table 1 Reports" generated quarterly by HIP are an acceptable basis for estimating premiums due HIP for contract years 1988 and 1989, HIP asserts that those reports are used by HIP and the Government to identify "Similarly Sized Subscriber Groups" (SSSGs) for the purpose of developing premium rates to be charged under the HIP Federal Employees Health Benefits (FEHB) Program plan, implying that SSSGs were used for that purpose in establishing the rates for 1988 and 1989. HIP Br. 17-18. We disagree.

The SSSG policy was not in effect during 1988 and 1989. It was implemented by OPM only in 1991, *after* the contract years upon which HIP's underpayment claim based upon Table 1 Reports is based. Kichak Tr. 871(6-9), 872(18-22), 875(12-15); Black Tr. 723(24-25)-724(1-9). In rate reconciliation instructions to community-rated prepaid plans for 1992, OPM advised car-

---

[4] In Potamkin Cadillac, the court noted that, "[w]hether or not [errors contained in computerized data sought to be admitted into evidence under the 'business records' exception to the hearsay rule] were corrected, the fact that they were made suggests that the [computerized data] required significant selection and interpretation of data, not simply a downloading of information previously computerized in the regular course of business." 38 F.3d at 633.

[5] The cases relied upon by HIP involved actual records maintained by the party as the original and contemporaneous source of the transaction. For example, in United Healthcare Corp. v. American Trade Insurance Co., Ltd., 88 F.3d 563 (8th Cir. 1996), the actual computer records of the company in the conduct of its business were viewed as business records within the meaning of Fed.R.Evid. 803(6).

riers (such as HIP) that "[t]he reconciliation requests information on your plan's [SSSGs]" and noted that SSSGs "became applicable beginning with the 1991 rate year." JX 17, at 289.[6]

HIP also misrepresents the testimony of trial witnesses Dennis Black, Nancy Kichak, and Leslie Strassberg regarding SSSGs. HIP asserts that Dennis Black, OPM's Deputy Assistant Inspector General for Audits, "testified that participating health plans are required to use Table 1 reports to identify the SSSGs." HIP Br. 18. In the testimony cited by HIP, Black Tr. 708/16-709(10), Mr. Black only testified that he "believed" that plans used Table 1 reports to identify SSSGs, *not* that they are required by OPM to use them for that purpose. See Black Tr. 708(1-6).

Next, HIP asserts that Nancy Kichak, OPM's Deputy Associate Director, Center for Work Force Policy and Planning Analysis, "testified that OPM uses Table 1 Reports to identify SSSGs when auditing a plan's rates." However, in the cited testimony, Kichak Tr. 872(16-25)-873(1-10), when asked whether Table 1 Reports are used to identify SSSGs, she testified "I don't know that that's true, that they used those reports." Kichak Tr. 873(6-10). In response to the follow-up question by HIP's counsel "To figure out the federal involvement, they used the Table 1 reports?," Ms. Kichak responded: "Again, I don't know that. When our auditors go out, they look at their billing records; and that's not necessarily what's reported on their Table 1." Kichak Tr. 873(15-19).

Next, HIP asserts that Leslie Strassberg, HIP's Vice-President and Chief Actuary, "testified that the Table 1 reports are used both by [HIP] and OPM in the rate development and rate reconciliation process, further lending credence to their content as a means of calculating under-

---

[6] The regulation concerning the SSSG policy is codified at 48 C.F.R. § 1602.170-11. This regulation was originally promulgated by OPM on July 2, 1990. See 55 Fed. Reg. 27,414.

payments for the 1988 and 1989 contract years." In fact, all that Mr. Strassberg testified in that regard is that, in the process of identifying SSSGs, HIP used Table 1 reports to determine enrollment in HIP's FEHB Program Plan, *not* that OPM used Table 1 Reports in the rate development and reconciliation processes. See Strassberg Tr. 513(6-8).

As discussed in the Government's initial post-trial brief, HIP's position that the Table 1 Reports for 1988 and 1989 are a reliable basis upon which to estimate premiums due for those years is undermined by its own statements about the quality of the enrollment statistics contained in those reports. In response to the finding contained in the 1991 OPM Inspector General audit report that HIP's enrollment system does not appear to be producing reliable enrollment statistics, HIP's management acknowledged that its enrollment file was significantly overstated, a condition that HIP attributed to untimely notification by the Government of terminations of enrollment in HIP's FEHB Program plan. DX 109, at 109/23, 109/28-109/29. According to Bernard J. Neeck, HIP's Executive Vice President and Chief Financial Officer and a part of its "top management," Reardon Tr. 126(19-25)-127(1-10), "terminations [of enrollment in HIP's FEHB Program Plan] are routinely reported to HIP exceptionally late, resulting in significant overstatements of the HIP enrollment file," and that, "[i]n 1990 alone, HIP wrote off more than $3 million due to FEHBP enrollment differences." DX 109, at 109/28-109/29.

HIP attempts to downplay the admission in 1991 by HUD management of the inaccuracy of the enrollment statistics contained in the Table 1 Reports for the 1988 and 1989 contract years by characterizing the contemporaneous statements of its top management as a concern that HIP's enrollment data "may have included individuals who should have been terminated." See HIP Br. 20. The statements of HIP's Executive Vice President and Chief Financial Officer in response to

the OPM Inspector General audit report, however, are not so tentative. Mr. Neeck stated flatly that "terminations [of enrollment in HIP's FEHB Program Plan] *are routinely reported to HIP exceptionally late, resulting in significant overstatements of the HIP enrollment file*." DX 109, at 109/29 (emphasis added).

HIP argues that the Government's reliance upon this contemporaneous admission by HIP of inflated enrollment in its FEHB Program Plan is misplaced for two reasons. First, HIP asserts that the testimony at trial "revealed" that the enrollment reconciliation process did not necessarily result in a reduction in enrollment. HIP Br. 20. In support of that contention, HIP claims that William Mulryan, a HIP Enrollment Reconciliation Clerk, "testified that enrollment reconciliation often resulted in adding as many, if not more, federal subscribers than would be terminated." HIP Br. 20. Nowhere in the testimony of Mr. Mulryan cited by HIP for that proposition, Mulryan Tr. 345(5-25)-348(1-6), does Mr. Mulryan state that enrollment reconciliation often resulted in adding as many, if not more, federal subscribers than would be terminated or anything like that. Moreover, the trial exhibits that are the subject of Mr. Mulryan's testimony – PX 45 and PX 46 – are enrollment reconciliation correspondence from two agency payroll offices dated January 16, 1992, and July 18, 1995, several years after the Table 1 Reports relied upon by HIP to estimate premiums due for the 1988 and 1989 contract years.

What HIP's argument ignores is that its admission of a significant overstatement of its enrollment file during the period covered by the 1991 OPM IG audit report (including 1988 and 1989), attributed to tardy reporting by employing agencies of termination of enrollments in HIP's FEHB Program plan, *is* consistent with *contemporaneous* enrollment reconciliation correspondence from HIP to the Government, specifically, an April 16, 1989 letter from Ms.

Patricia Jacovina, a Reconciliation Clerk in HIP's Enrollment and Billing Department, to the Department of Health and Human Services (DHHS). JX 16; Mulryan Tr. 358(12-25). This correspondence, which concerned enrollment discrepancies between HIP's internal enrollment system and a November 5, 1988 DHHS Reconciliation Report, indicates that there were twenty-nine "terminations" (i.e., "[p]ersons listed on HIP's files, but not on DHHS files") and only one "enrollment" (i.e., "[p]ersons listed on [DHHS's] files but not on HIP's files"). JX 16, at 1-2.

Second, HIP asserts that the testimony of James McLaughlin, HIP's Managing Director for Billing and Medicare Reconciliation, demonstrates that HIP's "fear that its enrollment may have been inflated was incorrect." HIP Br. 21. Specifically, HIP relies upon the vague testimony of Mr. McLaughlin that, at an unspecified time, he was advised by the HIP "Billing Department" "that they had reconciled with the feds." McLaughlin Tr. 375(5-8). Mr. McLaughlin was not asked by counsel to and did not elaborate upon what it meant to have "reconciled with the feds" or, more importantly, how any such enrollment reconciliation demonstrates that the earlier Table 1 Reports for 1988 and 1989, which are snapshots of HIP's enrollment system as of certain points in time, were accurate.

C. HIP's Contingency Reserve Claim

In its post-trial brief, HIP contends that it is "entitled to a contingent reserve payment equivalent to four percent of the underpaid premiums." HIP Br. 23. According to HIP, "[i]f [the Government had paid the full amount of premiums due [HIP], [the Government] would likewise have deposited in [HIP's] contingency reserve account an amount equal to four percent of the underpayment." HIP Br. 23-24. HIP further asserts that "[t]he Court should require [the Government] to fund fully [HIP's] Contingency Reserve to be used to lower rates [under HIP's FEHB

Program Plan]." HIP. Br. 25.

In the Government's initial brief, we demonstrated that: (a) the Court lacks jurisdiction to entertain HIP's contingency reserve claim, which is one for specific relief, inasmuch as that claim was not presented to the contracting officer for a decision, as required by the Contract Disputes Act, 41 U.S.C. §§ 601-13; (b) an order of specific performance would not be appropriate because to require OPM to make a retroactive deposit of funds to the Employees Health Benefits Fund (EHB Fund) for HIP's contingency reserve would be asking the impossible of OPM and there is nothing to indicate that, if the Court were to deny the requested injunctive relief, HIP would be harmed; and (c) in any event, HIP would not be entitled to an order requiring the deposit of anything exceeding the equivalent of three percent of any underpaid premiums into the contingency reserve, because that is all that HIP is or ever was *required* of the Government under any of the FEHB Program contracts between HIP and the Government during the 1988-1996 contract years. HIP's post-trial brief does not address the Government's contentions, including the jurisdictional issue.

Although, as discussed in the Government's initial post-trial brief, it appears that HIP is pursuing a claim for specific relief, its post-trial brief is not clear on this point. HIP does not characterize the relief sought as specific relief, much less address the showing that must be made for the Court to grant that equitable relief. At the "Conclusion" of its post-trial brief, HIP states that "judgment should be entered awarding [HIP]," among other things, "an additional $477,794, which represents the amount of money [the Government] should have deposited into the Contingency Reserve contemporaneous with the premium payments to [HIP] . . . ." HIP Br. 40.

To the extent that HIP seeks a monetary award to it for $477,794, that relief should be denied because it would put HIP in a better position than it would have been in if the alleged breach of contract had not occurred.[7] Under the FEHB Program contracts between HIP and the Government, HIP was entitled *only* to a payment to it of the agreed-upon contractual premiums for the health benefits services provided, *not* any amounts set aside by OPM for the contingency reserve established for HIP in the EHB Fund or for the administrative expenses of OPM. See 1985 Contract, §§ 1.2, 3.1(a), JX 1, at pp. 85-4, 85-14; 1991 Contract, § 3.1(a), JX 5, at p. III-1; 1996 Contract, § 3.1(a), JX 10, at p. 20.

D. HIP's Challenge To The Testimony Of The Government's Trial Expert

HIP's critique of the testimony of the Government's trial expert, Thomas F. Grogan, centers upon three broad contentions: (1) the data considered by Mr. Grogan in his assessment of the accuracy of HIP's database were too limited (HIP Br. 26-32); (2) Mr. Grogan's analysis should be afforded no weight because it allegedly is inconsistent (HIP Br. 32-39) is inconsistent; and (3) the analysis performed by Mr. Grogan supports HIP's premium underpayment claim (HIP Br. 39-40).

(1) HIP's Contention That Mr. Grogan's Analysis Is Incomplete

HIP argues that Mr. Grogan's refusal to consider additional documentation caused his sample analysis to be incomplete and inaccurate. According to HIP, Mr. Grogan refused to

[7] As a rule, when there has been a breach of contract, the non-breaching party is entitled to an award of damages that will place it "in as good a position as [it] would have been in had the breaching party fully performed." Rumsfeld v. Applied Companies, Inc., 318 F.3d 1317, 1324 (Fed. Cir. 2002) (quoting Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996)). This rule not only sets the floor for damages, but also the ceiling because the non-breaching party is not entitled to be put in a better position by the recovery than if the breaching party had fully performed the contract. Applied Companies, 318 F.3d at 1325; accord White v. Delta Construction International, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002) (non-breaching party "should on no account get more than would have accrued if the contract had been performed.").

consider explanations for identified errors by stating that "Mr. Grogan also never bothered to investigate further the twenty-nine instances where he identified a discrepancy between [HIP's] data and the federal enrollment and termination forms." HIP Br. 27. Of the 29 discrepancies identified by Mr. Grogan, eight discrepancies indicated that HIP understated a subscriber's premiums due (positive error) and twenty-one discrepancies indicated that HIP overstated a subscriber's premiums due (negative error). When asked by HIP's counsel if he investigated further to see whether there was something wrong with a document that indicated a discrepancy with the HIP data, Mr. Grogan testified: "[T]here was one case, yes, where I did that. And clearly there was something wrong with one of the documents that HIP got with respect to Denise Pasquale. And I did investigate, by looking at the OPF data, and concluded that, in fact, I recognized HIP got two conflicting documents. So I was able to conclude which of them was right and which of them was wrong." See Tr. Grogan 1342(23-25)-1343(1-8).

The Government provided Mr. Grogan with SF 2809s and SF 2810s obtained from Federal agencies and the Official Personnel Folders (OPFs) for members of the sample of subscribers analyzed by Mr. Grogan. During the period covered by HIP's premium underpayment claims, i.e., 1988-1996, with limited exceptions not shown to be relevant here,[8] health benefits actions were recorded on either the SF 2809 or the SF 2810. See FPM Supp. 890-1, § S13-2a(1), JX 11,

---

[8] After June 1995, toward the end of the claim interval, OPM permitted certain transactions between it and carriers relating to annuitants to be accepted by telephone without the need for "paper confirmations:" reinstatement actions; changes or corrections of enrollment effective dates; transfer-in actions from an employing agency to the retirement system; other actions when an enrollee is awaiting medical care; addition of family members to a family enrollment; and enrollment confirmations. Stip. ¶ 23, JX 19, at 9; FEHBP Letter No. 96-21 (4/10/96), PX 38(third page). HIP has not demonstrated much less pointed to anything in the record that would indicate that a discrepancy identified by Mr. Grogan for a sample member who was an annuitant could be explained away by any such telephonic transaction after June 1995.

at 55. The SF 2809s and SF 2810s define the extent of an individual's participation in the FEHB Program, including HIP's FEHB Program Plan. Jay Fritz, a Program Analyst in the Program Planning and Evaluation Group of OPM's Insurance Services Program, testified that he obtained the OPFs for members of the sample analyzed by Mr. Grogan for which enrollment discrepancies had been identified, that he removed and caused to be copied *all* SF 2809s and 2810s contained in the OPFs,[9] that he provided copies of those SF 2809s and SF 2810s to Mr. Grogan, and that DX 73 through DX 101 are copies of those forms. Tr. Fritz 967(8-25)-968(1-17). Mr. Grogan considered the SF 2809s and SF 2810s from the OPFs provided to him by OPM. See Grogan Tr. 1157(17-25)-1158(1-5), 1170(15-19), 1252(25)-1253(1-4), 1341(16-17).[10]

HIP criticizes Mr. Grogan for not considering SF 2811s[11] in his sample analysis, but those forms do not define enrollment in the FEHB Program. HIP Br. 27-28. SF 2811s are not

[9] There are several copies of each SF 2809 and SF 2810, including one copy for the enrollee, one copy for the employing office, one copy for enrollee's payroll office, and one copy for the carrier. Stip. ¶ 19. The employing office copy of a SF 2809 or SF 2810 is filed in the enrollee's OPF maintained by the employing office. Stip. ¶ 20, JX 19, at 8; FPM Supp. 890-1, § S13-4f, S13-8b(2) & c(5), JX 11, at 56, 57.

[10] HIP asserts that Mr. Grogan was "alerted to the fact that there was a potential that additional forms may exist in the OPFs" for the twenty-nine members of the subscriber sample for which Mr. Grogan found discrepancies between SF 2809s and/or SF 2810s and HIP's computerized enrollment data. HIP Br. 32. Mr. Grogan, however, did not acknowledge that. His testimony in that regard concerned individuals persons for whom no enrollment documents were located: "I know there are at least some people where we looked, where we found nothing at all. I know there are some transactions for which we do not have forms." Grogan Tr. 1258(6-10).

[11] The carrier copy of a SF 2809 or SF 2810 is sent to the carrier with a transmittal form, the Standard Form 2811 (SF 2811) ("Transmittal and Summary Report to Carrier"). Stip. ¶ 21, JX 19, at 9; FPM Supp. 890-1, § S19-1b, JX 11, at 81.

even filed in a subscriber's OPF.[12] As Mr. Grogan testified, he did not use the SF 2811s because they are a "summary of the documents, principally the SF2809s I think that these summarize, but possibly also the 2810s. So I looked directly at the 2809s and 10s." Grogan Tr. 1225(19-22). HIP employees Valerie Reardon, Courtney Chan, and Harold Miller all testified similarly that the SF 2811s came to HIP with SF 2809s and SF 2810s and that the SF 2811s were used as a control document to verify that all of the SF 2809s and SF 2810s sent were received and processed. Reardon Tr. 93(20-25)-94(1-21); Chan Tr. 245(18-25)-246(1-2); Miller Tr. 285(17-25)-286(1-12). Although certain SF 2811s may have identified the subscriber and action being taken, the information entered in HIP's enrollment database was taken from the SF 2809s and SF 2810s. Mr. Grogan properly confined his analysis to SF 2809s and SF 2810s because they contain the relevant information from which enrollment transactions were processed by HIP.

HIP also questions the fact that Mr. Grogan did not consider information contained in documents generated by the enrollment reconciliation process between HIP and Federal agencies. HIP Br. 28-29. At trial, however, HIP's counsel showed Mr. Grogan PX 111, a reconciliation letter dated October 30, 1995, from Janice Roper (Department of Agriculture) to Mr. Mulryan (HIP). This letter identified 30 individuals that were to be terminated effective September 5, 1995, with the exception of three people with handwritten notations. Mr. Grogan testified that based upon his research, only seven of the 30 individuals on the list of employees were actually terminated effective September 5, 1995, while HIP's enrollment data reflects that 19 individuals

[12] An original and two copies of the SF 2811 are prepared by the employing agency. Stip. ¶ 21, JX 19, at 9; FPM Supp. 890-1, § S19-3a, JX 11, at 81. The original and one copy of the SF 2811 are sent to the carrier. Id. The second copy is retained by the payroll office pending return to the payroll office of the duplicate certified by the carrier. Id.

are actively enrolled in the HIP FEHB Program Plan as of the end of the claim period. Grogan Tr. 1181(4-25)-1184(1-9). It is apparent, therefore, that dates in enrollment reconciliation letters were not used by HIP to process enrollment transactions.[13]

HIP also challenges Mr. Grogan's refusal, in assessing the accuracy of HIP's database, to consider other databases available from Government agencies. HIP. Br. 29. As Mr. Grogan testified, however, the databases available from the Government agencies were untested databases and therefore could not be relied upon as accurate. See Grogan Tr. 1239(1-25)-1240(1), 1340(7-10). Mr. Grogan did not use the other databases available from Government agencies because the data to which HIP's enrollment data should be compared are the original source documents, the SF 2809s and SF 2810s. As Mr. Grogan testified, although an agency database and a plan database may match, this does not necessarily result in them being accurate. For example, both databases could have the same inaccuracy or could have missed the same or

[13] PX 111 is a copy of the October 30, 1995 letter from the Department of Agriculture to HIP that was produced from HIP's files. It contains HIP's Bates numbers HIPNY 003342 to HIPNY 003344. The second page of this typewritten letter contains the statement "The following employees are no longer in your plan, please terminate them." There is a handwritten notation "T. 9-5-95" beside that line. According to Mr. Mulryan, this handwritten notation was put there by the agency and it instructs HIP to terminate the listed employees effective on September 5, 1995. Mulryan Tr. 354(16-23), 362(3-10), 363(10-14). That is not credible. Why would an agency send a typewritten letter to HIP along with a *handwritten* "T. 9-5-95" instead of simply stating "The following employees are no longer in your plan. Please terminate them effective September 5, 1995," if that is what the agency intended? In any event, Mr. Mulryan acknowledged that a person such as Denise Pasquale could have terminated or cancelled her enrollment in HIP's plan on some other date than September 5, 1995, and that if, subsequent to the enrollment reconciliation letter, HIP had received a form terminating Ms. Pasquale's enrollment at an earlier date, HIP would have modified its enrollment records to reflect the earlier termination date. Mulryan Tr. 366(5-9), 367(8-13).

different transactions. Grogan Tr. 1236(3-25)-1237(1).[14]

HIP argues that "[t]he potential for a document to eliminate a discrepancy is not idle speculation." HIP Br. 31. HIP cites four individuals from the sample analyzed by Mr. Grogan as examples of where additional forms had the potential to eliminate discrepancies: D. Pasquale, K. Iadarola, M. Jacquez and H. Byrd. Of these individuals, Mr. Grogan agreed that, based upon additional enrollment forms made available to him from OPFs for K. Iadarola, M. Jacquez, and H. Byrd after his March 28, 2003 report was issued, HIP's enrollment data do not appear to mis-state their enrollment.

Insofar as Denise Pasquale is concerned, however, the additional forms made available to Mr. Grogan do not eliminate the discrepancy identified by Mr. Grogan as to her. According to the HIP data, Ms. Pasquale commenced enrollment in the HIP FEHB Program Plan on January 14, 1990, and was continuously enrolled in the HIP plan until September 5, 1995 (apparently terminated by HIP pursuant to the October 30, 1995 reconciliation letter (PX 111) discussed above. An SF 2809 confirms the start date of January 14, 1990. See DX 37, at 37/222. As of the issuance of Mr. Grogan's March 28, 2003 report, that form was available along with two

[14] In his September 2003 report, Mr. Wills calculated a 1.00 percent premium underpayment for the Postal Service for 1996, based upon a Postal Service database. PX 121, at 17-18. Mr. Wills then compares that underpayment percentage with the underpayment of 0.56 percent calculated by him for 1996 based upon HIP's enrollment data and concludes that this "supports the calculation of a premium underpayment from [HIP's] enrollment records." Id. at 18. In the case of Mr. Wills's analysis of the OPM database, however, just the opposite is true. Mr. Wills calculated a 1.14 percent premium underpayment for OPM for the 1992-1996 period. Id. at 15. The underpayment calculated by Mr. Wills based upon the HIP enrollment data, when expressed as a percentage, is 2.00 percent, which is nearly twice the amount of the underpayment calculated from the OPM database. See Exhibit B to PX 121 (the sum of underpaid premiums calculated by Mr. Wills for 1992-1996 ($6,145,997) divided by the sum of premiums paid for 1992-1996 ($304,962,926)). That comparison does *not* support the calculation of a premium underpayment from HIP's enrollment records.

other SF 2809s. See DX 37, at 37/223 & PX 109. Both of these forms have effective dates of January 10, 1993. However, the two forms indicated enrollments in different health care plans. One SF 2809 (handwritten with signatures), DX 37, at 37/223 (Bates # KPMG00688), indicates that Ms. Pasquale terminated her enrollment in HIP, plan 511, and enrolled in US Health Care New York, plan JC1 effective January 10, 1993. See DX 37, at 37/223. The second SF2809 (type print without signatures), PX 109 (Bates # HIPNY 005500), indicates that Ms. Pasquale terminated her enrollment in US Heath Care New York, plan JC1, and enrolled in HIP, plan 511, also effective January 10, 1993.

Subsequent to Mr. Grogan's March 2003 report, additional SF 2809s and SF 2810s were made available from Ms. Pasquale's OPF. See DX 86, at 86/1, 86/2, and 86/4. The earliest of the three additional forms indicates that Ms. Pasquale was changing her self-only coverage in US Health Care New York, plan JC1, to self and family coverage, plan JC2, as of October 15, 1995. See DX 86, at 86/4. This SF 2809, the first Federal form available after January 10, 1993, supports Mr. Grogan's finding that the handwritten SF 2809 (DX 37, at 37/223) terminating the enrollment of Ms. Pasquale in the HIP FEHB Program Plan as of January 10, 1993, reflects Ms. Pasquale's true enrollment. Therefore, based upon review of the collection of SF 2809s and SF 2810s, Mr. Grogan correctly determined that PX 109 – the unsigned, typewritten form bearing HIP Bates # HIPNY 005500, which was not contained in Ms. Pasquale's OPF – is an incorrect form.

In its post-trial brief, HIP quotes an excerpt of Mr. Grogan's testimony to support its claim that locating additional forms would eliminate discrepancies. The limited quote used by HIP suggests that Mr. Grogan acknowledges that locating additional forms would result in only

finding corrections to identified errors ("there is a potential that if other forms were found, they might . . . eliminate other errors that are identified . . . ." Grogan Tr. 1262(7-14). HIP Br. 31. However, Mr. Grogan's full response to the question "Does this not give you pause to wonder whether there is any other void or new documentation that eliminates any of the other errors you have found in the report?" was "Potentially – and I know that's not a yes or no. I wouldn't say it gave me pause, but I do recognize yes, there is the potential that if other forms were found, they might either eliminate other errors that are identified, or create new errors that are not previously identified." Grogan Tr. 1262(7-14).

HIP asserts that another limitation of data considered by Mr. Grogan in assessing the accuracy of HIP's enrollment database is that Mr. Grogan did not personally review the OPFs for the individuals as to whom he had found discrepancies between FEHB Program enrollment forms and HIP's enrollment data. HIP Br. 32. But Mr. Grogan testified that he "personally did not go back and look at the OPFs" because, "[a]s [Mr. Grogan understood], there is confidential information there [which] is unrelated to my tasks in this case . . . ." Grogan Tr. 1254(5-25)-1255(1-2); see also Grogan Tr. 1255(11-16) ("I'm telling you that I was told there is confidential information included in those that would not be relevant to my analysis, that I should not have access to. So I asked that access be given to somebody who could confirm that, in fact, all of the 2809s and 10s from those OPFs were provided." Mr. Grogan also testified that, while he did not look at the actual OPFs, he reviewed the enrollment forms that were extracted from those OPFs. See Grogan Tr. 1341(16-17). As discussed above, Mr. Grogan relied upon Jay Fritz of OPM to provide him with copies of all SF2809s and SF2810s contained in the OPFs.

(2) HIP's Contention That Mr. Grogan's Analysis Is Inconsistent

HIP contends that Mr. Grogan's sample analysis is inconsistent and should be accorded no weight. HIP Br. 32. Specifically, HIP argues that the analysis should be accorded no weight based on Mr. Grogan's expanded definition of Federal forms to include OPM screen prints and the dependence upon these screen prints in his analysis, dependence on data from Ancestry.com, and Mr. Grogan's revised calculation at trial.

HIP claims that Mr. Grogan expanded his definition of Federal forms to include OPM screen prints and that he relied upon the screen prints in his analysis. HIP 34. As Mr. Grogan testified that "originally, as of the time of my March [2003] report, I did look at those [screen prints], as well. Those were represented to me to be for annuitants the equivalent of the form 2809s." Grogan Tr. 1170(22-24). When asked whether he relied upon information in the screen prints for finding errors, however, Mr. Grogan stated: "Based on the data that is contained in the OPFs, one does not need to rely on the print screens." Grogan Tr. 1171(3-4). The documentation made available from the OPFs subsequent to issuance of his March 2003 report thus allows Mr. Grogan to no longer rely upon data contained within the OPM screen prints to test HIP's data.

Next, HIP argues that Mr. Grogan relied upon data from the Ancestry.com database. HIP Br. 34. Two individuals from the sample of HIP subscribers analyzed by Mr. Grogan are used by HIP to support Mr. Grogan's reliance upon Ancestory.com: L. Rodriquez and T. Schwartz. HIP states that "Mr. Grogan again expanded what he considered authoritative enrollment forms to an on-line commercial database called "Ancestory.com," citing L. Rodriquez and T. Schwartz as examples. Mr. Grogan's final analysis, however, does not rely upon any information obtained

from Ancestry.com.[15]

Next, HIP points out that, at trial, Mr. Grogan made a presentation at the end of which he tried to introduce a revised calculation. HIP Br. 37. The presentation took the Court through his analysis and statistical calculation, which was valid. The revisions that Mr. Grogan introduced at trial were to reflect changes to his analysis based upon forms from the OPFs that were made available to Mr. Grogan subsequent to issuing his March 2003 report. The methodology used by Mr. Grogan did not change.

HIP also contends that Mr. Grogan abandoned his premise that the Federal forms were always correct and therefore ignored an error for S. Jones. HIP Br. 37. HIP's expert, John Wills, made various adjustments to HIP's data in order to calculate premiums due, one of which was to terminate dependents over 22 years of age who were not handicapped. Mr. Grogan's analysis is consistent with that adjustment by Mr. Wills, which, correctly changed subscribers with self-and-family coverage (plan 512) to self-only coverage (plan 511) if the dependents associated with the subscriber were over 22 years of age and not handicapped.

(3) <u>HIP's Contention That Mr. Grogan's Analysis Supports HIP's Claim</u>

HIP argues that the damages calculated by HIP ($9,128,180) are within the confidence range calculated by Mr. Grogan, which, at the 95% confidence level, is from $3.2 million to $9.4 million, resulting in a midpoint estimate of $6.3 million. Grogan Tr. 1279(8-25)-1280(1-12), 1356(15-25). However, within a range in a confidence interval, once a level of confidence is established, one can say that certain values are within the range while others are outside of it,

[15] No evidence has been presented to indicate that the data from Ancestry.com are incorrect. Additional data made available from OPFs subsequent to Mr. Grogan's March 2003 report from the OPFs, supports the data from Ancestry.com.

but one cannot further discriminate between values within the range. Grogan Tr. 1152(23-25)-1153(1-6). As discussed in our initial brief, the midpoint of a confidence interval is the only value within the range of a confidence interval for which, if the interval were constructed narrowly enough that it contained only the midpoint, there is an equal probability that the midpoint value is too high as there is that the midpoint is too low. Grogan Tr. 1155(18-22). The midpoint of $6.3 million for the range of premiums due calculated by Mr. Grogan, thus, is the only value within that range for which, if the confidence interval were narrowed to the extent that it contained just the midpoint, there is an equal chance that the midpoint value is too high as there is that it is too low. The analysis performed by Mr. Grogan demonstrates that the HIP__MAST.DB continues to overstate the amount of premiums due HIP for contract years 1990-1996, even with the adjustments to the sample made by Mr. Grogan subsequent to issuing his March 2003 report. Grogan Tr. 1359(7-12). HIP's $9.13 million underpayment claim for 1990-1996 is overstated.

E. The Measure Of Interest Upon Any Award Of Damages To HIP

HIP seeks "statutory interest on [HIP's] damages from the date it filed its claims until the date judgment is paid." HIP Br. 40. For any damages awarded to HIP as compensation for the alleged underpaid premiums, the measure of interest would be the rate of interest provided for by the Contract Disputes Act (CDA) (a) from January 14, 1997, to the date the judgment is paid upon any part of the judgment is compensation for unpaid premiums for 1988-1994, inasmuch as the certified claim for that period was submitted to the OPM contracting officer on January 14, 1997 (see Stip. ¶ 69) and (b) from February 15, 2001, to the date the judgment is paid upon any part of the judgment is compensation for unpaid premiums for 1995 and 1996, inasmuch as the certified claim for that period was not submitted to the OPM contracting officer until February

15, 2001 (see Stip. ¶ 71). See 41 U.S.C. § 611.[16]

## CONCLUSION

For the foregoing reasons and the reasons set forth in defendant's initial post-trial brief, HIP's premium underpayment claim for 1988 and 1989 lacks merit, its underpayment claim for 1990-1996 is overstated, and its contingency reserve claim should be dismissed for lack of subject matter jurisdiction. Even assuming that the Court has jurisdiction to entertain the contingency reserve claim, the requested equitable relief should not be granted, but if it were, the amount of the required deposit in the contingency reserve should not exceed three percent of any premium underpayment determined by the Court.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John E. Kosloske
JOHN E. KOSLOSKE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., Room 8012
Washington, D.C. 20530
Tele: (202) 307-0282

Attorneys for Defendant

OF COUNSEL:
SUSAN WHITMAN, ESQ.
Office of General Counsel
Office of Personnel Management
1900 E Street, N.W., Room 7353
Washington, D.C. 20410

JANUARY 22, 2004

[16] HIP would not be entitled to recover interest upon the contingency reserve claim, however, because it is not a claim for a sum due and payable to HIP. The CDA's interest clause only provides for interest "on amounts found due contractors . . . ." 41 U.S.C. § 611.