**Nos. 97-187C, 01-148C**
**(Judge Allegra)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**HEALTH INSURANCE PLAN OF GREATER NEW YORK, INC.**

**Plaintiff,**

**v.**

**THE UNITED STATES OF AMERICA,**

**Defendant.**

---

# HEALTH INSURANCE PLAN OF GREATER NEW YORK INC.'S REPLY TO DEFENDANT'S POST-TRIAL BRIEF

---

JEFFREY W. KING
**KING, PAGANO & HARRISON**
1730 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20006
(202) 371-6800
Counsel for Plaintiff Health Insurance Plan
of Greater New York, Inc.

OF COUNSEL
ANDREW B. DAHLINGHAUS
**KING, PAGANO & HARRISON**
1730 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20006
(202) 371-6800

January 22, 2004

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ....................................................................................................1

I. HIP-NY SATISFIED ITS BURDEN OF PROOF REGARDING DAMAGES ................2

II. DEFENDANT'S ATTEMPT TO SUPPLEMENT ITS EXPERT'S OPINION IS IMPROPER ....................................................................................................9

III. THE TABLE 1 REPORTS PROVIDE A MORE THAN ADEQUATE BASIS FOR CALCULATING DAMAGES FOR THE 1988 AND 1989 CLAIM YEARS ................12

A. Defendant And All FEHB Plans Rely On The Table 1 Reports ..........................12

B. The Table 1 Reports Are A Reliable Source Of Enrollment Data........................15

C. Professor Wills Validated The Integrity Of The Table 1 Reports ........................19

D. Professor Wills Used The Table 1 Reports To Ensure Accuracy Of The Calculations ....................................................................................23

IV. THIS COURT SHOULD AWARD HIP-NY ALL UNPAID PREMIUMS, INCLUDING AMOUNTS DEFENDANT FAILED TO DEPOSIT IN HIP-NY'S CONTINGENCY RESERVE..................................................................25

A. HIP-NY's 1997 And 2001 Certified Claims Included HIP-NY's Claims For Unpaid Contingency Reserve Contributions...............................................25

B. HIP-NY's Contingency Reserve Claim Is Not A Claim For Specific Performance ......................................................................................................28

C. Defendant Must Deposit The Full Four Percent Into HIP-NY's Contingency Reserve ........................................................................................30

CONCLUSION.........................................................................................................31

## TABLE OF AUTHORITIES

**PAGE**

**FEDERAL COURT CASES**


Benson v. Tocco, Inc., 113 F.3d 1203, 1209 ....................6

Bluebonnet Savings Bank v. United States, 266 F.3d (Fed. Cir. 2001).................... 3, 7-9, 14, 28

Central Appalachian Coal Co. v. United Mine Workers of America, 376 F. Supp. 914, 927 (S.D.W.V. 1974) ....................6

Cerberonics, Inc. v. United States, 13 Cl. Ct. 415 (1987) ....................26, 27

Contract Cleaning Maintenance, Inc. v. United States, 811 F.2d 586 (Fed. Cir. 1987) ....................27

Delco Electronics Corp. v. United States, 17 Cl. Ct. 301, 319 (1989) ....................2, 30

Franklin F.S.B. v. United States, 55 Fed. Cl. 108, 114 (2003) ....................28, 30

Glendale Federal Bank FSB v. United States, 239 F.3d ....................28

Griffis v. City of Norman, 200 U.S. App. LEXIS 25947 at *24 (10th Cir. October 17, 2000)........6

HEM Research, Inc. v. E.I. Dupont De Nemours & Co., 1990 W.L. 7429 at *3 (E.D. Pa. 1990)....................28, 30

Hughes Communication Galazy v. United States, a47 Fed. Cl. 236, 244 (2000)....................7, 14

In re: CSI Enterprises, Inc., 220 B.R. 687 (Br. Ct. Co. 1998) ....................21, 22

In re: Lake States Commodities, Inc., 271 B.R. 575 (N.D. Ill. 2002) ....................21, 22

International Measurement and Control Co. v. Productronix, Inc., 1983 U.S. Dist. LEXIS 13866 at *14 (N.D. Ill. Sept. 12, 1983)....................10

Locke V. United States, 283 F.2d 521, 524 (Cl. Ct. 1960)....................3

Nemer-Jeep Eagle, Inc. v. Jeep-Eagle Sales Corp., 992 F.2d 430 (2d Cir. 1993) ....................29

R.P. Richard Construction Co. v. United States, 51 Fed. Cl. 116, 125 (2001)....................2, 30

Santiago v. Miles, 774 F. Supp. 775 (W.D.N.Y. 1991)....................10

Teamsters and Employers Welfare Trust v. Gorman Brothers Ready Mix, 139 F. Supp. 2d 976, 981 (C.C. Ill. 2001) ....................10

TransAmerica Insurance Corp. v. United States, 973 F.2d 1572 (Fed. Cir. 1992)....................27

**FEDERAL STATUTES AND REGULATIONS**

48 C.F.R. § 1602.170-13(a)(1) and (d) ....................13

48 C.F.R. § 1652.216-70(b)(2) ....................13

48 C.F.R. § 1602.170-13....................13

48 C.F.R. § 1652.216-70(b)(4) ....................13

5 U.S.C. § 8906....................25

5 U.S.C. § 8909....................26, 29-31

**OTHER**

Restatement (Second) of Contracts § 344 (1981) ....................28

Corbin on Contracts, Damages §§ 990, 992 (1964)....................28

Pursuant to this Court's October 31, 2003 Order, Plaintiff, Health Insurance Plan of Greater New York ("HIP-NY"), respectfully submits this Reply to Defendant's Post-Trial Brief.

## INTRODUCTION

HIP-NY calculated the unpaid Federal Employees Health Benefits Program ("FEHBP") premiums due it on a subscriber-by-subscriber, day-by-day basis. This method easily satisfies the Court's standard of proof that damages be reasonable and non-speculative. Defendant, on the other hand, has failed to provide any alternative calculations to contest the amount of premiums that HIP-NY calculated it was due.

Rather, Defendant's analysis was a limited evaluation of the data used by HIP-NY to calculate the 1990 through 1996 portion of its underpayment claim. That analysis, conducted by Defendant's expert witness, Thomas Grogan, verified that HIP-NY had in fact been underpaid. Defendant failed to analyze any of the other available data to contest the fact that it had underpaid the premiums owed to HIP-NY or the amount of the underpayment. To the contrary, it was HIP-NY who assessed Defendant's payroll data, and that analysis confirmed an underpayment for each of the years reviewed.

As a result, Defendant is relegated to contesting only the amount of the underpayment here, rather than the fact of an underpayment. In its Post-Trial Brief, Defendant raised four basic arguments aimed at minimizing the amount of underpayment now due HIP-NY:

(1) That HIP-NY should be held to a higher standard of proof since the proof of damages also proves the breach, ignoring that an underpayment has already been conceded, at least for the majority of the contract years at issue; (Argument I).

(2) That Defendant should be allowed to supplement its expert's testimony to suggest that the midpoint of its expert's analysis, $6.3 million, is the appropriate amount HIP-NY was

underpaid for 1990 through 1996, ignoring its own expert's testimony that each amount calculated within this range was equally likely to constitute the underpayment (Argument III);

(3) That the Table 1 Reports are not reliable when, in fact, Defendant mandates the preparation of, and uses, these very reports (Argument II); and

(4) That the Court lacks jurisdiction over the contingency reserve portion of the damages, ignoring the law regarding the contingency reserve, as well as the testimony and stipulations admitted at trial (Argument IV).

The facts in this case establish that HIP-NY has more than fulfilled its obligation to calculate reasonable and non-speculative damages. Even Defendant's expert's narrow and flawed analysis verifies that HIP-NY's underpayment amount is within the 99% and 95% confidence intervals. That is more than enough to satisfy HIP-NY's burden to prove that it is owed $12,422,651.

## ARGUMENT

## I.

## HIP-NY SATISFIED ITS BURDEN OF PROOF REGARDING DAMAGES

Ignoring controlling legal precedent, Defendant argues that HIP-NY is held to a higher standard of proof here since proof of damages also proves a breach of contract. Defendant's Brief at p. 14. Defendant's contention is without legal support and ignores the facts already proven in this case. To satisfy its burden of proof regarding damages, a plaintiff must provide a reasonable basis for the computation of its damages that are not speculative. R.P. Richards Construction Co. v. United States, 51 Fed. Cl. 116, 125 (2001); Delco Electronics Corp. v. United States, 17 Cl. Ct. 302, 319 (1989).

The only case cited by Defendant regarding the standard for damages is in a footnote and contradicts Defendant's contention regarding a heightened standard of proof. In that case, Bluebonnet Savings Bank v. United States, 266 F.3d 1348 (Fed. Cir. 2001), the Court held that where "'reasonable probability of damage is clearly established, uncertainty as to the amount will not preclude recovery,' and the Court's duty is to 'make a fair and reasonable approximation of the damages.'" 266 F.3d 1348, 1356-57 (quoting Locke v. United States, 283 F.2d 521, 524 (Cl. Ct. 1960)). Contrary to Defendant's assertion, the Bluebonnet Court never held that a higher standard of proof should be imposed if the proof of damages also proves a breach.

HIP-NY has certainly satisfied its burden of proof under the Bluebonnet standard for damages. HIP-NY established that the contracts in issue were breached when Defendant underpaid it for contract years 1988 through 1996. Defendant's own expert testified that HIP-NY was underpaid premiums for contract years 1990 through 1996. Tr. at 1280/7-17 (Grogan). Moreover, payment data obtained from two of Defendant's own agencies, the Office of Personal Management ("OPM") and the United States Postal Service ("USPS"), revealed that HIP-NY was underpaid. Tr. at 587/2-588/3, 591/10-594/2 (Wills). Defendant never challenged this analysis or its results.

To the extent Defendant attempts to argue that its concession of a breach applies only to the 1990 to 1996 portion of the claim, there is ample independent proof of a breach in 1988 and 1989. As explained more fully below (see Argument III, supra), the Table 1 Reports provide reliable enrollment data to determine an underpayment. The Table 1 Reports were prepared from the meticulously entered and maintained enrollment database that HIP-NY's witnesses described. See HIP-NY Pre-Trial Brief at 6-12, 17-18, and testimony cited therein. Defendant never challenged any of that testimony or evidence. Both Defendant and HIP-NY used the data

in the Table 1 Reports for a variety of reasons and analyses. See Argument III.A, supra. In calculating the damages, Prof. Wills tested for, and took into account, any fluctuation in enrollment. Tr. at 1471/21-1476/6 (Wills). Using the Table 1 Reports, Prof. Wills was able to calculate the premiums due for 1988 and 1989. The amount of premiums due, when compared to the stipulated amount of premiums paid, showed a consistent underpayment in both 1988 and 1989. PX 121 (Sept. 8, 2003 Rpt. of J. Wills) at p. 4.

In the face of this evidence, Defendant provided no alternative analyses or calculations. Rather, it simply argued that the Table 1 Reports were not a reliable basis upon which to calculate damages. Yet, Defendant mandates that carriers, including HIP-NY, prepare Table 1 Reports for every quarter that the carrier participates in the FEHBP.

There is also substantial evidence corroborating the Table 1 Report analysis that Defendant breached its FEHBP contracts and underpaid HIP-NY. First, the evidence in this case proved that Defendant systematically underpaid community-rated carriers such as HIP-NY. Defendant's own witnesses testified that there was an underpayment in the FEHBP. Tr. at 895/5-10 (Kitchak); see PX 118 (Fritz Dep.) at p. 40/1-11 (characterizing the underpayment as "slippage"). In addition, Defendant repeatedly admitted in internal memoranda that there is a systematic underpayment to carriers, such as HIP-NY, that provide benefits under the FEHBP. In a study undertaken in 1991, OPM reached a conclusion that "[i]n some cases, it appears that the money they [the carriers] receive is less than it should be." PX 68 (Health Benefits Reconciliation Task Force, Summary of Findings and Recommendations (8/14/91)) at pp. 1, 3. The report continued to explain that individuals on leave without pay ("LWOP") contributed to these underpayments. Id. at 6; Tr. at 895/5-10 (Kitchak). There were subscribers on LWOP in 1988 and 1989.

Similarly, the Department of Justice, in response to other cases filed to collect unpaid FEHBP premiums for the same contract years at issue here, admitted that underpayments were occurring.

> OPM's analyses of the Federal Employees Health Benefit Program (FEHBP) to date provide strong evidence that substantial underpayments are occurring.
>
> * * *
>
> In addition, the independent and statistical analysis performed [in another case] demonstrated that underpayments within the FEHBP probably are substantially larger than contemplated by either the carrier or the government.

PX 73 (Letter to M. Holmes from J. Kijewski (2/18/94)). This evidence of a systematic underpayment is consistent with the Table 1 Report analysis. In fact, the underpayment percentage calculated using the Table 1 Reports for 1988 and 1989 is consistent with underpayment percentages calculated in similar cases for those two years. Specifically, the Table 1 analysis showed an underpayment of 3.08% for 1988 and 3.24% for 1989. The national average was 2.23% in 1988 and 3.54% in 1989. Compare DX 103 (June 2, 2003 Rpt. of J. Wills) at pp. 3-4 and attachment with PX 121 (Sept. 8, 2003 Rpt. of J. Wills) at Exhibit A.

The record also reveals that an outside accounting firm, KPMG, audited the FEHBP in 1996 and found payment discrepancies. The auditors found a persistent discrepancy between the premium amounts recorded as "payables," that is, the premiums owed the carriers, and the amount recorded as a "receivable" that is the premiums collected to pay the carriers. PX 97 (KPMG Audit of OPM Benefit Plans) Vol. 3 at 97-32. For example, the auditors found for just one year, for just the OPM annuitants, there was a $34 million discrepancy between what was owed FEHBP carriers (the payable) and the $157 million collected to pay the carriers (the

receivable). Id. This represents a 2.2% discrepancy, which is consistent with the discrepancy found in this case.[1]

Finally, Defendant, through its own expert witness, conceded that HIP-NY was underpaid premiums for contract years 1990 through 1996. Tr. at 1280/7-17 (Grogan). There is no basis to assume that the underpayment suddenly began in 1990. To the contrary, Defendant's internal documents concede the existence of an underpayment in the 1980's. PX 68 (Health Benefits Reconciliation Task Force, Summary of Findings and Recommendations (8/14/91)) at pp. 1-3, 6.

The courts have recognized the evidentiary value of a consistent or pervasive pattern of conduct. Such a pattern can serve as evidence supporting a breach of contract claim. c.f. Central Appalachian Coal Co. v. United Mine Workers of America, 376 F. Supp. 914, 927 (S.D.W.V. 1974)(considering past breaches of contract to determine whether to issue an injunction); see also Griffis v. City of Norman, 200 U.S. App. LEXIS 25947 at *23-25 (10th Cir. October 17, 2000)(finding a pattern of discrimination as evidence of current discrimination); see also Benson v. Tocco, Inc., 113 F.3d 1203, 1209 (11th Cir. June 2, 1997)(finding that a pattern of terminating older employees was relevant to show age discrimination). The evidence in this case, showing chronic underpayment in the FEHBP, certainly corroborates HIP-NY's Table 1 analysis and corresponding conclusion that Defendant breached its FEHBP contracts for contract years 1988 and 1989 by underpaying the premiums due.

Moreover, Defendant acknowledged that the underpayments were pervasive and unabated. In 1997, Defendant added an additional one percent to the FEHBP rates to account for these underpayments. PX 77 (FEHBP Letter to Community Rated Plans dated 10/11/96) at 1997

---

[1] In another instance, the auditors discovered that USPS had a past due amount of $400 million in FEHBP premiums "which was overlooked by [OPM] for eleven months." PX 98 (KPMG Audit of OPM Benefit Plans) Vol. 4 at 98-44.

Contract Amendments, pp. 6-7. The load factor did not eliminate underpayments. Rather, it simply compensated carriers such as HIP-NY each year going forward for the inevitable and systematic underpayment that continue to occur. PX 77 (FEHBP Letter to Community-Rated Plans dated 10/11/96) at p. 1. Defendant even acknowledged that it would not have agreed to this load factor unless there was a systematic underpayment in the FEHBP. See PX 118 (Fritz Dep.) at p. 40/1-11 (referring to underpayment as "slippage").

Accordingly, the only evidence introduced at trial showed that HIP-NY was underpaid in 1988 and 1989. Not only was an underpayment established by HIP-NY's analysis of the Table 1 Reports, but that analysis was corroborated by the consistent pattern of underpayments in the FEHBP for the contract years at issue, 1988 through 1996. Since a "reasonable probability" exists that Defendant breached the FEHBP contracts by underpaying premiums, the only issue is whether HIP-NY has provided a "fair and reasonable approximation of the damages." Bluebonnet, 266 F.3d at 1357.

The evidence introduced by HIP-NY regarding damages satisfied that burden. This Circuit has recognized that reliance on business records that were admitted into evidence constitutes a reasonable basis for calculating damages. Bluebonnet Savings Bank v. United States, 266 F.3d 1348, 1357 (Fed. Cir. 2001); Hughes Communications Galaxy v. United States, 47 Fed. Cl. 236, 244 (2000). For example, in Bluebonnet Savings Bank, a case relied upon by Defendant, damages were based on an internal memorandum, entitled the "Memo Account," that documented the amounts plaintiff expended as a result of the defendant's breach of one of the contracts at issue. The trial court rejected the document as the bases for determining damages because the sponsoring witness "was unable to fully explain the basis of all the costs set out in it." Bluebonnet, 667 F.3d at 1357. The Federal Circuit reversed the decision, finding that the

evidence showed it to be a business record prepared "in the normal course of business." Id. As a business record, the Court did not find the inability of the sponsored witness to explain the basis of all the costs to be fatal. Rather, the Court ruled that the document "meets the reasonable certainty test" for calculating damages. Id.

Here, like the plaintiff in Bluebonnet, Prof. Wills calculated the damages for both contract years 1988 and 1989 and 1990 through 1996 based upon business records that were introduced into evidence at trial—the HIP-NY enrollment data (PX 103) and the Table 1 Reports (JX 15). As several HIP-NY witnesses testified at trial, HIP-NY meticulously entered and maintained these data. See HIP-NY's Brief at pp. 6-11 and the Exhibits and Testimony cited therein. Moreover, the integrity of these data were essential to the successful operation of HIP-NY's business. Tr. at 393/1-394/15, 394/11-395/25 (Chappelear); Tr. 114/9-115/3 (Reardon). Indeed, in the event HIP-NY failed to maintain accurately its enrollment data, its entire commercial operation would be financially unsound. Tr. at 394/11-395/25 (Chappelear).

Based on these business records, Prof. Wills calculated the premiums due it for 1990 through 1996 for each subscriber for every day the subscriber was enrolled. See Tr. 576/20-577/8, 583/5-584/1, 584/2-8, 584/15-24 (Wills). Defendant does not dispute the methodology or the premium rates used by Prof. Wills. Tr. at 1132/16-1133/5, see 1121/1-1122/6, see also 1123/21-1124/18 (Grogan).

Similarly, using the enrollment reported in the Table 1 Reports, Prof. Wills multiplied the total number of subscribers by the total number of days in each quarter times the daily rate to determine the premiums due for 1988 and 1989. Tr. at 550/7-551/6 (Wills). The premiums due were then compared to the stipulated payments for 1988 and 1989 to determine the underpayments due HIP-NY. Such calculations are more than just a "fair and reasonable

approximation of the damages." Bluebonnet Savings Bank, 667 F.3d at 1356-57. Rather, they are precise calculations of the damages.

## II.

## DEFENDANT'S ATTEMPT TO SUPPLEMENT ITS EXPERT'S OPINION IS IMPROPER

Defendant attempts to minimize the effect of its expert's concession of liability by improperly trying to supplement that testimony. Specifically, Defendant's expert, Mr. Grogan, determined that he was ninety-five percent confident that HIP-NY was underpaid an amount between $3.2 million and $9.4 million for contract years 1990 through 1996. Tr. at 1280/7-17 (Grogan). Prof. Wills' calculation for that same period yielded an underpayment amount of $9.128 million, a number that is within Mr. Grogan's calculated range. Tr. at 1280/7-12 (Grogan).[2]

To minimize the effect of this concession, Defendant suggests that the $6.3 million midpoint of Mr. Grogan's range is the most reliable number within the range of underpayment provided by Mr. Grogan. Defendant's Brief at pp. 31-32. There was, however, no evidence at trial to support this contention. To the contrary, Defendant's new assertion is contradicted by Mr. Grogan's testimony.

Specifically, Mr. Grogan compared the enrollment data for a sample of subscribers in HIP-NY's enrollment database to select government forms. For any discrepancy between the HIP-NY enrollment data and the forms, Mr. Grogan assumed the HIP-NY data to be in error. Tr. at 1245/24-1246/4 (Grogan). Using a statistical analysis, Mr. Grogan calculated a range of the underpayments. Mr. Grogan testified that "the true value of premium underpayments would fall

[2] Mr. Grogan also verified that HIP-NY's damage calculations were within the bounds of the ninety-nine percent (99%) confidence interval. See Tr. at 1151/9-14 (Grogan).

somewhere within that range, according to this statistical test." Tr. at 1150/25-1151/7 (Grogan). Mr. Grogan testified that it was equally likely that any number within the range of underpayments was the amount HIP-NY was underpaid, including the amount calculated by Prof. Wills. Tr. at 1152/23-1153/6, 1280/18-25 (Grogan). Mr. Grogan never testified that the midpoint of that range was the most accurate underpayment amount for contract years 1990 through 1996.

The Courts have consistently held that parties may not introduce additional evidence in their post-trial briefs to support their contentions. Teamsters and Employers Welfare Trust v. Gorman Brothers Ready Mix, 139 F. Supp. 2d 976, 981 (C.D. Ill. 2001) (rejecting affirmative defense raised for the first time in a post-trial brief on the grounds that it resulted in an unfair surprise to opposing counsel, who would have no opportunity to respond); International Measurement and Control Co. v. Productronix, Inc., 1983 U.S. Dist. LEXIS 13866 at *14 (N.D. Ill. Sept. 12, 1983)(rejecting argument made for the first time in post-trial brief).

For example, in Santiago v. Miles, 774 F. Supp. 775 (W.D.N.Y. 1991), the defendants attempted to challenge the plaintiffs' expert witness' conclusion by raising claims that the analysis "excluded factors," "failed to account for" certain factors, was designed to "yield results favorable to the plaintiffs," and contained certain "trivial" mistakes. Id. at 799-800. The court rejected these challenges because the defendants failed to raise these issues at trial, making these arguments for the first time in the defendants' post-trial brief. Id.

In the instant case, Defendant is not only supplementing, but contradicting its expert's testimony. Specifically, Mr. Grogan testified at trial that it was equally likely that any number within the range, not just the midpoint, was the amount HIP-NY was underpaid. Tr. at 1152/23-1153/6, 1280/18-25 (Grogan). In its Brief, Defendant conveniently disavows its expert's

conclusion and instead argues that the mid-point of Mr. Grogan's confidence interval is the correct measure of damages.

Not only is there no evidence to support Defendant's new contention, Mr. Grogan did not accurately calculate the range of underpayments, much less the midpoint. As explained more fully in HIP-NY's opening brief, Mr. Grogan ignored available information and data, and failed to follow his own parameters for his analysis. HIP-NY's Brief at pp. 29-35. For example, Mr. Grogan considered the enrollment after 1995 of Mr. Theodore Schwartz to be an error, notwithstanding that there was no federal form identifying any error. Compare DX 37 (Mar. 28, 2003 Rpt. of T. Grogan) at Appendix 12 with DX 100 (Documents Pertaining to T. Schwartz). Similarly, Mr. Grogan contended that HIP-NY erred by extending the enrollment of another sample enrollee, Mr. Allen Cook, by thirty-one days when, in fact, the Federal form in question required such coverage. Compare DX 37 (Mar. 28, 2003 Rpt. of T. Grogan) at Appendix 12 with DX 82 (SF2810 for Allen Cook). Mr. Grogan also failed to take into account appropriate family coverage for a number of individuals in his sample. See e.g. Tr. at 1268/24-1271/9, 1323/18-1327/24 (Grogan); PX 129 (federal enrollment forms for Mr. Jones). Correcting just these errors in Mr. Grogan's analysis would substantially shift the range and the midpoint to higher numbers. PX 131 (Chart Illustrating Midpoint); Tr. at 1463/15-1465/22 (Wills).

Neither the parties nor the Court need guess at the proper midpoint or to approximate where within the range of damages calculated by Mr. Grogan the proper amount lies. Prof. Wills did a precise calculation for the 1990 through 1996 underpayments. The calculation involved a subscriber-by-subscriber, day-by-day calculation showing that Defendant underpaid HIP-NY by $9,128,180 for contract years 1990 through 1996.

## III.

## THE TABLE 1 REPORTS PROVIDE A MORE THAN ADEQUATE BASIS FOR CALCULATING DAMAGES FOR THE 1988 AND 1989 CLAIM YEARS

In its Brief, Defendant distances itself from the very Table 1 Reports that OPM mandates that every carrier prepare for every quarter that they participate in the FEHBP. Defendant's Brief at Argument II. Prof. Wills used the Table 1 Reports to calculate damages for claim years 1988 and 1989. Defendant, however, provided no analyses calling into question the reliability of the Table 1 Reports as a basis of calculating damages.

Having failed to undertake any analyses of the Table 1 data or the calculations undertaken by Prof. Wills, Defendant raises anecdotal contentions, all of which are contradicted by the evidence in the record. These arguments consist of: (a) Defendant's attempt to minimize its own reliance upon the Table 1 Reports, ignoring the testimony of its own witnesses at trial; (b) Defendant's assertion that a document stressing concern regarding reconciliation shows the Table 1 to be unreliable, ignoring testimony that explains the document; (c) Defendant's contention that Prof. Wills failed to assess the accuracy of the data, ignoring the analyses he undertook and the alternative calculations that validate the reasonableness of the Table 1 calculations; and (d) Defendant's implication that Prof. Wills used the Table 1 analysis to increase the 1988 and 1989 claim, when, in fact, the evidence shows that the claim based on the archived enrollment data was greater.

### A. Defendant And All FEHBP Plans Rely On The Table 1 Reports

Contrary to Defendant's contention that Defendant "does not place significant reliance upon Table 1 Reports," the trial testimony showed quite the opposite to be true. Defendant's

Brief at 21. Defendant's own witnesses testified that Defendant relies on Table 1 Reports in several aspects of its management of the FEHBP. Specifically, a health plan's FEHBP rates are subject to two periodic reviews. The carrier annually reconciles the FEHB rates, and Defendant periodically audits the rates of each carrier under the FEHBP. A basic premise of both rate reconciliation and audits are to ensure that the premiums the federal government pays are a fair market rate. 48 C.F.R. § 1602.170-13(a)(1) and (d); see also 48 C.F.R. § 1652.216-70(b)(2). To determine whether the rates are fair, the FEHBP rates are compared to the rates of two similarly sized subscriber groups ("SSSGs"). 48 C.F.R. § 1602.170-13. If the FEHBP rates are higher than those of the SSSGs, the carrier owes the difference to Defendant. If, on the other hand, the FEHBP rates are lower, Defendant is required to reimburse the carrier for the difference in the rates. 48 C.F.R. § 1652.216-70(b)(4).

Defendant's witnesses, Dennis Black, Associate Director of Audits, and Nancy Kitchak, Deputy Associate Director, Center for Work Force Planning and Policy Analysis, testified that participating health plans were required to use Table 1 Reports to identify the SSSGs. Tr. at 707/20-708/6 (Black); Tr. at 872/14-873/3, 876/4-877/25 (Kitchak). Mr. Black further testified that Defendant annually questions hundreds of millions of dollars in rates and that the vast majority of the questioned rates are the result of the difference between the FEHBP rates and the rates charged the SSSGs. Tr. at 708/1-711/15 (Black). Based on the testimony of Defendant's witnesses, therefore, the Table 1 Reports are an accurate enough measure of a carrier's enrollment to be used during reconciliation and during the audit of hundreds of millions of dollars in FEHBP rates every year. The facts proven at trial also show that Defendant uses the Table 1 Reports for a variety of other statistical analyses, including reports to Congress. Tr. at 907/5-18 (Kitchak).

HIP-NY's Vice President and Chief Actuary, Leslie Strassberg, verified that the parties "used the Table 1 Reports" to "identify the two employee groups that are most similar in size to the federal employees group" in the rate reconciliation process. Tr. at 511/19-513/8 (Strassberg). This lends further credence to the Table 1 Reports as a means for calculating underpayments for 1988 and 1989 contract years. The fact is that Defendant mandates that every plan that participates in the FEHBP prepare Table 1 Reports every quarter. Tr. at 511/2-15 (Strassberg). Failure to produce the Table 1 Reports would be a violation of the health plan's contractual duties. JX 1-3 at § 1.3, JX 4-10 at § 1.4 (FEHBP Contracts for 1985 and 1988 through 1996).[3]

Finally, it is undisputed that the Table 1 Reports are business records prepared in the normal course of business pursuant to the requirements of the FEHB contracts at issue. See JX 15 (Table 1 Reports); Tr. at 511/2-15 (Strassberg). The enrollment data on the Table 1 Reports were obtained from HIP-NY's enrollment database and were utilized by HIP-NY in the normal course of business. Tr. at 511/2-15 (Strassberg); Tr. at 544/8-545/8 (Wills). The courts have found such business records to be a reliable source to calculate damages in similar circumstances. Bluebonnet Savings Bank v. United States, 266 F.3d 1348, 1357 (Fed. Cir. 2001); Hughes Communications Galaxy v. United States, 47 Fed. Cl. 236, 244 (2000).

---

[3] Defendant contends that the Table 1 Reports are not used to determine a plan's enrollment when computing adjustments to the rates part of an annual rate reconciliation process. To explain, if a rate adjustment is needed in reconciliation or in an audit, the amount of the rate adjustment is multiplied by the enrollment to determine the total amount due the health plan or Defendant. At trial, HIP-NY proved that the adjustment is based upon enrollment as set forth in the "March 31 Headcounts." DX 113-9 (1990 Reconciliation Instructions); DX 112 (1989 Reconciliation Instructions). Ms. Kitchak contended that OPM headcounts, not the Table 1 Reports, were the "March 31 Headcounts" identified in the regulations. During cross-examination, however, Ms. Kitchak was forced to admit that the OPM headcounts identified the enrollment as of the latter part of February or the first part of March of each year, not March 31 of that year. Tr. at 896/1-897/3, 903/1-7 (Kitchak); JX 18 (1995 Administrative Kit); JX 17-175 (1992 Administrative Kit). The only "March 31 Headcounts" are the Table 1 Reports. As a result, the Table 1 Reports were properly used to calculate enrollment and complied with the regulations mandating the use of the "March 31 Headcount."

Accordingly, Defendant mandates the preparation of, and relies on the Table 1 Reports for a variety of reasons, including to identify the SSSGs, the single most important aspect in reconciling and auditing rates that annually affect hundreds of millions of dollars in premiums. Nonetheless, Defendant incredulously claims that it can rely on the Table 1 Reports for all these purposes, but that Table 1 Reports are not sufficient to calculate damages in this case.

**B. The Table 1 Reports Are A Reliable Source Of Enrollment Data**

Relying on a document prepared in 1991 in response to an audit of HIP-NY's FEHBP rates, Defendant contends that HIP-NY previously admitted that its enrollment data were inflated and inaccurate during 1988 and 1989. Defendant's Brief at p. 23. As proven at trial, HIP-NY did express concern in 1991 that the various employing agencies of Defendant were not reconciling the enrollment and, therefore, HIP-NY's enrollment data may have included individuals who should have been terminated. See Tr. at 374/14-19 (McLaughlin). Defendant's contention, however, ignores the other portions of the testimony at trial.

James McLaughlin, Managing Director of Billing and Medicare Reconciliation, testified that HIP-NY's initial fears that enrollment may have been inflated were incorrect. He testified that, even after having achieved 100% reconciliation, HIP-NY continued to suffer a consistent underpayment. Tr. at 374/25–376/2 (McLaughlin). Defendant's own witnesses acknowledged that they expected that there should be little, if any, underpayment if HIP-NY and Defendant reconciled their enrollments. See Tr. at 737/18-738/16 (Patterson). As a result, and as verified by Defendant's witnesses, an underpayment could not be explained by enrollment discrepancies when there is 100% reconciliation.

Moreover, the testimony at trial revealed that the enrollment reconciliation process did not necessarily result in reduction in enrollment. William Mulryan, the HIP-NY Enrollment

Reconciliation Clerk, testified that enrollment reconciliation often resulted in adding as many, if not more, federal subscribers than would be terminated. Tr. at 345/5-348/7, 351/16-352/25 (Mulryan). Defendant provided no evidence to counter this testimony.

In its Brief, Defendant cites to a single reconciliation letter claiming that the letter indicated that twenty-nine individuals were terminated from HIP-NY with only one new enrollment added. See JX 16 (Reconciliation Letter 4/14/89). Defendant's characterization of this exhibit is very misleading.[4]

First, HIP-NY's Enrollment Reconciliation Clerk, Mr. Mulryan, explained that HIP-NY would compare the namelist it received from the employing agencies to HIP-NY's enrollment records. HIP-NY then prepared a letter to each agency "showing the discrepancies from the reconciliation" of the agency namelist to HIP-NY's enrollment records. Tr. at 341/13-343/3 (Mulryan). The employing agencies and HIP-NY would then resolve these discrepancies by either sending a response to HIP-NY's list, sending back a marked-up copy of HIP-NY's letter or by instructing HIP-NY over the telephone. Tr. at 345/5-346/1, 349/18-351/5 (Mulryan).

The document cited by Defendant, JX 16, is HIP-NY's reconciliation letter identifying the discrepancies, not the actual resolution of those discrepancies. To determine how the discrepancies were actually resolved, Defendant must cite to a letter back from the employing agency or a copy of the HIP-NY letter marked up by the agency or by HIP-NY identifying a resolution to the discrepancies. Tr. at 345/5-346/1, 349/18-351/5 (Mulryan). Defendant understood this when its counsel cross-examined HIP-NY's Enrollment Reconciliation Clerk, Mr. Mulryan:

---

[4] To avoid confusion, the date Defendant subscribes to the letter, April 16, 1989, is incorrect. The date of the letter is April 14, 1989. See JX 16 (Reconciliation Letter 4/14/89).

> Q. The first page of Joint Exhibit 16 contains an item that says Termination. Persons listed on page 5 (sic) are not on HHS, Department of Health and Human Service, file. Do you see that?
>
> A. Yes. I do.
>
> Q. You testified that before the enrollment reconciliation process you notified an agency in a situation where your file showed certain people enrolled, but the Agency's records showed persons not being enrolled at the time. Could you tell us what happened if the Agency didn't respond? What would you do?
>
> * * *
>
> A. We usually gave a 30 day period, and after 30 days we would terminate based on the date of their reconciliation [list] to us.
>
> Q. So in the case of Joint Exhibit 16, their reconciliation is a reference to the health benefits reconciliation report as of November 5, 1988.
>
> A. Correct.
>
> Q. <u>*So if DHHS had not responded to this letter*</u> within 30 days, the practice would have been to drop the 29 individuals from HIP's rolls effective November 5, 1988.
>
> A. Yes.
>
> Q. <u>*Now when an agency did respond to one of these reconciliation letters*</u> in a situation where HIP's rolls indicated a person was enrolled, the agency's files indicated the person was not enrolled, I believe it was your testimony that you would follow the agency's instruction as to when to terminate the individual?
>
> A Yes. Yes. For the termination dates, yes.

Tr. at 359/1-360/9 (Mulryan) (emphasis added).

Defendant never bothered to determine whether DHHS had in fact responded to HIP-NY's reconciliation letter. Fortunately, the record in this case provides at least a partial answer. The reconciliation letter in JX 16 is also part of PX 43, which was admitted into evidence in this

case. Exhibit PX 43 contains additional documents resolving some of the discrepancies. For example, Ann Kepich is listed as being on HIP-NY's enrollment list, but not DHHS's list. JX 16 (Reconciliation Letter 4/14/89) at p. 2. Exhibit PX 43 includes a HIP-NY form dated April 18, 1989, showing Ms. Kepich transferred from DHHS to the Defense logistic agency. PX 43 (Reconciliation Letter 4/14/89 and attached forms). Similarly, PX 43 includes a HIP-NY form that appears to be dated July 13, 1989, showing that Mildred Polite transferred from DHHS to the Department of Labor. Id. This form also indicates that Ms. Polite's new agency "never forwarded" the federal forms to effectuate the transfer. Id.; also see PX 43 at forms for E. Romani, M. Fraser, K. Heim. These individuals were not terminated from HIP-NY, as Defendant implies, but simply transferred to new employing agencies. Yet, Defendant ignores the documents originally attached to JX 16 and attempts to imply misleadingly that all twenty-nine individuals were terminated. Defendant's Brief at p 24.

Accordingly, Defendant's citation to a single reconciliation letter does little to counter the testimony and a substantial number of reconciliation letters that illustrate the reconciliation process often added as many or more new enrollees as were terminated. There were hundreds of reconciliation letters over the course of the 1988 through 1996 claim years. In fact, many of those letters indicate that the majority of transactions that took place during enrollment reconciliation were new enrollments or agency transfers, not terminations. Tr. at 347/10-348/13, 350/11-352/25 (Mulryan); see also e.g., PX 45 (Reconciliation Letter 1/16/92); PX 46 (Reconciliation Letter 7/18/95); PX 111 (Reconciliation Letter 10/30/95). For example, in PX 45, thirteen new subscribers were added from the reconciliation letter, while only five subscribers were terminated. Tr. at 345/5-349/11 (Mulryan). Defendant has provided no creditable evidence to counter this fact.

As a result, the lack of reconciliation that concerned HIP-NY in the early 1990's would not have inflated its enrollment. This was born out by the fact that, even after having achieved 100% reconciliation, HIP-NY continued to suffer a consistent underpayment. Tr. at 374/25–376/2 (McLaughlin).

## C. Professor Wills Validated The Integrity Of The Table 1 Reports

Ignoring the testimony at trial, Defendant asserts that Prof. Wills did nothing to analyze the reliability of the Table 1 Reports and that the resulting calculations, therefore, should be discounted. Defendant's contention is both factually and legally barren.

In an attempt to justify its contention, Defendant quotes Prof. Wills' testimony out of context. The testimony identified by Defendant in its Brief concerns Prof. Wills verifying his deposition testimony regarding his initial review of the Table 1 Reports. See Defendant's Brief at 15-16. Defendant contends that the testimony illustrates how Prof. Wills failed to validate the source and reliability of the Table 1 Reports.

Defendant's argument is, at best, baseless. Defendant fails to cite Prof. Wills' testimony in which he explains that, before he issued his final report and testified, he took numerous steps to validate the source and reliability of the Table 1 Reports. Tr. at 545/1-547/16 (Wills); PX 121 (Sept. 8, 2003 Rpt. of J. Wills) at pp. 3-4. Prof. Wills verified that the Table 1 Reports were produced from the HIP-NY enrollment database. PX 121 (Sept. 8, 2003 Rpt. of J. Wills) at pp. 3-4. This assured Prof. Wills that the data contained on the Table 1 Reports were reliable, as they were obtained directly from the HIP-NY enrollment database that previous witnesses testified were so meticulously entered and maintained.

Prof. Wills also verified that the Table 1 Reports were, in fact, used by HIP-NY and Defendant in their management of the FEHBP. PX 121 (Sept. 8, 2003 Rpt. of J. Wills) at p. 4.

The parties' reliance upon the Table 1 Reports also supported Prof. Wills' determination that the Table 1 Reports were reliable to calculate the premiums due. Prof. Wills also considered the fact that the Reports were prepared "in response to OPM requirements." Tr. at 642/21-643/6 (Wills); see PX 121 (Sept. 8, 2003 Rpt. of J. Wills) at p. 4. Prof. Wills further testified that he interviewed HIP-NY personnel to verify these facts and the reliability of the data in the Reports. Tr. at 642/21-643/13 (Wills); PX 121 (Sept. 8, 2003 Rpt. of J. Wills) at pp. 3-4. Prof. Wills also verified that any fluctuation in annual enrollment was accounted for in his calculation of an underpayment for contract years 1988 and 1989. Tr. at 1471/21-1476/6 (Wills).[5]

In addition, Prof. Wills calculated the underpayments for 1988 and 1989 using two alternative methodologies that further verified the reasonableness of the amount calculated using the Table 1 Reports. As Defendant noted in its Brief, Prof. Wills developed a national average based upon approximately fifteen prior underpayment claims for which he had available data. DX 103 (June 2, 2003 Rpt. of J. Wills), at pp. 3-4. The underpayment percentages for the national averages were very close to the underpayment percentages determined using the Table 1 Reports. Compare DX 103 (June 2, 2003 Rpt. of J. Wills) at pp. 3-4 with PX 121 (Sept. 8, 2003 Rpt. of J. Wills) at pp. 4-5. Accordingly, the national average calculation ($2.46 million) confirmed the reasonableness of the amount calculated under the Table 1 Reports ($2.82 million). Id.

Similarly, Prof. Wills also calculated 1988 and 1989 underpayments by applying HIP-NY's average underpayment percentage for 1990 through 1996 to the 1988 and 1989 payments. This rendered a $1.94 million underpayment, further verifying the Table 1 Reports were a

[5] Defendant's own witnesses verified the lack of any fluctuation in the enrollment after the January open season. See e.g. Tr. at 880/17-23 (Kitchak).

reasonable basis from which to calculate damages. DX 103 (June 2, 2003 Rpt. of J. Wills), at pp. 3-4. Prof. Wills testified that he used the Table 1 Report methodology because it was based upon actual HIP-NY enrollment data and allowed him to calculate the actual premiums due and compared the premiums due to the premiums paid as stipulated by the parties. Tr. at 642/21-643/6; PX 121 (Sept. 8, 2003 Rpt. of J. Wills) at pp. 3-5.

Finally, Prof. Wills also was able to compare the calculation to the amount previously calculated using the archived IPMF data. Although Prof. Wills was concerned that those data may have been incomplete, they did provide some guidance as to what had been initially calculated. The record in the case showed an underpayment of $3.74 million based on the archived IPMF data. DX 68 (HIP-NY Workpaper re: "HIP-NY FEHBP 1988-1996 Underpayments").[6] Accordingly, Prof. Wills took extensive steps to verify the reliability of the Table 1 Reports.

The case law cited by Defendant to support its contentions, two bankruptcy court cases, is readily distinguishable from the facts in the instant case. Specifically, Defendant cites In re: Lake States Commodities, Inc., 271 B.R. 575 (N.D. Ill. 2002) and In re: CSI Enterprises, Inc., 220 B.R. 687 (Br. Ct. Co. 1998), claiming both of these cases required the "testing" of data before they could form the bases of an expert's opinion. Defendant's Brief at p. 17. Neither case stands for that proposition.

---

[6] The supporting document for the original calculation for 1988 and 1989 included a payment amount for 1988 as reported by Defendant. HIP-NY subsequently determined that OPM provided incomplete payment data for 1988, similar to its failure to provide complete data for 1996. As a result, HIP-NY adjusted the 1988 payment from the $35,348,371.91, the amount originally identified in Defendant's Response to HIP-NY's Requests for Admissions, to $37,278,970.28, the amount that the parties ultimately stipulated to prior to trial. Pre-Trial Stipulations at ¶ 60.

In Lake State Commodities, Inc., the bankruptcy trustee hired an expert to evaluate whether the bankrupt investment group had conducted a Ponzi scheme and whether the investment group was insolvent at the time it made certain payments to select investors. 271 B.R. at 580. The expert based his analysis upon an internal report of each investor's investments, called the "Net Cash Report," and a report prepared by an accounting firm, the "KPMG Report." Id. at 579-80. The bankruptcy court, however, determined that these reports were inadmissible. Id. The court nonetheless admitted the expert's report, but determined that the expert's reliance upon the two reports did not convert these inadmissible documents into admissible proof. Id. Moreover, the Court found that the expert failed to interview any of the employees of the debtor to determine the validity of the report, or the underlying data. Id. at 587. It was this failure to interview these individuals and to assess the reliability of the reports that rendered the expert's report, although admissible, not persuasive. Id.

Similarly, in CSI Enterprises, Inc., 220 B.R. 687, a bankruptcy trustee retained an expert in an action seeking to recover money that two bankrupt debtors allegedly paid to creditors. In order to recover the money, the trustee had to prove that the debtors were insolvent at the time of the transfer. Id. at 690. In evaluating the solvency of the debtors, the expert selectively reevaluated certain assets, lowering their value from that which was put on the balance sheet. The expert, however, failed to reevaluate the liabilities. Rather, the expert simply accepted the amounts set forth in one balance sheet, rejecting without explanation the amount in a different balance sheet. The expert also never made any inquiries of the debtors or interviewed any of the debtors' employees who were familiar with the financial affairs. The court rejected the expert's testimony because he did not conduct "any search for the truth of the actual amount of indebtedness." Id. at 697.

Unlike the experts in Lake States Commodities and CSI, Prof. Wills conducted an analysis and investigation of the data upon which his analysis for 1988 and 1989 relies. He interviewed HIP-NY employees responsible for the maintenance of the data and the preparation of the Table 1 Reports. He considered how the reports were used by the parties and that the Reports were produced at Defendant's mandate. He prepared alternative calculations of the underpayments that further verified the amount of underpayment calculated using Table 1 Reports was reasonable, and not speculative.[7]

## D. Professor Wills Used The Table 1 Reports To Ensure Accuracy Of The Calculations

In a final attempt to discredit HIP-NY's underpayment calculation for contract years 1988 and 1989, Defendant challenged the reason Prof. Wills' used the Table 1 Reports to calculate the 1988 and 1989 underpayments. Defendant suggests that Prof. Wills adopted the Table 1 methodology to increase the underpayment calculation. Defendant's Brief at pp. 12 and 18. To the contrary, the record in this case indicates that the underpayment calculated using the archived IPMF data was $3,742,467, over $900,000 higher than the $2,816,686 in underpayments calculated using the Table 1 Reports. DX 68 (HIP-NY Workpaper re: "HIP-NY FEHBP 1988-1996 Underpayments").

Defendant, nonetheless, contends that Prof. Wills reliance on the Table 1 Reports was not necessary because complete archived IPMF data for 1988 and 1989 were available. Defendant based this contention on the testimony of HIP-NY witnesses who participated in the data download. As these witnesses testified, however, they simply downloaded the data. Tr. at

[7] It is noteworthy that, if the four different calculations undertaken by Prof. Wills for the 1988 and 1989 claim period (the archived IPMF data, the Table 1 Reports, the national average, and the underpayment percentage for 1990 through 1996) were averaged, the underpayment would be $2,719,950, very close to the $2,816,686 calculated using the Table 1 Report. This further verifies the reasonableness of that analysis.

522/25-523/6 (Steinberger) (testifying that he "provided all available HIP-NY data."). Prof. Wills was assigned to review and analyze the download and determine if the data were complete. Tr. at 542/10-543/4 (Wills). Unfortunately, he determined that the archived data may be missing transactions.

Prof. Wills distinguished himself by applying an alternative method that ultimately yielded lower results, rather than rely on the archived IPMF data, which potentially were missing transactions. As demonstrated at trial, Prof. Wills continuously updated his analysis to ensure that it included the most recently available data and took into account any issues regarding the data, whether identified by him, his client, Defendant or its expert. PX 121 (Sept. 8, 2003 Rpt. of J. Wills) at p. 3. For example, Prof. Wills discovered that the payment reported by OPM for 1996 were missing over $3 million of payments that were made in 1997 for contract 1996. Prof. Wills corrected the mistake, reducing the claim by over $3 million, hardly an effort to inflate the claim as alleged by Defendant.

Defendant characterized this diligence as the "evolution" of Prof. Wills' analyses, ignoring that his own expert attempted to change his analyses on the stand. Defendant's Brief at p. 7. Defendant can attempt to disparage Prof. Wills' commitment to ensuring an accurate analysis, but has done nothing substantive to discredit that analysis.

Prof. Wills' recognized that, to calculate an underpayment with possibly incomplete data, would violate his ethical obligations as an accountant and as an expert witness to this Court. The missing transactions in the archived data could have either increased or decreased HIP-NY's claim for unpaid premiums. Tr. at 543/5-21 (Wills). For these reasons, Prof. Wills calculated an underpayment using an alternative source of enrollment data, the Table 1 Reports. The Table 1

Reports, business records verified by Prof. Wills, form a reasonable basis to calculate the damages for 1988 and 1989.

## IV.

## THIS COURT SHOULD AWARD HIP-NY ALL UNPAID PREMIUMS, INCLUDING AMOUNTS DEFENDANT FAILED TO DEPOSIT IN HIP-NY'S CONTINGENCY RESERVE

Defendant's final attempt to reduce the amount of damages due HIP-NY is to raise a potpourri of challenges to the contingency reserve portion of Prof. Wills' damage calculations. First, Defendant contests whether the contingency reserve claim was included in the original administrative claim, attempting to construe the law and the claim extremely narrowly. Second, Defendant tries to redefine the contingency reserve claim as a claim for specific performance, rather than a claim for money damages as asserted by HIP-NY. Finally, Defendant seeks to reduce the contingency reserve claim from the four percent calculated by Prof. Wills to the three percent, ignoring the facts stipulated in this case.

### A. HIP-NY's 1997 And 2001 Certified Claims Included HIP-NY's Claims For Unpaid Contingency Reserve Contributions

Defendant's argument that HIP-NY failed to exhaust its administrative remedies is without merit. HIP-NY filed two Certified Claims for premium underpayments demanding that OPM carry out its contractual and statutory duties on behalf of the United States to collect and pay all the unpaid premiums due HIP-NY. PX 60 (Certified Claim Letter 1/14/97) at p. 1; PX 61 (Certified Claim letter 2/14/01) at p. 2. The FEHB regulations mandate that Defendant deposit a portion of its premium payments into a plan's contingency reserve fund. Section 8906 of the FEHB Act describes the contributions Defendant is required to pay into the EHB Fund. See 5 U.S.C. § 8906. Section 8909 of the Act mandates that portions of the premium payment shall be

set aside to provide a contingency reserve fund for each FEHB Plan. 5 U.S.C. § 8909(b). These funds are intended to be used by FEHB Plan carriers to defray increases in rates or to increase plan benefits. Id. Any duty to remedy the failure to pay Section 8906 premium underpayments, therefore, automatically carries with it the duty to make the statutorily mandated deposits into the plan's contingency reserve fund.

As stated above, HIP-NY's 1997 and 2001 Certified Claims demanded that "OPM carry out its contractual and statutory duties on behalf of the United States to collect and pay the unpaid premiums due HIP-NY . . .." PX 60 (Certified Claim Letter 1/14/97) at p. 1; PX 61 (Certified Claim letter 2/14/01) at p. 2. The Certified Claims, therefore, requested that OPM carry out its duties under Sections 8906 and 8909, among others. Based on the plain language of the Certified Claims, Defendant was on notice that HIP-NY's claim for premium underpayments also included a demand for unpaid premiums due HIP-NY's contingency reserve. Accordingly, HIP-NY exhausted its administrative remedies, and hence, HIP-NY's contingency reserve claim is within this Court's jurisdiction.

HIP-NY's administrative claims sufficiently set forth the contingency reserve portion of its claim. Indeed, this Court has held that a plaintiff exhausts its administrative remedies even when the legal theories provided in its certified claim differ from those set forth in its complaint. This Court's decision in Cerberonics, Inc. v. United States, 13 Cl. Ct. 415 (1987), illustrates this principle of law.

The case involved a contract the plaintiff had with the Department of the Navy. The plaintiff submitted a claim to the contracting officer requesting the sum of $36,120, as "fair and equitable fee" to cover a contract modification. Id. at 416. After the contracting officer denied its claim, plaintiff brought suit in the Federal Court of Claims seeking an "equitable adjustment"

based on three alternative causes of action. Id. at 417. The defendant moved to dismiss, arguing that the causes of action were new claims had not been presented to a contracting officer for final decision as required by the Contract Disputes Act ("CDA"). Id. at 418. The Court disagreed and held that, since the contractor's complaint was based on the same "set of operative facts" as the claim provided to the contracting officer, the plaintiff did exhaust its administrative remedies, and hence, the Court did have jurisdiction to hear the Complaint. Id. at 419.

Here, as in Cerberonics, the contingency reserve portion of HIP-NY's claim is based on the same set of "operative facts" as its claim for underpayments. Both of HIP-NY's Certified Claims and its Complaints request the unpaid sum of money and are based on Defendant's failure to pay HIP-NY all premiums due it during the contract years 1988 to 1996, whether those premiums were paid directly to it, or deposited in HIP-NY's contingency reserve.

The two cases cited in Defendant's Brief offer no support for its contention that HIP-NY failed to exhaust is administrative remedies. For example, in Contract Cleaning Maintenance, Inc. v. United States, 811 F.2d 586 (Fed. Cir. 1987), the primary issue was whether a claim that was not certified could survive a motion to dismiss when its amount in controversy during litigation exceeded the statutory threshold requiring certification. In this case, the Court considered a series of informal letters from the contractor to the contracting officer to constitute a sufficient claim and, therefore, denied the defendant's motion to dismiss. Id. at 591-93. Similarly, in TransAmerica Insurance Corp. v. United States, 973 F.2d 1572 (Fed. Cir. 1992), the second case cited by Defendant, the Federal Circuit held that the claim was sufficient despite the fact it did not specifically request a "final decision." Id. at 1578-79.

HIP-NY has properly asserted its claim for contingency reserve damages. Payment into the contingency reserve is not discretionary, but automatic upon payment of the premiums. As a

result, HIP-NY's claim alleging FEHB premium underpayments necessarily incorporates a claim that its contingency reserve was underfunded.

**B. HIP-NY's Contingency Reserve Claim Is Not A Claim For Specific Performance**

HIP-NY's contingency reserve claim seeks money damages that will make HIP-NY whole. The claim, therefore, is a legal claim and not one for specific performance as claimed by Defendant. This Court has held that "[t]he consequences the law imposes for breach of contract are for the purpose of making the non-breaching party whole." Franklin F.S.B. v. United States, 55 Fed. Cl. 108, 114 (2003) (citations omitted). In contrast, a claim requesting specific performance seeks damages "other than a money payment for harm already done . . . ." Corbin on Contracts, Damages § 990.

The courts have ruled that "one way the law makes the non-breaching party whole is to give him the benefits he expects to receive had the breach not occurred. Bluebonnet Savings Bank v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (quoting Glendale Federal Bank FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (citing Restatement (Second) of Contracts § 344 (1981)); see also HEM Research, Inc. v. E.I. Dupont De Nemours & Co., 1990 W.L. 7429 at *3 (E.D. Pa. 1990) ("An action for damages for breach of contract is an action to "enforce" the contract."). The general rule is that "[a] contract-breaker can be charged with the amount of an expected gain that his breach has prevented, if when the contract was made he had reason to foresee that his breach would prevent it from accruing." Arthur Linton Corbin, Corbin on Contracts, Damages § 992 (1964).

The money damages HIP-NY seeks under its contingency reserve claim are foreseeable results of the Defendant's breach of the FEHB contracts. Defendant could foresee that its failure to make all premium payments due to HIP-NY under the FEHB contracts would necessarily be

accompanied by a failure to make all required deposits into HIP-NY's Contingency Reserve Fund. See 5 U.S.C. § 8909. Moreover, Defendant could also foresee that the damages suffered by HIP-NY and its contingency reserve fund would be equal to that amount Defendant should have contributed thereto had it honored its contractual obligations to make premium payments, and deposited contemporaneously the appropriate additional percentage of those premiums into HIP-NY's contingency reserve.

HIP-NY's contingency reserve claim is not concerned with an intra-agency transfer of funds as Defendant suggests in Footnote 27 of its Post-Trial Brief. Like all other judgments obtained against Defendant, these sums come from the Judgment Fund, not an individual agency or OPM. The contingency reserve portion of HIP-NY's claim is no more an intra-agency transfer than the remainder of HIP-NY's claim for unpaid premiums. To the contrary, HIP-NY seeks only a payment from the Judgment Fund into its contingency reserve fund to ensure that it is made whole, the basic premise for remedying any breach of contract.

Nor does HIP-NY seek to compel OPM, the agency that administers the FEHBP, to undertake any specific action. Rather, HIP-NY seeks only to have the payment deposited into the contingency reserve, as it would have had the Defendant paid the full amount of premiums. The funds will then by disbursed exactly as they would have been had Defendant properly paid the full amount of premium in the first place. Accordingly, HIP-NY simply seeks all sums of money to which it is entitled as a result of Defendant's breach of its FEHBP contract with HIP-NY.

The sole case Defendant cites Nemer-Jeep Eagle, Inc. v. Jeep-Eagle Sales Corp., 992 F.2d 430 (2d Cir. 1993), provides no support for Defendant's unfounded contention that HIP-NY's claim for payment into its contingency reserve fund is a claim for specific performance.

Indeed, this case simply sets forth the standard for obtaining specific performance in this Court. HIP-NY, however, is seeking money damages that will make HIP-NY whole. Such claims constitute legal, not equitable, relief. See e.g., Franklin F.S.B. v. United States 55 Fed. Cl. 108, 114 (2003); H.E.M. Research, Inc. v. E.I. Dupont De Nemours & Co., 1990 W.L. 7429 at *3.

Finally, Prof. Wills' calculation of unpaid contingency reserve premium payments satisfies the "reasonable certainty" test for damages. R.P. Richards Construction Co. v. United States, 51 Fed. Cl. 116, 125 (2001); Delco Electronics Corp. v. United States, 17 Cl. Ct. 302, 319 (1989). The calculations were based on the statutorily prescribed method of calculating contingency reserve deposits. See 5 U.S.C. § 8909. Prof. Wills used that statutorily mandated method and multiplied HIP-NY's underpayment amount for 1988 through 1996 by four percent. This yielded an underpayment to HIP-NY's contingency reserve in the amount of $477,794. Tr. at 531/6-24, 586/9-18 (Wills).

## C. Defendant Must Deposit The Full Four Percent Into HIP-NY's Contingency Reserve

Finally, Defendant argues that, if HIP-NY is entitled to contingency reserve damages, only three percent of the premiums, rather than four, should be paid into HIP-NY's contingency reserve. Defendant contends that one percent should be withheld because the FEHB Act designated this amount as an administrative fee. Defendant's Brief at p. 39. This argument ignores the stipulations entered into in this case where the parties specifically stipulated that any unused portion of the administrative fees was automatically deposited into the contingency reserve fund.

The FEHB regulations do require Defendant to deposit an additional one percent into HIP-NY's administrative reserve contemporaneously with all premium payments. 5 U.S.C. § 8909(b). The Regulations pertaining to the FEHB Act, however, also requires that unused

portions of a plan's administrative reserve be transferred to the plan's contingency reserve. 5 U.S.C. § 8909(b). As the parties stipulated, any amount not used for administrative fees will be deposited into the contingency reserve fund. Pre-Trial Stipulations at ¶ 8.

The amount of administrative fees for the years 1988 through 1996 have already been fully paid to OPM, the administrative agency for the FEHBP. The unpaid premiums will not generate additional administrative fees. Rather, those fees were set and paid in 1988 through 1996. Accordingly, the additional one percent administrative fee would, and should now, automatically be transferred to HIP-NY's contingency reserve. 5 U.S.C. § 8909(b); Pre-Trial Stipulations at § 8.

## CONCLUSION

HIP-NY has satisfied its burden of proving a reasonable basis for the damages it claims. Its calculations are based on business records that were admitted into evidence in this case. Those business records, HIP-NY's enrollment data and the Table 1 Reports that were prepared from those data, were scrupulously entered and maintained by HIP-NY. HIP-NY's damage calculations are, therefore, reasonable and not speculative. Defendant has provided no alternative calculation to either disprove the damages or to provide the Court with an alternative amount of damages. For these and the foregoing reasons, this Court should award HIP-NY judgment in the amount of $12,422,651, plus statutory interest from the date it filed its administrative claims.

Respectfully submitted,

Dated: January 22, 2004

/s/

JEFFREY W. KING
**KING, PAGANO & HARRISON**
1730 Pennsylvania Ave, N.W., Suite 900
Washington, DC 20006
(202) 371-6800
(202) 371-6770 (fax)

Counsel for Plaintiff, Health Insurance Plan of Greater New York, Inc.

OF COUNSEL
Andrew B. Dahlinghaus

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 22nd day of January 2004, I caused a copy of the foregoing HEALTH INSURANCE PLAN OF GREATER NEW YORK INC.'S REPLY TO DEFENDANT'S POST-TRIAL BRIEF to be delivered via electronic mail to the following individual:

John Kosloske, Esq.
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W, 8th Floor
Washington, D.C. 20530

Counsel for Defendant

/s/
Andrew B. Dahlinghaus