# In The United States Court of Federal Claims

Nos. 97-187C, 01-148C

(Filed: August 31, 2004)

| | | |
|---|---|---|
| HEALTH INSURANCE PLAN OF GREATER NEW YORK, INC., Plaintiff, v. THE UNITED STATES, Defendant. | * * * * * * * * * | Trial; Contract Disputes Act; Federal Employees Health Benefits Program; Failure to pay premiums; Underpayment for 1990 through 1996 determined; Underpayment for 1988 and 1989 denied; Administrative and contingency reserves; Jurisdiction to resolve non-monetary disputes; Specific performance; Interest. |

## OPINION

*Jeffrey W. King,* King, Pagano & Harrison, Washington, D.C., for plaintiff.

*John E. Kosloske*, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Peter D. Keisler*, for defendant.

**ALLEGRA, Judge:**

This contract case involves the Federal Employees Health Benefits Program (FEHB Program) and is before the court following a trial in Washington, D.C. At issue is whether the defendant, the United States, breached its FEHB Program contracts with plaintiff, Heath Insurance Plan of Greater New York, Inc. (HIP-NY), by failing to pay all the premiums that were due for contract years 1988 through 1996.

## I. FINDINGS OF FACT

Based on the record, including the parties' stipulations, the court finds as follows:

**A. Background: The FEHB Program.**

In 1959, Congress passed the Federal Employees Health Benefits Act (FEHB Act), Pub. L. No. 86-382, 73 Stat. 708 (*codified at* 5 U.S.C. § 8901-15 (1994)[1]), to provide heath insurance benefits to civilian federal government employees through contracting with prepaid health plans, including health maintenance organizations (HMOs), such as HIP-NY. Since 1978, the Office of Personnel Management (OPM) has administered the FEHB Program. *See* Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 906(a), 92 Stat. 1111, 1224-25. Under the FEHB Act, OPM is authorized to contract with qualified carriers offering health benefit plans for renewable term of at least one year. 5 U.S.C. § 8902(a). Through negotiations, OPM sets the amount of premiums paid to each plan on a per subscriber basis, known as the "subscriber rate," for both "self-only" and "self-and-family" enrollees. Along with many other carriers, HIP-NY's plan rates are set using the "community rate" method, under which the rate of payment is based "on a per member per month capitation rate or its equivalent that applies to a combination of the subscriber groups for a comprehensive medical plan carrier." 48 C.F.R. § 1602.170-2 (2004).[2]

A Federal employee or annuitant selects a health benefits plan and is "enrolled" therein. These enrollees and the government then make contributions into the Employees Heath Benefit Fund ("the Fund"), which is maintained by OPM. Any agency that fails to withhold the proper health benefits contributions from an enrollee is, nonetheless, responsible for ensuring that the full amount of the owed contribution is deposited into the Fund. 5 C.F.R. § 890.502(c). The FEHB Act provides that, in addition to contributions for health benefits, the enrollees and the government must contribute amounts, in the same ratio as their contributions for health benefits, necessary to cover the administrative costs of the program and to provide for a contingency reserve – not to exceed 1 percent of the enrollee's contribution is set aside for the former and not to exceed 3 percent thereof for the latter. 5 U.S.C. § 8909(b). The statute further provides that "from time to time and in amounts it considers appropriate," OPM "may transfer unused funds for administrative expenses to the contingency reserves of the plans then under contract," in which case, the contingency reserve is credited "in proportion to the total amount of the subscription charges paid and accrued to the plan for the contract term immediately before the contract term in which the transfer is made." *Id.* The contingency reserve also includes "income derived from dividends, rate adjustments, or other refunds made by a plan." *Id.*

The preferred minimum balance for a contingency reserve for a community rated plan is one month's subscription charges at the average recurring monthly rate paid from the Fund for

---

[1] All references herein are to the 1994 version of the United States Code. The court has reviewed all the pertinent versions of the statute in effect for the years in question and found no significant variations.

[2] All references herein are to the 2004 version of the Code of Federal Regulations. The court has reviewed all the pertinent versions of these regulations in effect for the years in question and, except for renumbering and minor word changes not herein relevant, found no significant variations.

the plan during the most recent contract period. 5 C.F.R. § 890.503(c)(2). Amounts that exceed the preferred minimum balance for the contingency reserve may be used to "defray increases in future rates, or may be applied to reduce the contributions of enrollees and the government to, or to increase the benefits provided by, the plan from which the reserves are derived." 5 U.S.C. § 8909(b); *see also* 5 C.F.R. § 890.503(c)(2). When a community rated plan's contingency reserve exceeds the preferred minimum balance, the plan "may request OPM to pay to the plan a portion of the reserve not greater than the excess of the contingency reserve over the preferred minimum balance." 5 C.F.R. § 890.503(c)(4). In that event, "[t]he carrier shall state the reason for the request" and "OPM will decide whether to allow the request in whole or in part and will advise the plan of its decision." *Id*. OPM "may authorize such other payments from the contingency reserve as in the judgment of OPM may be in the best interest of employees and annuitants enrolled in the program" and "[a] carrier for a plan may apply to OPM at any time for a payment from the contingency reserve when the carrier has good cause," such as "variations from expected community rates." 5 C.F.R. § 890.503(c)(5).[3]

The FEHB Act authorizes OPM to prescribe regulations for the operation of the FEHB Program, most of which are contained in FPM Supplement 890-1.[4] Under this supplement, OPM "has overall responsibility for administration of the law," including the responsibility for "depositing withholdings and contributions, remitting premiums to carriers, and accounting for the fund." FPM Supp. 890-1, § S2-2(a)(4). Federal agencies participating in the program are responsible for: (i) "designating a health benefits officer and, at the employing office levels, health benefits officials;" (ii) "determining eligibility or ineligibility of employees and registering eligible employees (including determining acceptability of belated enrollments and changes of enrollment);" (iii) "insuring that registration forms are properly completed, including the employee's social security number;" (iv) "processing health benefits actions and determining proper effective dates;" (v) "maintaining a controlled system of transmitting health benefits forms to carriers;" (vi) "remitting and accounting for withholdings and contributions;" and (vii) "maintaining and certifying necessary records." FPM Supp. 890-1, §S2-3a. Finally, the supplement indicates that each carrier is responsible for "contacting agency payroll offices to

---

[3] Summarizing these rules, a 1989 set of OPM instructions explained that "[t]wo of the uses for these reserves specified in the law are to defray increases in future rates and to reduce contributions of employees and the Government to the plan." The instructions indicated that the contingency reserves could be used to effectuate such reductions in two ways: (i) "[w]hen a plan's actual rate for a given year turns out to be higher than the estimated rate incorporated in the net-to-carrier rate, we make up the difference;" and (ii) "[o]nce a plan's contingency reserve exceeds its minimum preferred balance [*i.e.*, one month's subscription rate]," the excess would be returned to the Federal government and enrollees in the form of a "rate reduction negotiated with the plan." These instructions also made clear that the contingency reserve would be increased by whatever portion of the administrative reserve not used in a given year.

[4] FPM Supp. 890-1 was originally a supplement to the Federal Personnel Manual. After that manual was abolished, OPM reissued the supplement as an "Operating Manual," entitled "The Federal Employees Health Benefits Handbook for Personnel and Payroll Offices."

reconcile enrollment records" and "maintaining financial and statistical records and reporting on operation of its plan." FPM Supp. 890-1, §S2-4a.

Under the program, within 31 days after becoming eligible, an employee must either select a plan with which to enroll or elect out of the FEHB Program. FPM Supp. 890-1, §5-1a. Except for a coverage change from a self-and-family enrollment to self-only enrollment, which may be made at any time, an employee may enroll or make changes in enrollment only in connection with certain enumerated events, including a new appointment, return from military service, a change in marital or family status, or the "open season" provided annually by OPM. FPM Supp. 890-1, §§S7-1, S7-3a, d, e, f & g. A subscriber may cancel his or her enrollment at any time by filing an appropriate request with the employing office. The cancellation takes effect on the last day of the pay period in which the appropriate request is received by the employing office. 5 C.F.R. §890.304(d)(1).

In order to enroll in a health care plan, or alter health care subscription status, government employees and agencies utilize official federal government forms SF 2809 and SF 2810.[5] *See* FPM Supp. 890-1, § S13-2a(3). A SF 2809 notifies a carrier of a new enrollment, a change in enrollment status – such as from self-only to self-and-family – or the cancellation of an enrollment by a current subscriber. A SF 2810 notifies a carrier of enrollment termination, transfers of federal employees from one agency to another, and name changes. *Id.*[6] Unlike the SF 2809, the SF 2810 does not require the signature of the affected federal employee. *Id.* Another federal form, the SF 2811, acts as a cover sheet when agencies transmit SF 2809s and 2810s to the appropriate carriers, but also provides a perpetual inventory report by enrollment code each time there is a change. *Id.* at §§ S19-1b, S-19-3(g)-(h).[7] At one time, this document also certified the total enrollment of agency employees in a given health plan, broken down by self-only and self-and-family status, *id*. at § S19-1b, but this practice was discontinued in

---

[5] In addition to this method of enrollment, beginning in the early 1992, several agencies began transmitting enrollment transactions via computer discs or tapes; beginning in June of 1995, enrollees could alter certain aspects of their enrollment by directly telephoning their carrier. *See* FEHBP Letter No. 96-21 (4/30/96). Beginning in November 1996, employees of certain agencies were given the option of using automated transmissions rather than the SF 2809, to make certain enrollment changes. FEHBP Letter No. 96-33 (7/1/96).

[6] The employing office's copy of a SF 2809 or SF 2810 is filed in the enrollee's Official Personnel Folder (OPF) maintained by the employing office. FPM Supp. 890-1, §§S13-4f, S13-8b(2) & c(5). The OPF contains "long-term records affecting the employee's status and service." 5 C.F.R. § 293.304. There is "only one OPF maintained for each employee regardless of service in various agencies," *id*. at §293.302, and that record is controlled by OPM, *id*. at §293.303.

[7] An original and two copies of the SF 2811 are prepared by the employing agency. FPM Supp. 890-1, §S19-3a. The original and one copy are sent to the carrier, while the second copy is retained by the payroll office pending return to that office of the duplicate certified by the carrier. *Id*.

October of 1994. During the periods at issue, the government was responsible for maintaining the various copies of these forms, *id.* at §§ S13-4f, S13-8B(2) & c(5), and was required to pay the carrier an equitable adjustment for any errors resulting from the inaccurate or untimely notification of enrollment changes.

**B. The HIP-NY Contract**

HIP-NY is a non-profit corporation that provides health care benefits to the private and public employment sectors in the greater New York area. During the claim period, 1988 to 1996, OPM contracted with HIP-NY to provide health benefits under the FEHB Program. Three separate contracts spanned this period, effective January 1st of 1985, 1991 and 1996, respectively, each of which was renewed annually during the claim period. Under these contracts, OPM was required to pay HIP-NY specified subscription charges – essentially the enrollment charges less the amounts retained in the administrative and contingency reserves. In exchange, HIP-NY was obliged to provide all the required benefits and coverage to subscribers enrolled in its plan until such time as their enrollment was terminated or voluntarily cancelled. Clarifying this point, the 1991 and 1996 contracts both provided that "[a] person's eligibility for coverage, effective date of enrollment, the level of benefits (option), the effective date of termination or cancellation of a person's coverage, the date any extension of a person's coverage ceases, and any continuance of benefits beyond a period of enrollment and the date any such continuance ceases, shall all be determined in accordance with regulations or directions of OPM given pursuant to chapter 89, title 5, United States Code."

The FEHB Act provides that "[e]ach Government agency shall keep such records, make such certifications, and furnish [OPM] with such information and reports as may be necessary to enable [OPM] to carry out its functions under [the Act]." 5 U.S.C. § 8910(c). In each of the three contracts at issue, OPM agreed to maintain or cause to be maintained records from which the names and birth dates of all health plan subscribers could be determined, further requiring that such information be furnished to the carrier by OPM or other Federal agencies, at such times and in such form and detail as to enable the carrier to maintain an accurate record of subscribers. The contracts further provided that the carriers were entitled to rely on the information furnished by OPM and that any liability incurred in reliance thereupon was a valid charge against the contract, in the form of an equitable adjustment. In effectuating these provisions, OPM instructed employing agencies and their payroll offices that "carrier copies of SF 2809s and SF 2810s should be sent to the appropriate carrier (with SF 2811) on a daily or weekly basis, depending on the volume in the payroll office," further advising that "[u]nder no circumstances should SF 2809's and 2810's be accumulated for longer than one week." FPM Supp. 890-1, §S19-2(a).

Although the FEHB Act itself does not demand that carriers and employing agencies reconcile enrollment data, the contracts between OPM and HIP-NY began, in 1991, to provide for such reconciliation "as often as feasible and necessary," but not less than annually. Regarding this requirement, the OPM supplement provides that "[r]econciliations are an essential element of the enrollment system" the purpose of which is "to ensure that all participating

carriers maintain an accurate and reliable inventory of enrollees eligible for benefits."[8] Notwithstanding these reconciliation requirements, during the claim period, HIP-NY was not permitted to make an enrollment change until an employing agency (or OPM in the case of an annuitants) notified HIP-NY of a change in the enrollment status of a member of its plan.

**C. HIP-NY's Computerized Enrollment Systems.**

From the beginning of the claim period until July 1994, HIP-NY employed a computerized enrollment system called the "Insured Persons Master File" ("IPMF") to organize information on its members, including those enrolled under the FEHB Program, and facilitate the administration of its health plans. In 1992, HIP-NY began the arduous process of converting its computerized enrollment system from IPMF to a new system, called "Q/Care." Between 1992 and 1994, HIP-NY undertook the process of synching data between the two systems.[9] Beginning in November 1995, HIP-NY entered and maintained enrollment data solely in the Q/Care system and discontinued active use of IPMF.

HIP-NY employed a detailed process for entering and checking enrollment data on these enrollment databases. Briefly summarized, HIP-NY's Enrollment and Billing Department received from government agencies SF 2809s and 2810s, covered by an SF 2811 transmittal sheet, and checked for enrollment gaps or other obvious problems by comparing the information listed on the SF 2811 with the forms attached thereto. If a gap or problem was identified, this

---

[8] The supplement identifies three types of reconciliations: (i) "reconciliations within a payroll office;" (ii) "reconciliations within a carrier;" and (iii) "joint reconciliations between payroll offices and carriers." FPM Supp. 890-1, § S19-4a. Regarding these, the supplement indicated that a payroll office should reconcile monthly. *Id.* at § S19-14b. The supplement does not specify the desired frequency of carrier reconciliations, but indicates that "any discrepancies will be brought to the payroll office's attention by separate correspondence." *Id.* at § S-19-4c. Finally, with respect to enrollment reconciliations between a carrier and a payroll office, the supplement provides that payroll records must be reconciled with the carrier's records "on the basis of the SF 2809's and SF 2810's sent in support of SF 2811's." *Id.* at § S19-14d(1). These reconciliations are to be performed as "often as feasible and necessary," but not less than annually. *Id.* at §S19-4(d)(3).

[9] Beginning in 1992, HIP-NY electronically transferred ("migrated") data for FEHB plan enrollees from IPMF to Q/Care. If an enrollee had active coverage with HIP-NY beginning before March 1, 1990, the enrollment data was migrated from IPMF to Q/Care with March 1, 1990, designated as the default first date of coverage. Between 1992 and 1994, enrollment data was entered into IPMF, but was then transferred, through a process called "backbridging," to Q/Care. From July 1994 until November 1995, HIP-NY entered all enrollment data into Q/Care, and then transferred it to IPMF through the same backbridging process.

department contacted the agency for clarification and correction.[10] Next, the documentation was batched by transaction type (*e.g.*, new enrollments, terminations) and sent to a separate data entry component, where the forms were divided into smaller batches, each of which was given a control sheet to identify the number of transactions. Information then was entered into a queue system called "Pertec" in preparation for being uploaded into the IPMF database. Thereafter, a specially-trained clerk set the computer to "verification mode" and reentered every keystroke, prompting the system to identify any variation between the initial data entry and the verification text, and allowing the clerk to correct input errors. Any problems or anomalies identified through this process were returned to the Enrollment and Billing Department for further review. After the data was entered, HIP-NY personnel compared the number of entries on each control sheet against those listed by the computer. Finally, tape from the data entry component was sent to a separate data control development group where it was finally entered into the IPMF system. The latter group performed further edits – such as checking for duplicate social security numbers and making sure birth dates were in logical sequence – to ensure that the data fit various system parameters. Any problems identified were again returned to the Enrollment and Billing Department for resolution.

In mid 1994, HIP-NY began entering its enrollment data directly into the Q/Care system. However, the only significant change from the previously described process for entering information into IPMF was that, when using Q/Care, the Enrollment and Billing Department was responsible for entering the data directly into the system instead of sending it to a separate data entry group. Q/Care performed the same checks and edits as did the IPMF system and instantaneously identified data entry issues and problems, allowing the responsible clerk to immediately investigate and make appropriate corrections. These same edits were also performed on data that was electronically transferred from OPM to HIP-NY.

**D. HIP-NY's claims for unpaid premiums.**

Between 1988 and 1996, OPM paid HIP-NY on the second and fourth Thursday of each month in lump-sum payments via wire transfer. During that same period, OPM provided carriers, including HIP-NY, with quarterly reports, entitled "HB Recap By Plan," identifying deposits made and credits applied by OPM during the preceding three-month period. These reports identified the payroll offices from which the payments or credits originated, and whether payments were made for self-only or self-and-family coverage, but they did not identify the specific subscribers for whom the payments were made. It is uncontested that OPM paid HIP-NY the following premiums during the claim period:

[10] For example, if a form listed an individual as a new enrollee but that person was already in the system, or if HIP-NY received a form terminating a member that HIP-NY's records showed as already terminated, HIP-NY contacted the agency to verify the data.

| CONTRACT YEAR | PREMIUMS PAID |
|---|---|
| 1988 | $ 37,278,970.80 |
| 1989 | $ 46,026,907.67 |
| 1990 | $ 52,728,555.87 |
| 1991 | $ 58,844,817.05 |
| 1992 | $ 61,789,367.62 |
| 1993 | $ 64,108,116.20 |
| 1994 | $ 64,051,813.78 |
| 1995 | $ 59,392,302.09 |
| 1996 | $ 55,621,326.83 |

These payments totaled $499,261,969 during the nine-year claim period.

On January 14, 1997, HIP-NY submitted to the OPM contracting officer a certified claim for "underpaid premiums" for contract years 1988 through 1994, contending that it was entitled to $13,657,317.52 in unpaid premiums, plus any interested owed under the Contract Disputes Act (CDA), 41 U.S.C. §§ 601-13. The contracting officer did not issue a decision upon this claim and it was deemed denied. On March 24, 1997, plaintiff filed a complaint with this court reasserting therein the substance of its prior CDA claim. On December 17, 1999, this court dismissed two counts of the complaint for lack of jurisdiction. On February 15, 2001, HIP-NY submitted to the OPM contracting officer a certified claim for "premiums due" for contract years 1995 and 1996, contending that HIP-NY was due $1,352,112.39 in unpaid premiums, plus any interest owed under the CDA. On March 6, 2001, the contracting officer issued a decision denying the claim. On March 15, 2001, plaintiff filed a second complaint with this court reasserting the substance of its second CDA claim. On April 16, 2001, this court ordered these two cases consolidated.

**E. The Trial.**

Trial in both consolidated cases was conducted in the court's electronic courtroom in Washington, D.C., between September 10 and 25, 2003. At trial, plaintiff claimed that the United States, acting through OPM, failed to pay the total amount of premiums due it under the FEHB Program for the contract years in question, that is, the difference between what OPM owed HIP-NY for contract years 1988 through 1996, and what it actually paid HIP-NY during that period. Defendant conceded that HIP-NY fully performed under the relevant contracts. Additionally, the parties agreed on the proper rate to be applied to each HIP-NY FEHB plan subscriber, and on the amount OPM actually paid HIP-NY during each contested contract year.

Where the parties differed was on the number of FEHB plan subscribers carried by HIP-NY during 1988 through 1996.

At trial, HIP-NY argued that it had established, through a thorough analysis of data extracted from its internal membership databases, as well as documentation required by, and sent to, OPM, that the number of enrollees for whom benefits were provided by HIP-NY during 1988-1996 exceeded the number for which HIP-NY received payment during that period. Plaintiff relied on its expert, Mr. John Wills, to prove that membership information extracted from its records demonstrated that HIP-NY carried more members than for which it was paid. Mr. Wills described the basic approach he used to determine whether HIP-NY had been underpaid between 1988 and 1996, thusly – "[t]he conceptual model is to look to specific time periods, look to the subscribers enrolled within this time period, determine the period of enrollment for these subscribers and then multiply the enrollment times the premium associated with the enrollment to enable us to capture subscriber-specific premiums for each discrete time period." Apart from these basic similarities, plaintiffs proof for two periods – 1988 and 1989, on the one hand, and 1990 through 1996, on the other, differed dramatically.

Plaintiff initially focused on the latter of these two periods, presenting various witnesses who testified about the above-described processes for receiving materials from OPM and entering transactions into the company's membership databases, as well as the panoply of steps that HIP-NY took to ensure the accuracy of its enrollment data. This testimony essentially was uncontroverted. Starting from this foundation, Mr. Wills described how he initially performed tests designed to confirm the accuracy of the data taken from HIP-NY's enrollment database, for example, checking for double enrollments, and verifying that each dependent in the database was linked to a subscriber. Using HIP-NY's data, he then constructed individual time lines identifying every day a given subscriber was enrolled in HIP-NY's FEHB plan, and what type of coverage was provided to that subscriber.[11] Each of these time lines accounted for periods when coverage was discontinued, thereby ensuring that there was no overlap in time lines for employees who had transferred to other agencies. As part of his analysis, Mr. Willis determined that the time lines reflected the period for which premiums were owed under the contract by adjusting plan effective and termination dates for various purposes.[12] To corroborate his

[11] Describing this part of his process, Mr. Wills stated that – "I'd like to characterize the individual calculation as the creation of premium time lines which enable us to track for each person the discrete period of time within the claim that they participated in HIP's plan and on what criteria, or what level they participated." Mr. Wills testified that the purpose of the time lines "was to allow us to calculate premiums at the subscriber level for their unique coverage over the entirety of the claim period."

[12] In this step, he, *inter alia*, eliminated short term gaps in coverage, adjusted the effective dates of coverage for "newborn" members to the start of the payroll period in which they were born, adjusted termination dates for "overage dependants" by ending coverage at the end of the pay period in which occurred a dependent's twenty-second birthday, and adjusted termination dates to coincide with the end of the pay period in which a subscriber died.

findings, he randomly sampled HIP-NY's subscription data and compared his time lines to federal forms, reconciliation reports, utilization reports, and medical records. Based on this analysis, Mr. Wills concluded that HIP-NY's database contained no "systemic errors." He then determined how many enrollees were in HIP-NY's database for each day of a given year of the claim period, multiplied that number by the amount the parties stipulated was owed per subscriber, and subtracted from that product the amount the parties stipulated was paid to HIP-NY during each year of the claim period. Based on these calculations, he concluded that OPM underpaid HIP-NY in the amount of $9,128,180 for years 1990-1996.

Mr. Wills could not rely upon this same detailed process to calculate the alleged underpaid premiums for claim years 1988 and 1989 because the Q/Care system was not operating during those years and there was some indiction that certain data from the IPMF system had not been properly "archived" and was missing.[13] Instead of creating individual time lines for 1988

---

[13] Describing the problems that led him to eliminate the 1988 and 1989 claim years from his February 2003 expert report, Mr. Wills testified as follows:

Q: And could you describe to me what that issue was?

A: Well, what happened is in analyzing certain results from the sample that the Defendant's expert had pulled, we were coming across dates that didn't correlate to dates that we had in our enrollment system and we couldn't discern from the enrollment system exactly where those dates came from.

Q: So what did you do?

A: We met with personnel and researched these dates, discussed in detail with them what possibly could have caused this and came to the realization that we didn't have all the information necessary for '88 and '89 in terms of all the transactions that had impacted some of those effective dates.

Q: Why was that of concern?

A: Well, it was a concern because if we didn't have the ability to create all the timelines, we couldn't calculate the claim with the same degree of accuracy and the concern became not just the omission of certain subscribers, but the omission of transactions that actually would affect the premiums in both directions and we couldn't discern the effect.

*    *    *    *

and 1989, Mr. Wills derived plaintiff's alleged damages using statistics contained in HIP-NY's "Table 1" reports for 1987, 1988 and 1989. The Table 1 reports do not contain identifying information about particular enrollees, but instead list gross enrollment figures for HIP-NY's FEHB plan for a given quarter. These figures, which were based on HIP-NY's internal enrollment data, were broken down into self-only and self-and-family categories for the last quarter of 1987 and each of the four quarters in 1988 and 1989. Without verifying the enrollment figures in these reports, Mr. Wills determined HIP-NY's FEHB plan enrollment for each quarter by simply averaging the reported enrollments at the beginning and end of each quarter. Adding together those averages, and multiplying them by the rate to be paid for each subscriber – either self-only or self-and-family – he determined the premiums due for that period. Mr. Wills then subtracted from that figure the amount the parties stipulated was paid to HIP-NY and concluded that OPM had underpaid HIP-NY $2,816,676 for contract years 1988 and 1989.

For its part, defendant asserted that HIP-NY failed to satisfy its burden of proof in this matter because its methodology for determining enrollment overstated HIP-NY's enrollees and, correspondingly, inflated the calculation of premiums due. In particular, it challenged the accuracy of HIP-NY's enrollment databases. For the 1990-1996 claim, defendant's expert, Mr. Grogan, testified that he had discovered various inconsistencies between two sets of federal enrollment forms and the information in HIP-NY's databases. Specifically, Mr. Grogan described that, for 196 "randomly chosen" HIP-NY subscribers, he compared HIP-NY's enrollment data with the information reflected on SF 2809s and 2810s found in the respective enrollee's personnel file. In the case of discrepancies, Mr. Grogan assumed the federal forms correctly reflected an employee's actual enrollment status. Based on this assumption, he did not examine any of the SF 2811s involved in these transactions, nor did he attempt to find other documents that might explain the discrepancies. Using this process, Mr. Grogan found 29 discrepancies in the population he studied, 21 of which were instances in which he claimed that HIP-NY's databases overstated enrollment duration. Mr. Grogan used these results to infer characteristics regarding the accuracy of HIP-NY's enrollment data.

Based on this analysis, Mr. Grogan initially concluded that HIP-NY's database overstated the amount of premiums due, and that the actual amount of underpayment was between $1.156 million and $8.23 million, with a 95-percent confidence interval, and between $49,000 and $9.3

---

Q: So you could have had a termination or an enrollment and you couldn't tell which was missing?

A: That's right.

Q: Did you determine what to do?

A: I eliminated those two years from the claim at that point in time.

Later, in June of 2003, he first used the Table 1 information to establish damages for this period, as described below.

million, with a 99-percent confidence interval.[14] However, after presenting these conclusions in a well-scripted power point presentation based on his March of 2003 expert report, Mr. Grogan changed several key observations, relying on information that had been supplied to him several months before trial, and eliminated at least two of the previously-asserted discrepancies.[15] Then, under cross-examination, he conceded that: (i) he had originally included 236 individuals in his sample and had reached his final sample of 196 subscribers by excluding any individuals for whom he could not find the appropriate SF 2809s or SF 2810s; (ii) information regarding the individuals in his sample could be contained on other Federal forms and in OPM and employing agency records that he did not to review; and (iii) forms and correspondence found in the personnel files of the 29 individuals for whom Mr. Grogan had found discrepancies proved several of those discrepancies to be wrong and, in some cases, showed that the HIP-NY records actually understated the premiums owed them. Based on these adjustments, Mr. Grogan testified that the actual underpayment range was between \$3.2 million and \$9.4 million, with a midpoint of \$6.3 million, using a 95 percent confidence interval. HIP-NY's claimed underpayment of \$9.128 million fell within this revised range.

Mr. Grogan did not testify regarding plaintiff's 1988 and 1989 claims. Instead, defendant presented evidence to demonstrate that the Table 1 reports were not a sufficiently accurate source of enrollment data to establish liability and damages. Defendant suggested that statements from

---

[14] Regarding what he meant in referring to "confidence intervals," Mr. Grogan unqualifiedly testified:

> To understand what a confidence interval is, you should understand that what it is . . . is a range of values with a specified level of confidence. You conclude the range of values is, for example, I am 95-percent confident that this range of values will contain the true value of the underpaid premiums.

He further explained that "you could construct narrower confidence intervals, which would give you a more precise estimate of the range," but "you wouldn't be as confident that they contain the true value of premiums underpaid." Finally, he testified that "another truism" regarding confidence levels is that "once you establish a particular level of confidence – 95 percent let's say – you can say with confidence that certain values are within that range," but "you cannot further discriminate among values within the range." By way of example, he concluded that "any value within the range of \$1.16 million and \$8.23 million would have an equal probability as any other value within that range of being the true measure of underpaid premiums."

[15] Mr. Grogan did not modify his expert report prior to trial in violation of RCFC 26(a)(2) & (e)(1). *See generally, Jacobson v. Deseret Book Co.*, 287 F.3d 936, 951-52 (10th Cir. 2001) (describing the comparable requirements of the Federal Rules of Civil Procedure); *IPPV Enters., LLC v. Echostar Comm., Corp.*, 191 F. Supp. 2d 530, 571-72 (D. Del. 2002) (same). Based on this, the court limited his direct testimony regarding the modifications of his conclusions, *see* RCFC 37(c)(1); this issue, however, was fully explored in the cross-examination and redirect of the witness.

HIP-NY personnel indicating the company's view that enrollment was generally inflated during 1988 and 1989, cast additional doubt on the accuracy of enrollment data generated by HIP-NY during those years.

Finally, plaintiff argues that if the court finds that the government underpaid HIP-NY during any or all of the 1988-1996 claim period, OPM should be required to place an additional four percent of the determined amount of underpayment in HIP-NY's contingency reserve. For its part, defendant contends, first, that the court lacks jurisdiction to entertain this part of the claim, as plaintiff failed to raise it before the contracting officer. Second, it claims that even if jurisdiction lies, plaintiff's contingency reserve claim should be viewed as a request for specific performance which this court should deny.

## II. DISCUSSION

In this case, the court must first determine whether HIP-NY has proven that defendant underpaid it premiums due during contract years 1988 through 1996. Because there are differences in the nature of the proof, the court will consider this issue in two segments, first focusing on the period from 1990 through 1996 and then considering 1988 and 1989. Should this court find that the government underpaid premiums for any part of these claim periods, it must then determine whether the government is required to contribute up to 4 percent of the amount of the underpayment to OPM's administrative reserve and plaintiff's contingency reserve.

### A. Was There an Underpayment of Premiums?

As in any claim for breach of contract, in order to recover here, plaintiff must establish that: (i) a valid contact existed between HIP-NY and the government; (ii) the contract gave rise to a duty or obligation; (iii) the government breached that duty or obligation; and (iv) the breach of that duty or obligation resulted in damages. *See San Carlos Irrigation and Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *Cornejo-Ortega v. United States*, 61 Fed. Cl. 371, 373 (2004). In the case *sub judice*, the parties have stipulated that the first two prongs of this analysis are satisfied, that is, valid contracts existed between the parties for the provision of health benefits under the FEHB Program during all of periods in question and defendant had a duty under these contracts to pay premiums to HIP-NY at the applicable rate for each federal employee subscriber.

In this case, the last two prongs of the above analysis are interwoven: whether there was breach here is inextricably intertwined with plaintiff's ability to prove at least some damages. Thus, if plaintiff successfully proves that the government underpaid premiums, it will be entitled to damages equal to the amount of that underpayment, having thus also established that there was a breach.[16] Plaintiff "bears the burden of proving the fact of loss with certainty, as well as the

---

[16] Plaintiff contends that the testimony of the government's expert, Mr. Grogan, admits at least some underpayment, and therefore establishes breach. In the court's view, his testimony was more equivocal.

burden of proving the amount of loss with sufficient certainty so that the determination of the amount will be more than mere speculation." *Willems Indus., Inc. v. United States*, 295 F.2d 822, 831 (Ct. Cl. 1961), *cert. denied*, 370 U.S. 903 (1962).

**1. Claim years 1990 through 1996**.

Many of plaintiff's factual contentions with regard to its 1990 through 1996 claim are essentially uncontroverted. Thus, defendant offered little, if any, response to plaintiff's evidence demonstrating the integrity of the processes by which it received enrollment data and entered it into HIP-NY's enrollment database, through IPMF and Q/Care. Nor does defendant seriously contest that HIP-NY took appropriate care in systematically sorting the incoming federal forms and entering the data found thereon, that HIP-NY's employees followed company policies designed to ensure that the information on the enrollment forms was properly transferred to the database, and that the IPMF and Q/Care systems themselves performed automatic and manual checks designed to guarantee that imported data conformed to system parameters.[17] Moreover, testimony established that, in addition to the foregoing quality control measures, HIP-NY regularly reconciled its enrollment records with those of federal payroll offices and conducted outreach to its members (*e.g.*, mailing membership cards and information letters) designed to spur them to notify HIP-NY about enrollment errors. Through these various steps, plaintiff gave new meaning to the computer sobriquet "GIGO" – instead of "garbage in, garbage out," it showed the integrity of the information derived from its systems by focusing on the quality of the data entered therein, *i.e.*, "good input, good output."

Plaintiff, however, went a step further. Its expert, Mr. Wills described the rigorous approach that he and his colleagues employed in gathering and testing the data from the IPMF and Q/Care systems and using that information to construct time lines for each of the HIP-NY subscribers. Through this approach, Mr. Wills accounted for each day a subscriber was enrolled under HIP-NY's FEHB plan, verifying, *inter alia*, that there was no overlap in time coverage, that coverage was consistent with contract requirements, and that the IPMF and Q/Care databases did not produce systematic errors. Mr. Wills ran multiple checks on the accuracy of the data in the HIP-NY systems, including computerized tests that compared the results from the IPMF and Q/Care systems, as well as requiring HIP-NY personnel to verify the accuracy of data through outside documentation.[18] In addition, he randomly identified a set of 66 HIP-NY federal

---

[17] At trial, defendant repeatedly asked plaintiff's witnesses whether HIP-NY's methodologies led to a database that was "100 percent correct." Not surprisingly, they all indicated that it was not – but, in and of itself, that does not preclude recovery here. The law does not require an injured party to prove either a breach or the damages flowing therefrom with absolute (100 percent) certainty. *See Franconia Assoc. v. United States*, Nos. 97-381C & 97-3812C through 97-38112C at 37-38 (Fed. Cl. Aug. 30, 2004). Defendant has not cited a case that indicates otherwise.

[18] By way of more specifics: After downloading the information from HIP-NY's databases into his subscriber-specific time lines, Mr. Wills compared the data in both to ensure it

subscribers and compared their enrollment time lines against corroborative documents, such as federal forms, reconciliation documents, utilization reports and medical records. All of this research confirmed the accuracy of the data that he used to construct the time lines. As a result of his findings, Mr. Wills calculated the underpayment for each year of the 1990 through 1996 period, setting that figure at $9,128,180. While defendant contends that the Mr. Wills did not, in fact, verify the accuracy of the HIP-NY databases, this court finds otherwise, not only the basis of plaintiff's proof regarding the quality controls it employed in entering data into the system, but also based on the thoroughness of the checks employed by Mr. Wills, which showed that there were no systemic errors within the results drawn from the systems.[19]

For its part, defendant relied heavily on the testimony of its expert, Mr. Grogan. But, Mr. Grogan actually corroborated the results reached by Mr. Wills. Using a power point presentation, he initially challenged the accuracy of Mr. Wills' results by analyzing the databases themselves[20] using a sample of 196 HIP-NY subscribers for whom OPM could locate any of the relevant SF 2809s and SF 2810s. Comparing the computer data to the information found on these two forms, Mr. Grogan found 29 discrepancies, 21 of which showed, in his view, that the HIP-NY database overstated the premiums owed. Using these results, he calculated that the actual amount of the underpayment of premiums was between $1.156 million and $8.23 million, with a 95-percent confidence interval, leading him to conclude that there was an extraordinarily high likelihood that plaintiff's damages were not the $9.128 million that Mr. Wills had calculated.

---

matched. Next, he used computer programs to detect and eliminate subscribers enrolled in multiple time lines or databases. He also adjusted the data to correct coverage periods or subscriber status (self-only or self-and-family) because of overage dependents, newborn dependents, small gaps in coverage, and extended coverage for employees involuntarily terminated. He also ran "validity program checks," which verified that the other tests had caught any overlaps in coverage or other errors in the system.

[19] At trial and its post-trial briefs, defendant made much of the fact that Mr. Wills repeatedly updated his expert reports, but the court perceives those updates as increasing, rather than decreasing, the reliability of the results ultimately reached. Indeed, defendant's expert, Mr. Grogan, might have benefitted from such an approach.

[20] In its post-trial briefs, defendant appears to question the admissibility of the databases utilized by plaintiff's expert, Mr. Wills, in concluding the amount owed HIP-NY by OPM during the 1990 through 1996 period. This objection, however, was not made at trial and, therefore, was waived. *See* Fed. R. Evid. 103(a)(1). Moreover, there is no indication that the databases themselves were introduced into evidence and Mr. Wills' reliance thereon is perfectly appropriate under the rules. *See* Fed. R. Evid. 703; *see also LaCombe v. A-T-O, Inc.*, 679 F.2d 431, 436 (5th Cir. 1982) ("when the expert witness has consulted numerous sources, and uses that information together, with his own professional knowledge and experience, to arrive at his opinion, that opinion is regarded as evidence in its own right and not as hearsay in disguise."); *United States v. Sims*, 514 F.2d 147, 149 (9th Cir. 1975) ("the expert synthesizes the primary source material – be it hearsay or not – into properly admissible evidence in opinion form").

At this juncture, however, Mr. Grogan began to unravel his own testimony, in a fashion reminiscent of Penelope's tapestry of Homerian fame. First, he admitted that his power point presentation was based on his March, 2003, report and that since that time, he had discovered that several of his previously-identified discrepancies were erroneous – in one of those instances, the correction shifted what he believed had been an overpayment to HIP into a statistically significant underpayment. Based on these adjustments, Mr. Grogan testified that the actual underpayment range was between $3.2 million and $9.4 million, with a midpoint of $6.3 million, using a 95 percent confidence interval. As Mr. Grogan then readily admitted, HIP-NY's claimed underpayment of $9.128 million thus fell ***within*** this revised range.[21]

To make matters worse, under cross-examination, Mr. Grogan conceded several other key points that, in the court's estimation, further undercut his testimony. First, he acknowledged that

---

[21] On this point, Mr. Grogan testified, on cross-examination –

Q: Would you not agree that within your confidence level, a 95-percent confidence level, that the calculation by HIP of $9.128 million falls within the 95-percent confidence value?

A: Yes . . .

* * * * *

Q: [A]ll things being equal, that would mean there is an underpayment somewhere between $3.2 and $9.4 million based upon your analysis?

A: That's correct. The confidence interval would suggest that somewhere between $3.2 and 9.4 is the true value. And, in fact, the Plaintiff's claim falls within that; it falls at the 92-percent level.

Defendant argues that it was unnecessary for Mr. Grogan to alter his report or prepared testimony to remedy the errors he knew were incorporated in his March 2003 report and his power point presentation because his final conclusion remained that HIP-NY's database is inaccurate. This claim is pure sophistry for at least two reasons. First, in terms of fairness and candor, Mr. Grogan testified for almost 45 minutes regarding his prior findings, before admitting that they – and the power point presentation that incorporated them – had significantly changed as the result of information he possessed months earlier. As it turned out, plaintiff was prepared for this turn of events, but not because Mr. Grogan had previewed his testimony, as the rules require. Moreover, while Mr. Grogan, at defendant's prompting, blithely continued to maintain that his ultimate conclusion was unaffected by these changes, he was forced to admit that plaintiff's damages estimate fell within his new confidence interval. Ultimately, it is those new results and, not Mr. Grogan's perplexing failure to modify his report or testimony, that leads the court to conclude that his testimony does not rebut that of Mr. Wills.

he had originally considered 236 individuals for his sample, but had eliminated a number of individuals for whom he could not find the appropriate SF 2809s or SF 2810s. While Mr. Grogan suggested that this was a neutral proposition, designed simply to winnow down his study population, he previously had emphasized that, under his approach, HIP-NYs data was presumed to be correct if it was not shown to be erroneous. Thus, had Mr. Grogan included all 236 individuals in his sample, the overall level of discrepancies found would have dropped, thereby increasing the underpayment range. Moreover, the fact that forms could not be found for some of these 236 individuals reveals a more fundamental, problem with Mr. Grogan's methodology – in verifying the information on the 196 subscribers he actually studied, Mr. Grogan generally limited himself to the information contained on the SF 2809s and SF 2810s found by OPM in a given individual's personnel file. He did not consider and, in most cases, did not even seek out, other forms (*e.g.*, SF 2811s), correspondence or records, either from OPM or the employing agency, that might have shed light on whether the data in the HIP-NY database was, in fact, correct. At trial, plaintiff not only showed generally that, consistent with OPM policies, a number of transactions involving enrollees were not reflected on the SF 2809s and SF 2810s, but also specifically demonstrated, using various other documents, that several of the remaining discrepancies identified by Mr. Grogan were actually accurately captured in the HIP-NY database. Were additional adjustments made for these phantom discrepancies, the range of the likely underpayment would again shift upwards.

Overall, without any assurance that the limited number of federal forms that he reviewed controlled the accuracy of HIP-NY's enrollment database, Mr. Grogan presumed that such documents represented the entire slate of relevant federal forms for each sampled subscriber. Based on this fact alone, the court is left with no confidence in Mr. Grogan's analysis. To the extent that his analysis is probative, it verifies that plaintiff's damage estimate is within the range of acceptable results. In arguing to the contrary, defendant, in its post-trial briefs, cites several treatises for the proposition that plaintiff's damages estimate is faulty because it is not near the midpoint of Mr. Grogan's revised damage range. But, Mr. Grogan unqualifiedly testified that any value within his damage range "had an equal probability as any other value within that range of being the true measure of underpaid premiums." Based on this testimony, the court rejects defendant's attempt to fill the gaping holes Mr. Grogan created in the fabric of its defense through the *post hoc* supplementation of the record with bits and pieces from selected treatises.

Accordingly, the court finds that plaintiff has demonstrated that defendant owes it premiums totaling $9,128,180 for the claim period of 1990 through 1996.

**2. Claim years 1988 and 1989.**

Mr. Wills could not calculate the underpaid premiums for claim years 1988 and 1989 using the same detailed methodology he employed for 1990 through 1996 because certain data from the IPMF system – the only database HIP-NY had during those years – was not archived. At one point, Mr. Wills concluded that this problem was insurmountable. In his final expert report, however, he calculated the damages for these years using statistics contained in quarterly reports that were filed by HIP-NY with OPM, which summarized HIP-NY's FEHB enrollment for the last quarter of 1987 and all of 1988 and 1999. These reports, referred to as "Table 1

reports," do not list identifying information about particular enrollees, but instead contain gross enrollment figures, broken down into self-only and self-and-family categories. While the testimony on how these reports were prepared is sketchy, it appears that they were contemporaneously generated by HIP-NY personal, using plaintiff's internal enrollment data. However, Mr. Wills did not – and, apparently could not – verify the accuracy of the enrollment figures in these reports. Rather, he determined HIP-NY's FEHB plan enrollment for each quarter by simply averaging the reported enrollments at the beginning and end of each quarter. Adding together those averages, and multiplying them by the rate to be paid for each subscriber, Mr. Wills determined the premiums due for a given period. He then subtracted from that figure the amount the parties stipulated was paid to HIP-NY and concluded that OPM underpaid HIP-NY $2,816,676 for contract years 1988 and 1989.

Plaintiff asserts that enrollment figures from the Table 1 report provide a reliable basis for the calculations that Mr. Wells performed. There are several factual problems, however, with this assertion. First, it is unclear how the Table 1 reports were prepared – there was no direct testimony describing the process by which data was taken from HIP's enrollment database and entered into these reports and no indication of the sort of safeguards, verification steps and reconciliations characteristic of the 1990 through 1996 data. Second, there is no indication that, during the years in question, the Table 1 reports served a functional purpose that demanded from HIP-NY the sort of precision necessary to make the premium calculations required here. While plaintiff claims that these reports were used to compare the discount rates charged "similarly sized subscriber groups," the record indicates this process did begin until 1991.[22] Rather, it appears that, during 1988 and 1989, the Table 1 reports were used only to publicize the number of participants in a given FEHB plan and the record does not support plaintiff's claim that they were used for more dollar-intensive purposes, such as rate reconciliations and audits. Third, there is at least some indication that the specific figures in the HIP-NYs' Table 1 reports in question may be inaccurate. Thus, in response to a 1991 OPM Inspector General audit, HIP-NY admitted that there had been overstatements of enrollment during the period in question. While the evidence conflicts as to whether the overstatement was plaintiff's fault, the fact remains that

---

[22] OPM used "similarly sized subscriber groups" or "SSSGs" as the basis for ensuring that groups of Federal enrollees essentially received the lowest rates available to comparably-sized groups of subscribers from other employers. Under a procedure adopted on July 2, 1990, *see* 55 Fed. Reg. 27,414 (1990), effective in 1991, *id.* at 27,407, "SSSGs" were defined as a comprehensive medical plan's two employer groups which best met three criteria: (i) "[h]ave total number of contracts at the time of the rate proposal arithmetically closest in size to the previous September's FEHB subscriber enrollment, as determined by OPM;" (ii) "[p]urchase substantially the same basic benefit package proposed for the Federal group;" and (iii) "[a]re renewed during the plan's fiscal year." *Id.* at 27,414. Even under this new 1991 methodology, the Table 1 reports were not used for carriers, such as HIP-NY, which had more than 1,500 FEHB subscribers. *Id.* at 27,414. Consequently, if anything, these procedures suggest that, for carriers such as HIP, the Table 1 figures were not believed to be accurate enough even to determine the comparable size of two groups of subscribers, let alone to perform the more precise premium calculations at issue.

the audit raises doubts about the quality of the Table 1 statistics that plaintiff is unable to dispel. Finally, unlike plaintiff's data for 1990 through 1996, there is no way to verify the accuracy of these statistics by comparing them either to other statistics or to the records available for individual plan members.

In short, plaintiff's proof for the 1988 and 1989 claim period is a far cry from the detailed statistical methodology it employed to prove its claim for 1990 through 1996. The former lacks all of the indicia of reliability of the latter. Indeed, the only indicia of reliability that Mr. Wills cited in support of his use of the Table 1 reports is that they were generated contemporaneously – in the court's view, this is insufficient, standing alone, to ensure that any determination of the additional premiums owed HIP-NY for 1988 and 1989 would be anything more than pure speculation *in vacuo* – what Holmes once called "churning the void to make cheese."[23] In short, the court finds plaintiff's proof on this claim wholly unconvincing.[24]

**B. Plaintiff's contingency reserve claim**

Lastly, plaintiff alleges that if the court finds – as it has – that the government underpaid premiums to HIP-NY during any or all of the 1988 through 1996 claim period, defendant should be required to place an additional four percent of the underpayment into the contingency reserve

---

[23] Even assuming, *arguendo*, that the numbers listed in the Table 1 reports for self-only and self-and-family coverage for each of the nine quarters are accurate, simply averaging the numbers at the beginning and end of each quarter fails to take into account the potential for broad fluctuations within each three-month period. For example, on March 31, 1988, the Table 1 report shows 9,707 members enrolled in self-only coverage; at the end of the subsequent quarter, that number shows 9,718 members. Employing Mr. Wills' approach, one would determine that there were, on average, 9,712.5 members under self-only coverage for the second quarter of 1988. But, that altogether disregards the possibility that there were swings in the membership between April 1, 1988 and June 30, 1988, with the possibility that, for periods, the membership was below 9,707. There is no way to know this by simply looking at an enrollment snapshot for each quarter. What is needed – and what plaintiff and Mr. Wills obviously could not provide – is not a simple average, but instead a weighted average, appropriately accounting for the amount of time in each period enrollment figures hovered at certain levels.

[24] While discussed sparingly at trial, Mr. Wills' June 2, 2003, report presented two additional methods for establishing underpayment for this period. Under the first of these, Mr. Wills essentially took the percentage of underpayment he had determined for contract years 1990 through 1996 and simply projected it to contract years 1988 and 1989. In the second, Mr. Wills determined the underpayment to HIP-NY for 1988 and 1989 by applying the average percentage of premium underpayment in other cases in this court involving different carriers. Neither of these approaches either independently establishes the underpayment for 1988 and 1989, nor buttresses plaintiff's reliance on the Table 1 data. They rely on unproven assumptions, none of the least of which is that there is no significant variation between year-to-year and plan-to-plan in the level of premium underpayments. Averaging the results does not solve this problem.

on HIP-NY's behalf. This, the argument continues, represents the only way to make plaintiff whole, because had the government properly paid premiums during the claim period, it would have been required to place these monies into the FEHB Fund. Plaintiff further argues that HIP-NY was directly affected by OPM's failure to deposit sufficient funds for HIP-NY into the contingency reserve, because such funds could have been used to lower HIP-NY's rates and thereby increase its membership. Defendant responds that the contingency reserve claim was not presented to the contracting officer, requiring this court to dismiss this claim for lack of jurisdiction. It further asserts that, if this court does have jurisdiction, it would be inappropriate to place the entire four percent in the Fund, as only three percent should go to the contingency reserve, with the other one percent being reserved for administrative costs.

The parties agree that the Contract Disputes Act (CDA) grants jurisdiction to this court over a contractor's request for relief only when the action is based on a qualifying claim filed by the contractor and a final decision (or a deemed final decision) by the contracting officer. 41 U.S.C. § 605(a); *James E. Ellett Constr. Co., Inc. v. United States*, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996); *Reflectone, Inc. v. Dalton,* 60 F.3d 1572, 1575 (Fed. Cir. 1995 ) (en banc); *Santa Fe Eng'rs, Inc. v. United States*, 818 F.2d 856, 858 (Fed. Cir. 1987). In this regard, the Federal Circuit has explained that "there is a clear indication in the legislative history that Congress did not intend the word 'claim' to mean the whole case between the contractor and the Government; but, rather that 'claim' means each claim under the CDA for money that is one part of a divisible case." *Joseph Morton Co. v. United States*, 757 F.2d 1273, 1281 (Fed. Cir. 1985). Regarding the content of such claims, the Federal Circuit has further indicated that "certain magic words need not be used" and that all that is required is that the contracting officer has "adequate notice" of the basis of the claim. *Transamerica Ins. Corp., Inc. v. United States*, 973 F.2d 1572, 1578 (Fed. Cir. 1992); *see also Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987); *Colon v. United States*, 35 Fed. Cl. 337, 341 (1996).

While defendant contends that plaintiff's contingency reserve claim was not presented to the contracting officer in either of the claims here, plaintiff highlights that both the January 1, 1997, and February 14, 2001, certified claims sent by it to the contracting officer state that "HIP-NY requests that OPM carry out its contractual and statutory duties on behalf of the United States to collect and pay the unpaid premiums due HIP-NY for the [1988-1994, and 1995-1996] contract years." While, there is no specific reference in these claims to the contingency reserve or to the specific amounts allocable thereto, it remains that one of the "contractual and statutory duties" of the United States under the FEHB program is to pay a designated portion of collected premiums into the contingency reserve. This is required both by 5 U.S.C. § 8909, the regulations thereunder, and the various contracts in question. Because the obligation to fund the contingency reserve and administrative account was well known and flows directly from the government's contractual and statutory duty to collect and pay premiums to its FEHB Program carriers, the government was on notice that this duty would attach were it found to have underpaid premiums

to HIP-NY. As such, in the court's view, plaintiff's claims were adequate to satisfy the exhaustion requirements of the CDA.[25]

Apart from this CDA assertion, defendant does not argue that this court lacks jurisdiction to declare that defendant must fund the contingency reserve and administrative reserve, as required by law. Instead, it contends that such relief essentially request specific performance, the prerequisites for which, it claims, have not been met. But, this assertions belies a fundamental misunderstanding of this court's CDA jurisdiction over nonmonetary claims.

Regarding that jurisdiction, the Federal Circuit has observed that "[i]n defining the jurisdiction of the Court of Federal Claims over CDA disputes, Congress has chosen expansive, not restrictive language." *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1268 (Fed. Cir. 1999). As amended in 1992, the Tucker Act gives this court CDA jurisdiction "to render a judgment upon any claim by or against . . . a contractor under section 10(a)(1) of the Contract Disputes Act, including [certain specific kinds of non-monetary disputes] and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of the CDA." 28 U.S.C. § 1491(a)(2). In construing this clause, the Federal Circuit has noted, "[s]ignificantly, that portion of the statute begins by broadly granting the court jurisdiction over 'any claims'; it starts the list of specific kinds of nonmonetary disputes with a nonrestrictive term ('including'); and it ends the list with equally nonrestrictive language ('and other nonmonetary disputes.')." *Alliant*, 178 F.3d at 1268. In *Garrett v. General Electric Co.,* 987 F.2d 747 (Fed. Cir. 1993), that same court concluded that the 1992 amendments to the Tucker Act were intended to ensure "jurisdictional parity" between the boards of contract appeals and this court and then held that the jurisdiction of the boards includes what it characterized as a "nonmonetary substitute for monetary relief." *Id*. at 750-51.[26] Contrary to defendant's claims, exercise of this declaratory jurisdiction does not require this court to find that the prerequisites for requiring specific performance (*e.g.*, an inadequate remedy at law) are met. *See Western Aviation*

---

[25] Defendant argues that the claim letters submitted by HIP-NY are inadequate because they do not demand that a specific sum certain be deposited into either the administrative fund or the contingency reserve. However, the decisional law makes clear that, in the case of a nonmonetary claim (see discussion below), there is no requirement that a sum certain be stated. *See Clearwater Constructors, Inc. v. United States*, 56 Fed. Cl. 303, 309-11 (2003) ("To state a non-monetary claim there is no requirement that the contractor make a request for a sum certain;" to set forth a non-monetary claim, the contractor must set forth a demand "seeking as a matter of right . . . the adjustment or interpretation of the contract terms."); *GPA-I LP v. United States*, 46 Fed. Cl. 762, 766-67 (Cl. Ct. 2000).

[26] *See also Sharman v. United States*, 2 F.3d 1564, 1572 (Fed. Cir. 1993); *CW Gov't Travel, Inc. v. United States,* 2004 WL 1737889 (Fed. Cl. July 26, 2004); *Tiger Natural Gas, Inc. v. United States*, 2004 WL 1570152 (Fed. Cl. July 9, 2004); *Ho v. United States*, 49 Fed. Cl. 96, 101 (2001).

*Maintenance v. General Services Adm.*, 98-2 B.C.A. ¶ 29,816 (1998); *see also Rig Masters, Inc. v. United States*, 42 Fed. Cl. 369, 373 (1998).[27]

As to this claim, the issue, therefore, is simply what did the statute, regulations and contracts provide. By way of answer, the FEHB Act states that, in addition to contributions for health benefits, the enrollees and the government must contribute amounts, in the same ratio as their contributions for health benefits, necessary to cover the administrative costs of the program and to provide for a contingency reserve – up to 1 percent of the enrollee's contribution is set aside for the former purpose and up to 3 percent thereof for the latter. 5 U.S.C. § 8909(b). While the contracts did not precisely specify what figure "up to" these percentages would be set aside, the OPM regulations in force between 1990 and 1996 provided that the enrollment charge was the "rate approved by OPM for payment to the plan for each enrollee, plus 4 percent of which one part is for an administrative reserve and 3 parts are for a contingency reserve for the plan." 5 C.F.R. § 890.503(a). Consistent with this regulatory language, defendant must credit the administrative reserve and HIP-NY's contingency reserve one percent and three percent, respectively, of the amount of the underpaid premiums found due and owing to plaintiff for the period from 1990 through 1996.[28]

In so holding, the court rejects HIP-NY's claim that the full four percent should be contributed to its contingency reserve. Neither the statute, the regulations nor its contracts require this result. Rather, the statute provides that "from time to time and in amounts it considers appropriate," OPM "may transfer unused funds for administrative expenses to the contingency reserves of the plans then under contract," in which case, the contingency reserve is credited "in proportion to the total amount of the subscription charges paid and accrued to the

---

[27] Indeed, since this court generally lacks jurisdiction to award specific performance, *see Massie v. United States*, 226 F.3d 1318, 1322 (Fed. Cir. 2000), it would be odd to treat the traditional requirements for affording such relief as a limitation on this court's express ability, under the CDA, to resolve nonmonetary disputes. To the extent that this court should hesitate to exercise its jurisdiction to resolve nonmonetary disputes because a monetary remedy is available, such is certainly not the case here. That is because plaintiff would be exceedingly hard-pressed to prove the profits it would have lost as the result of its premiums being somewhat higher than might otherwise have been, particularly since the mechanism governing the contingency reserve gives OPM discretion in deciding when and how to dispense funds from the reserve. Indeed, on brief, defendant flatly asserts that "[a] claim for such lost profits, to say the least, would be speculative."

[28] On brief, defendant argues that the court should not grant this relief because OPM is in no position to require agencies to deposit funds into the administrative fund and HIP-NY's contingency reserve. The relevant statute, however, imposes this obligation not on OPM, but on "the government," 5 U.S.C. § 8909(b), and OPM's regulations make clear that this obligation exists whether or not the premiums are collected from the enrollees, 5 C.F.R. § 890.502(d). Thus, it is for defendant, and not this court, to work out amongst the affected agencies how to accomplish that which the statute requires.

plan for the contract term immediately before the contract term in which the transfer is made." 5 U.S.C. § 8909(b); *see also* 5 C.F.R. § 890.503(C)(4). Accordingly, it ultimately will be for OPM, and not this court, to determine whether any transfer from the administrative reserve to HIP-NY's contingency reserve is appropriate.[29]

## III. CONCLUSION

This court need go no farther. Based on the foregoing, it finds that HIP-NY has proven that, for the claim period of 1990 through 1996, it is entitled to additional premiums in the amount of $9,128,180. Further, exercising its jurisdiction under 28 U.S.C. § 1491(a)(2), this court declares that, consistent with the applicable statute and regulations, appropriate adjustments must be made to the OPM administrative reserve account and to HIP-NY's contingency reserve account.

In its post-trial reply brief, defendant reminds the court that statutory interest here should be applied from January 14, 1997, for any compensation awarded for contract years 1988 through 1994, and from February 15, 2001, for an compensation awarded for contract years 1995 and 1996. To allow for the entry of a judgment reflecting this distinction, on or before September 24, 2004, the parties shall file with the court a joint report reflecting which portions of the additional premium dollars found above are attributable to the respective interest periods. If the parties disagree as to this calculation, they shall state separately the reasons for their positions.[30] The court will order the entry of an appropriate judgment thereafter.

No costs.

**IT IS SO ORDERED.**

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[29] Plaintiff argues that the parties stipulated that any amount of money not used for administrative fees will be deposited into the contingency reserve fund. A review of the cited portion of the parties' pretrial stipulations (paragraph 8) reveals no such agreement. Rather, this paragraph essentially parrots the language of section 8909(b).

[30] This process shall not be employed to reargue or seek reconsideration of any of the points resolved by this court's findings and conclusions. Agreeing to the amounts for these periods neither signifies agreement with this court's findings and conclusions nor waives any argument or rights the parties might otherwise have, including any rights to appeal.